UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ADAPTIVE SPECTRUM AND SIGNAL ALIGNMENT, INC., Plaintiff, vs. CHARTER COMMUNICATIONS, INC., Defendant.

Case No. 2:24-cv-00124

Marshall, Texas

---

**TRANSCRIPT OF INITIAL PRETRIAL CONFERENCE**
**February 20, 2026**

**BEFORE THE HONORABLE ROY S. PAYNE**
**UNITED STATES MAGISTRATE JUDGE**

---

APPEARANCES:

For the Plaintiff:

MS. MELISSA R. SMITH
Gillam & Smith, L.L.P.
303 South Washington Avenue
Marshall, Texas 75670
melissa@gillamsmithlaw.com

MR. ROBERT F. KRAMER
MR. ANDREW G. HAMILL
MR. DAVID ALBERTI
Kramer Alberti Lim & Tonkovich LLP
950 Tower Lane, Suite 1725
Foster City, California 94494
rkramer@krameralberti.com
ahamill@krameralberti.com
dalberti@krameralberti.com

*********************************************

APRIL HARGETT, CSR, RPR, RVR
Federal Official Court Reporter
300 Willow Street
Beaumont, Texas 77701

APPEARANCES (Continued):

MS. NICOLE E. GLAUSER
Kramer Alberti Lim & Tonkovich LLP
500 West 2nd Street, Suite 1900
Austin, Texas 78701
nglauser@krameralberti.com

For the Defendant:

MR. DAVID EISEMAN, IV
MS. XUEMENG WANG
MR. ANDREW MASON MATHER
Quinn Emanuel Urquhart & Sullivan LLP
50 California Street, 22nd Floor
San Francisco, California 94111
davideiseman@quinnemanuel.com
ellewang@quinnemanuel.com
andrewmather@quinnemanuel.com

MS. DEEP ACHARYA
Quinn Emanuel Urquhart & Sullivan LLP
1300 I Street Northwest, Suite 900
Washington, DC 20005
deepaacharya@quinnemanuel.com

MR. TREVOR QUIST
Quinn Emanuel Urquhart & Sullivan LLP
2755 East Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
trevorquist@quinnemanuel.com

MR. RAJAT KHANNA
Quinn Emanuel Urquhart & Sullivan LLP
191 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
rajatkhanna@quinnemanuel.com

MR. WEN XUE
Greenberg Traurig LLP
One Vanderbilt Avenue, 31st Floor
New York, New York 10017
xuew@gtlaw.com

APPEARANCES (Continued)

MR. MATTHEW J. LEVINSTEIN
Greenberg Traurig LLP
360 North Green Street, Suite 1300
Chicago, Illinois 60607
levinsteinm@gtlaw.com

* * *

Proceedings reported by stenotype. Transcript produced by computer-aided transcription.

---0---

(The following proceedings were held in open court commencing at 9:03 a.m., reported as follows:)

(Call to order of the Court.)

THE COURT: Good morning. And please be seated.

We are here this morning for the pretrial conference in *ASSIA v. Charter Communications*, which is our Case No. 2:24-124. I'll note for the record that we are in the historic Harrison County Courthouse fondly referred to as the 1901 courthouse. And we appreciate the county allowing us to use it on days like today.

Would counsel state their appearances for the record?

MS. SMITH: Good morning, your Honor. Melissa Smith for the plaintiff. And it's a pleasure, your Honor, to be in this lovely courtroom this morning. I am joined this morning by Mr. Rob Kramer, Ms. Nikki Glauser, Mr. Andrew Hamill, and Mr. David Alberti.

And, your Honor, the plaintiff is ready to proceed.

THE COURT: All right. Thank you, Ms. Smith.

MR. EISEMAN: Good morning, your Honor. David Eiseman with Quinn, Emmanuel on behalf of defendant Charter. With me is Deepa Acharya, Trevor Quist, Elle Wang, Rajat Khanna, and Andrew Mather. And Mr. -- well, Mr. Levinstein will make his appearance in a moment. But -- why don't I do that for everyone?

So Matt Levinstein from Greenberg Traurig and Wen Xue also from Greenberg Traurig. And Mr. Dacus sends his apologies. He's over in Judge Gilstrap's courtroom in trial; otherwise, he'd be here.

THE COURT: All right. Thank you, Mr. Eiseman.

MR. EISEMAN: And we are ready to proceed, your Honor.

THE COURT: All right. Very good. I will also say that any -- any extended remarks, I would appreciate having from the podium like you've done so far this morning. If all you need to say is something along the lines of yes or we agree, you can do that from the microphones at counsels' table just to save time.

I will note that this case is currently on Judge Gilstrap's March 16 trial docket. There are two other cases currently on that docket, the *Bosch* case and

the *Eireog* case. I am not expecting the *Eireog* case to be reached on that docket. There are three other *Eireog* cases that are on Judge Schroeder's docket, and I anticipate that one of those will go to trial before the *Eireog/Lenovo* case does. All of which is to say that I think you have a relatively high likelihood of being reached depending on what happens in the *Bosch* case.

Judge Gilstrap starts a trial at the end of next week. Typically around the end of that trial, he will issue the order of trials for his next docket, which is the March 16 docket. So I'm anticipating that some time probably the week after next, you'll get an order of trials for the March 16 docket.

I've looked over the pretrial order in this case, and I -- I see that the plaintiff is requesting 11 hours and the defendant is requesting 18, if I'm reading it right. And I guess I would like to hear from defendant on what the basis for the 18-hour request is or, put it this way, if the defendant wants to argue for more than 11 hours per side, this would be the time to do that.

MS. ACHARYA: Good morning, your Honor. Deepa Acharya for defendant Charter.

THE COURT: Good morning.

MS. ACHARYA: We are requesting for

additional time over the 11 hours. We've requested for 18 given the complexity of the technology in this case. There are two different types of technologies, both very complex. And to be able to accurately represent that and explain that technology to the jury, we think that amount of time is necessary. There's also three asserted patents in this case. None of -- two of which are related. But there are a number of asserted patents with respect to each of those -- a number of asserted claims with respect to each of those asserted patents that are at issue.

Those claims are also lumpy, so being able to properly to be able to explain those claims, the application of those claims, both for the infringement side and the invalidity side, we believe additional time are necessary.

THE COURT: What witnesses are you expecting to call on the technology issues that you're referring to?

MS. ACHARYA: We have a number of witnesses from Charter who we will be bringing to trial on the various technologies. We assume there'll be about three or four Charter witnesses, potentially more. We also will be possibly bringing a third-party witness from Plume. Plume is also implicated in a number of

technology that is at issue, so we also have third parties that probably will be coming as well.

THE COURT: I'm looking at your witness list. And if you need to grab your witness list, that's fine, but tell me more about what witnesses you're expecting to call on the technology side.

MS. ACHARYA: If you don't mind, your Honor, I'm just going to walk back and get my list.

Your Honor, on the technical side of the case, we will have our two technical experts, Dr. Almeroth and Dr. Shoemake. We will also have potentially a couple of our witnesses related to the accused PMA technology --

THE COURT: Who is your second expert? I'm sorry. I didn't --

MS. ACHARYA: Sure. It's a little bit lower down on the list, Dr. Matthew Shoemake.

THE COURT: All right. I see it. Okay. Go ahead.

MS. ACHARYA: We will have a number of witnesses related to the accused PMA technology, potentially Mr. Roger Stafford, potentially Mr. Petersen, and Mr. Liew. There may be others depending on how ASSIA's presentation in the opening goes, but for now I think we can focus on those three

for the PMA technology.

THE COURT: And so that's -- I got Roger Stafford. Who were the other two?

MS. ACHARYA: Mr. Petersen -- Matt Petersen.

THE COURT: All right.

MS. ACHARYA: And Mr. Jay Liew, L-i-e-w.

THE COURT: All right. Those are the ones that you say would testify relating to the PMA technology?

MS. ACHARYA: Correct. We haven't decided at this moment whether all three will be attending trial, but we anticipate some combination of those three.

THE COURT: All right. And you say you have another technical witness that you might call?

MS. ACHARYA: Correct. There's a couple others on other related technology -- not related -- the other accused technology, which has to do with Wi-Fi. And those witnesses could potentially be Aaron Nead, Dave Rodrian --

THE COURT: Let me --

MS. ACHARYA: Sure. Aaron Nead, N-e-a-d.

THE COURT: All right.

MS. ACHARYA: Dave Rodrian, R-o-d-r-i-a-n.

THE COURT: All right.

MS. ACHARYA: And Mr. Rodney Shamburg,

S-h-a-m-b-u-r-g.

THE COURT: All right.

MS. ACHARYA: And then there are also potential witnesses who may come in to explain -- there's a prior relationship between ASSIA and Charter that predates the patent -- the complaint in this case. And depending on how some of the pretrial motions, such as MSJs that we have filed, we may need to bring in some of those witnesses as well.

And then I mentioned a Plume witness, that's Mr. Hotchkiss -- Adam Hotchkiss.

THE COURT: And what's Mr. Hotchkiss's relationship to the case?

MS. ACHARYA: Charter uses a technology called OpenSync, which is supplied by Plume. And that OpenSync technology is accused in this case with respect to allegations -- not the Plume -- not the PMA allegations.

THE COURT: All right. And I saw there was a question at least at some point in the pretrial order about whether Charter has identified a corporate representative. Is -- has that been addressed yet?

MS. ACHARYA: That has not, your Honor. A lot of that depends at the moment on the pretrial motions and whether certain issues are going to be

presented or not at trial. So we have not come to grounds on who our corporate witness is. I believe ASSIA hasn't either.

THE COURT: All right. Then we will reach that issue, I guess, a little later. I will consider your request for time beyond the typical 11 hours.

MS. ACHARYA: Thank you, your Honor.

THE COURT: All right. Thank you, Ms. Acharya.

Does the plaintiff want to offer any response to the argument that the technology in this case would require additional time?

MR. KRAMER: Your Honor, very, very briefly. Robert Kramer on behalf of ASSIA. We understand that normal length, if there is such a thing, is in the range of 11 hours --

THE COURT: And you're a little taller than our last speaker, Mr. Kramer. If you could pull that up. Thank you.

MR. KRAMER: Certainly. We understand that the typical length of time, if there is such a thing, is around 11 hours. Eighteen seems significantly more. We do have two technologies here. That's common in many of these cases. So just hearing how many witnesses Charter has stated, I didn't hear a confirmed they will call all

these. It sounds like they're still dabbling a little, figuring out who that's going to be. We hope the parties can very quickly get to ground on that. We're ready to do that at any time -- the corporate representative, too -- to really find out, so the parties can properly prepare.

In other cases, recently the *Optis* trial, 5 patents, 10 hours per side, 13 total witnesses, 7 experts, and the judge gave time back. So, certainly, it can be done in the normal range. We don't think 18 hours really would make any sense. That feels like an overreach, but your Honor will handle that issue. Beyond that --

THE COURT: Thank you, Mr. Kramer.

I will carry this issue for the moment and look further at the record as we go through and -- and give the parties a definitive response at that time.

Returning to the -- to the schedule, in addition to the time that will be allowed for the presentation of the evidence, each side will have 30 minutes for voir dire. That will be conducted after the Court has done a general voir dire of the jury. I would say that Judge Gilstrap's practice is to allow counsel to use the first few minutes -- typically, three minutes or so -- in a high-level, non-argumentative

description of what's at issue in the case. I do stress the non-argumentative aspect of that because that is something that Judge Gilstrap will enforce.

After the counsel have finished with their questioning, the Court will take up challenges for cause. And after giving counsel a few minutes to consult with each other, you'll be called on to exercise four peremptory challenges per side in a blind simultaneous fashion, meaning a written delivery to the Court of the four peremptories. The first eight jurors remaining in the order in which they were randomly seated will constitute the trial jury. There are no alternates in federal civil litigation now so all of the jurors will deliberate.

After the jury has been impaneled, and typically that's right around the lunch break, then the Court will give a relatively brief preliminary instruction about the manner and schedule of the trial for the jurors. And then each side will have 30 minutes to present opening statements. At the close of the evidence, each side will have 40 minutes to offer closing arguments. The plaintiff can save a portion of that closing argument time, which must be less than half, for rebuttal. And then the jury will deliberate. The Court typically gives the closing instructions --

the final jury instructions before the closing arguments.

I would ask you to continue to work on the jury instructions. The Court expects that that will be an ongoing process between counsel, so that near the end of the trial, there should be a fairly close agreement on what the final jury instructions should contain. The Court will have an informal charge conference at the end of the evidence, which is just an opportunity to learn where the -- where the serious objections are. And then after the final draft of the jury instructions is delivered to counsel, there'll be a final jury charge conference on the record so that you can state your objections.

During the trial, Judge Gilstrap will be in chambers daily at around 7:30 with the idea of being able to resolve any objections that have just come up and need to be resolved before the jury reports at 8:30. The goal is to not keep the jury waiting on any of these objections. So it's important that they be timely pursued. I think you've got a very detailed protocol in your pretrial order, and we'll go over any issues about that in a moment. But I think what you have agreed to should work fine with what the Court expects.

If there are issues that counsel are not able

to resolve through the meet-and-confer process, the bottom line is that those disputes need to be identified in an e-mail to the law clerk assigned to the case by 10:00 p.m. the night before they are to be argued. And then by 7:00 the following morning, counsel are expected to deliver a three-ring binder to chambers that has a copy of any demonstrative or exhibit or other document that is at issue and would be helpful for the Court to have a copy of, along with a short narrative, half page or so, from each side about what the dispute is in order to then be prepared to meet with the Court and take that up by 7:30 or soon thereafter each morning.

The jury, as I mentioned, is expected to be there by 8:30 daily. The Court provides lunch in the courthouse to the jury in order to keep the lunch break down to a minimum, which may run around 45 minutes. So counsel should be prepared for that idea of a relatively brief lunch break. The goal is to give the jurors a long day but a short week. That's what they're after is longer days and shorter trials. So, typically, the jury will go until sometime close to 6:00 in order to get as much time in as possible.

The one thing I will mention that is a little different from what you have in your pretrial order is as far as disputes in the deposition designations. As

you've recognized in your order, Judge Gilstrap's goal is to have those disputed designation issues resolved the day before the deposition is to be used so that if there is a need to edit the depositions, many of which are video, that there'll be time to make sure that that is accomplished properly and that it doesn't then hold up the presentation of those to the jury. That works smoothly during the trial, but you should be aware that if the plaintiff wants to be able to offer deposition designations or deposition testimony on the first day, meaning with a Monday jury selection on Monday afternoon, then the plaintiff needs to make sure that those were addressed the week before.

And so you can be in touch with Judge Gilstrap's chambers and arrange time for any objections to those designations to be addressed the week before the trial. If you're not able for any reason to make those arrangements with Judge Gilstrap's chambers, you can certainly consult my chambers as well and we'll help facilitate that. But in any event, if you don't get those objections addressed before Monday, then you will not be able to use those objections -- the -- those designations on Monday. So just be aware of that.

At the end of the evidence, the parties will

be given an opportunity to make any Rule 50(a) motions. You are now ordered to withhold those motions until the close of all evidence, and I put that order on the record so that you won't be concerned about waiver by not making those motions earlier. So you are ordered to hold all Rule 50(a) motions until the close of all of the evidence.

A couple of protocol issues. I imagine you've all been informed by local counsel that Judge Gilstrap's practice is to require that witnesses not to refer to other persons by first name only. The record becomes confused by doing that. And so you should advise your witnesses, as well obviously as your trial team, that you can use last name only or first and last name, just not first name only. So prepare your witnesses on that.

There will be times when the parties will want to present evidence that is subject to protection under the protective order in this case or in other cases. And we recognize that the courtroom may need to be sealed for that purpose. If you want to preserve the opportunity to request that the transcript be sealed, you need to exercise that request on the record at the time that the evidence is to be offered. Judge Gilstrap has a standing order that you should consult about how

to preserve that right and exercise that option.

And one of the overriding goals of that is to try and get you to group confidential evidence as much as possible so that we can limit the number of times that the courtroom needs to be cleared and sealed and unsealed. And also I would just remind you that it's important that you notify the Court as soon as the confidential part of the evidence is complete so that the courtroom can be promptly reopened. It is important to the Court to try and maintain public access to the courtroom as much as possible.

There -- I think the deadline for a jury questionnaire to be sought has recently passed. Has that proposed questionnaire been tendered to the jury administrator?

MR. EISEMAN: It has, your Honor.

THE COURT: All right. Very good. Thank you, Mr. Eiseman.

In that case, that questionnaire will be sent out to the venire. Because there is more than one case on the docket for this venire, it may be a blended questionnaire, but you will get access to that questionnaire on the Wednesday before the jury selection, which would be March the 11th in this case, I think. The goal of that questionnaire is to allow you

to -- to exercise your peremptories and your challenges for cause for that matter more efficiency -- more efficiently with less time involved in voir dire. I think the questionnaire sometimes gives you more information than your actual time questioning the venire.

But the tradeoff is that we require -- we need that you maintain those questionnaires in strict confidence; that they be not distributed or disseminated beyond your trial team, that they not be duplicated or in any way distributed such that they would end up in a database in the cloud somewhere. We do expect a lot from our jurors, and it's important to us that, in addition to the service that they have to render, that they also not have their privacy invaded by having these questionnaires with personal information be distributed. So keep those closely. And when the process is done, either return or destroy them for the protection of that information.

Obviously, you are allowed to do investigation of the venire once you get that list, but there are restrictions on that, all of which are designed to keep the jurors from having the sense that they are being investigated. So, for instance, we direct you not to question their friends, family,

neighbors, coworkers, or others who are likely to report back to them that they're being investigated. If you have databases that are available to you that can be consulted without it getting back to the members of the venire, then you're free to do that.

Judge Gilstrap has a standing order that has considerably more detail about what the limitations on that are, so I would suggest that you check out that standing order if you're intending to do any investigation of the venire before the jury selection.

You have indicated in your pretrial order that you're going to provide jury notebooks, and it looks like you have described them in the way that the Court prefers. So I'll leave that the way it stands. I think everything you've provided in the pretrial order on that is appropriate. Those jury notebooks should be delivered to Judge Gilstrap's chambers by that Wednesday before the jury selection. Keep those two dates together. In other words, your questionnaires will be available the afternoon of Wednesday, March 11. Your notebooks should be delivered at that same time.

During the trial, the experts are held to the four corners of their reports. That means there are occasionally issues about whether particular questions are within the scope of those reports. In order for the

Court to be able to promptly rule on those, it's necessary for the Court to have ready access to the expert reports. So you will be called on and you'll get additional detail about this directly from chambers of Judge Gilstrap, but you should be aware that you will be called on in that week before trial to provide the Court with copies of your experts' reports. We don't intend that to include all of the exhibits or appendices to those reports, just to the text of the reports, but you should be prepared to provide those both in hard copy and in electronic format during that week before.

I will say that both sides should be judicious about the exercise of objections regarding the scope. Those often require sending the jury out and that can take a significant amount of time, all of which will be charged to whichever side losses that objection.

Let me see. What I would like to turn to now is the issues in the pretrial order. Before we adopt the pretrial order, I would like to go through and resolve those.

And as we're turning to that, I'll ask does either side have anything they want to bring up or any questions they want to ask about what has been covered so far?

MS. GLAUSER: No, your Honor.

THE COURT: All right.

MS. ACHARYA: Your Honor, we have one issue.

THE COURT: All right. If you'd come up.

MS. ACHARYA: Your Honor, you may have seen that ASSIA recently dropped one patent from the case, the '996 patent. The parties filed a motion -- a joint motion for that recently. That implicates now a number of issues that may have previously been brought before the jury at trial. We did not have an opportunity to brief those issues with respect to motions in limine. And so we're asking the Court if it would be open to leave for Charter to brief an additional motion in limine related to issues that are no longer applicable in this case. And we just want to make sure that those issues aren't addressed before the jury.

THE COURT: Can you give me some idea of, for instance, what you're describing?

MS. ACHARYA: Sure, your Honor. So the '996 patent implicated a specific technology called PMA. PMA is also implicated with respect to the '313 patent, which is still at issue in this case. However, the '996 patent implicates downstream PMA and the '313 implicates upstream PMA. While the technologies have overlaps, the value related to downstream PMA is much higher than the value related to upstream PMA. And so we want to

preclude ASSIA from eliciting testimony, evidence, presenting arguments that show the value of downstream PMA because it could be highly prejudicial to Charter.

You'll see -- we'll go into detail with respect to the exhibit objections and with respect to the MILs. I think those issues will be flushed out a little bit more. But downstream PMA is not accused in the case anymore, and there are no damages that ASSIA's expert has attributed to downstream PMA.

THE COURT: For the benefit of the record, when you refer to PMA, that's profile management application?

MS. ACHARYA: Correct, your Honor.

THE COURT: I saw that counsel very graciously provided me with an index of abbreviations, which included advising me that MIL stood for motion in limine, but did not mention what PMA stands for.

MS. ACHARYA: I apologize, your Honor.

THE COURT: But in any event, I did eventually discover that, and so I'm happy to include it in the record.

As far as the issue about upstream versus downstream PMA, I -- let's address that as we go through the motions in limine. But I will ask you to raise at the end of that process the same issue you're bringing

now, and we can decide whether we need to take it up in some particular way and what the timing of that should be. But just bring that issue back up at the end of the motions in limine, if you would.

MS. ACHARYA: We'll do. Thank you, your Honor.

THE COURT: All right. Thank you, Ms. Acharya.

And I guess I'll just ask plaintiff to be prepared to address that issue when we reach the end of the process and we take it up again.

MS. GLAUSER: We will, your Honor.

THE COURT: All right. Thank you.

Turning to the pretrial order, there were a couple of disputes. The first one is shown on Page 13 of the pretrial order, which is Paragraph A(8) under "Trial Stipulations." And I am -- I guess I should hear from counsel for plaintiff first on that.

Ms. Glauser, the way that's written, it talks about whether or not evidence should be presented about Charter generally respecting intellectual property. Is that supposed to be generally not respected? I mean, tell me what that issue is.

MS. GLAUSER: Yes, your Honor. During the parties' meet and confers, Charter suggested a motion in

limine that would preclude ASSIA from being able to argue that Charter does not generally respect intellectual property. And as part of that conference, which I think will be a number of issues for the Court, we said that we would not do that; that we would reserve the right to say that Charter has not respected ASSIA's intellectual property, but not to generally characterize that Charter does not generally respect intellectual property.

The issue that's in dispute in the pretrial order is that we think that Charter should likewise not be able to argue the flip side of that coin, which is Charter should not be allowed to argue that it generally respects intellectual property. The only relevant issue for this jury is whether or not Charter has infringed, respected, or willfully infringed ASSIA's patents. And so we think that if ASSIA is precluded from discussing Charter's general approach or respect towards intellectual property, it should likewise be prevented from offering a suggestion or evidence or argument regarding whether it generally respects patent rights.

THE COURT: I have never felt that it was improper for a defendant to make a general statement about respecting intellectual property. And, clearly, the plaintiff is going to be arguing that they have not

respected ASSIA's intellectual property, but I don't see any unfair prejudice in them being allowed typically through their corporate representative or counsel to say that they generally respect intellectual property.

Is there anything unique about this case that I need to take into account in connection with that issue?

MS. GLAUSER: I don't think there's anything unique to this case other than the idea that ASSIA has agreed not to do the opposite. And so it's really more of a "what's good for the goose should be good for the gander" here.

THE COURT: All right. In other words, you're saying you have agreed not to argue that they are corporate pirates when it comes to intellectual property?

MS. GLAUSER: Yes, your Honor. Although not with those words. And so we would stay within the bounds of the Court's standing motions in limine, but, yes.

THE COURT: Well, you saved us some trouble by agreeing to that, but I don't think that that is a sacrifice. But I will in Paragraph 8 say that neither party is to offer evidence or argument that the other does not generally respect intellectual property. But

that doesn't restrict your ability to argue about this case and whether in this case those rights have been respected.

MS. GLAUSER: Thank you very much, your Honor.

THE COURT: Thank you.

Does Charter have anything that needs to be heard on this issue?

MS. ACHARYA: No, your Honor. We agree with what the Court suggested.

THE COURT: All right. Thank you. Then let me see --

MS. GLAUSER: I'm happy to sit down, but I believe the next issue coming up is likely my argument as well.

THE COURT: All right. That's just fine. So that is on Page 16 of the pretrial order under "Trial Management Procedures." Tell me what the issue is on that.

MS. GLAUSER: Your Honor, the issue here is that ASSIA has proposed to Charter that a reasonable amount of time before trial starts, the parties do two things; first, they identify whether or not they're going to have a corporate rep testify at trial and the identity of that corporate rep. The second is that the

parties disclose a good faith list of the witnesses that they actually intend to call live.

And the reason that we've suggested this procedure is because through the standard disclosure of witness lists, as your Honor saw earlier this morning, Charter has disclosed 13 engineers that it has listed as may call live. And with the trial within the bounds of what is typically provided for -- for hours per side, it's not realistic that Charter intends to call 13 live fact witnesses. And so what we're requesting is that the parties agree, and the Court order, that 14 days before trial -- we are also prepared to do it today, if that's better -- but the 14 days at least before trial, the parties disclose the corporate representative that will testify and the witnesses that the parties actually intend to appear live and testify at trial.

THE COURT: And I assume that your request is based on what you feel is the time you need to prepare for cross-examination or what?

MS. GLAUSER: Yes, your Honor. In addition to being able to identify which witnesses we may need to call adversely in our case-in-chief. So it is in part preparation for cross-examination for defendant's case-in-chief, as well as preparation for what would be plaintiff's case-in-chief.

THE COURT: I guess it's not uncommon for the parties to reach an agreement about an earlier disclosure of witnesses that will be called, but there is, as the defendant points out, a provision in this pretrial order already for identifying witnesses. I think it's two days before each day of trial.

MS. GLAUSER: There is, your Honor. I think the purpose of that notice is to further clarify who the live testifying witnesses would be. It's also disclosure of the order, right? And so the idea would be that two weeks before, it's a good faith list of what is intended for the trial that's coming. The two nights before is now based on having heard the opening, for example, and as Charter said it needed to further clarify its witnesses, it discloses those that it actually will without changes.

THE COURT: Are there other cases in this district that you're familiar with where such an order has been entered?

MS. GLAUSER: Your Honor, I am not. Typically, we have in these cases before Judge Gilstrap in the Eastern District reached an agreement with the other side. And so there are agreed joint pretrial orders that I have entered in other cases in which the parties had reached this agreement. I have not yet been

a part of a case in which the parties haven't been able to come to some reasonable time in advance of trial when they would limit a list like Charter's that includes over 16 live witnesses with only perhaps, you know, somewhere between 11 and 18 hours of trial.

THE COURT: And I noticed that, frankly, the plaintiff's witness lists has similar numbers of potential trial witnesses, doesn't it?

MS. GLAUSER: It is close. It is not quite as expansive, and that's why we've suggested that the parties agree on a date for that mutual exchange. Or if the defendant feel that their disclosure is dependant on ASSIA's disclosure first, we would also be open to the idea of ASSIA disclosing and then Charter doing it, so sequentially instead of at the same time. We are prepared to do so today, if that's helpful. We -- because Charter hadn't accepted that proposal, suggested that if they needed more time, it be done two weeks before trial. But we do believe that in this case, based on the number of witnesses on the parties' witness lists, it makes sense to come to a more good faith disclosure of who they actually intend to call live.

THE COURT: And has the plaintiff identified the corporate representatives that the plaintiff will have at trial?

MS. GLAUSER: That corporate representative is going to be Dr. John Cioffi. We have not, but we have told Charter that we are willing to do so.

THE COURT: All right. Thank you, Ms. Glauser.

MS. GLAUSER: Thank you very much, your Honor.

MS. ACHARYA: Your Honor, as I mentioned earlier today, there are a number of issues that are still in play, which makes it pretty difficult for Charter at this time to be able to identify its corporate witnesses or to be able to identify the specific witnesses it intends to present at trial. We think that until we have orders on the motions for summary judgment, motions in limine, the Daubert motions, we cannot identify a corporate witness.

For example, there are issues related to pre-suit knowledge. To the extent that our MSJ is granted, that could affect who we actually present as our corporate witness. Also, there are MSJs directed to certain patents and infringement allegations and invalidity issues in place. If those go away, that could also affect who we bring as our corporate witness.

So I would say unless we have those orders more than 14 days before trial, it's going to be very

difficult for Charter to be able to identify who that corporate witness would be.

With respect to the other witnesses, again, the similar issue is in place. Because until we know what issues are in place, we don't entirely know which specific witnesses we're going to bring to trial. In addition, because we're defendants, we go second, and some of ASSIA's presentation could affect who we end up actually calling as witnesses. Some of this may be affected by timing and how much time we have available to us after the cross-examination.

And then, finally, some of this is also at issue with respect to whether we have 11 hours versus additional time, such as the 18 hours that we have requested, so there are a number of issues that are still at flux. So I would posit that we proceed with the disclosure schedule that's set forth in the joint pretrial order. We are not against identifying our corporate witness early, assuming we have the orders on the pretrial motions that are pending.

THE COURT: All right. I think what I'm going to do is after we finish this hearing today, I'm going to make a determination about trial time. In the order that sets out that trial time, I'll also make a determination about when the corporate representative

needs to be identified. And I do think that the Court expects that the parties will have that knowledge sooner than they would have the knowledge of who all of their other witnesses will be.

And I'll also in that same order intend to address how much before trial it is necessary for each side to identify the realm of their witnesses, not the order. I do think the agreement you've reached in the pretrial order adequately addresses the order of witnesses. But in terms of just identifying which witnesses you will call, and all that would be, I think, would be what the plaintiff is describing as a good faith effort to identify the -- the group of witnesses that you'll be drawing from.

But, thank you, Ms. Acharya.

MS. ACHARYA: Your Honor, if I could just clarify or make one more point on the corporate witness part just to get, I guess, a little additional detail. So, for example, if issues related to pre-suit willfulness or pre-suit damages related to marking evidence is at issue, we may want to bring someone like Mr. Koerper or Mr. Leuschner to explain that as our corporate witness.

If those issues are out, and PMA is still at play in this case because those patents are still at

issue, for example, we may have Mr. Patterson [sic] be our corporate witness. If those issues are out, it could be, for example, Mr. Rodrian. So that's why I would just ask the Court that if there is a deadline on corporate witness, that it be tied to whenever we receive the pretrial order because that -- on the pending motions because that will heavily affect who we present as our corporate witness.

THE COURT: I understand that that is the most advantageous order of things, but I can only tell you is that we'll come as close as we can to that. The -- this case has a little fewer such motions than some cases and that's helpful, but all I'll do is tell you that we'll prioritize to the extent we can.

Do you -- if you want to identify what you consider to be the most important of your pending motions in terms of making these decisions, I'm happy to get that and I'll give the plaintiffs the opportunity to do the same. In the pretrial order on Page 33, there is a list of defendant's pending motions. So if you want to use that to address what you think the priority should be, that would be helpful.

MS. ACHARYA: Sure, your Honor. We believe the motion related to pre-suit damages and pre-suit willful infringement is one of our more important

motions because that would address in addition whether testimony, evidence, or argument related to the prior relationship would be --

THE COURT: And so the pretrial order lists those by docket number. Which ones are you referring to?

MS. ACHARYA: Sure, your Honor. That one is Docket No. 217.

THE COURT: That's what you consider your first priority?

MS. ACHARYA: Correct, your Honor.

THE COURT: All right. And I noticed that that was one that has an asterisk that indicates that the dismissal of the -- I think it was the '996 had some effect on it.

MS. ACHARYA: Correct, your Honor. That '996 patent plus -- it was at issue with respect to that motion. That motion now has been limited in terms of the patents that are at issue to the '313 -- just -- actually, just the '313 patent because -- oh, '313 and the '398 and the '654 patents.

THE COURT: So you're saying it's limited to the -- all three patents that are still asserted and a part of it that related to the '996 is no longer relevant?

MS. ACHARYA: Correct, your Honor. There's certain patents that are at issue with respect to pre-suit damages, certain of those asserted patents are related to the no pre-suit willful infringement, but it would cover all of the remaining asserted patents.

THE COURT: Okay. All right. Is there any other order of the remaining motions that you think indicates which will be most influential for your preparation?

MS. ACHARYA: Yes, your Honor. And it's two for the somewhat similar reasons. So there is the motion to exclude ASSIA's damages expert Stephen Dell, which is Docket No. 219, and also Charter's Motion in Limine No. 1, which we'll be arguing today.

THE COURT: All right.

MS. ACHARYA: And that's Docket No. 299.

THE COURT: That's the one about the --

MS. ACHARYA: The *Entropic* litigation.

THE COURT: *Entropic*, yes.

All right. Then I will try to give priority to those motions in addressing yours.

So thank you, Ms. Acharya.

MS. ACHARYA: Thank you, your Honor.

THE COURT: Does the plaintiff have an order of priority that you want to request the Court to go by

in making sure we address these motions timely?

MS. GLAUSER: If I may ask one clarifying question, your Honor? If -- are you asking for an order of importance with regard to the disclosure of the corporate representative or generally with regard to the pending motions?

THE COURT: And I'm certainly not suggesting that this is the importance to your case, but in terms of making decisions about witnesses that you'll call, the corporate representative and others, if there -- if some of these should be given priority in that sense, then that's what I'm asking.

MS. GLAUSER: Thank you very much, your Honor.

As far as plaintiff goes, we believe we could make a good faith identification of our witnesses without getting a ruling on the pending motions. Now, of course, if the Court decided to grant our motion for summary judgment of no invalidity, that would change whether or not we would put on a rebuttal case with regard to those patents to discuss their validity. So we would want the option to review how the motions affect the presentation of the case.

But as far as an identification of the corporate representatives and witnesses we intend to

call live at trial, we believe that that can be done even while the motions are pending.

THE COURT: All right.

MS. GLAUSER: Thank you, your Honor.

THE COURT: Thank you, Ms. Glauser.

All right. Then I will address the dispute about how much pretrial notice is necessary for the witnesses in the manner that I mentioned a moment ago.

I think I've already addressed the need to vary from your trial management just for the first day depositions. So we have addressed that. Other than that, the procedure that you've got seems accurate.

I had a question on Page 18 of the pretrial order. At the bottom of the page, there is a heading that is labeled No. 3 for witnesses, discovery responses, physical exhibits, and the like. It doesn't appear to relate to the surrounding text.

Is that just a stray entry, or is there something that has been left out?

MS. GLAUSER: If I may, your Honor? At the bottom of Page 18, that subheading No. 3 of witnesses, discovery responses, physical exhibits, and demonstratives, does carry over to what is Paragraph 8 then regarding that disclosure. 8(a) talks about listing the witnesses that will be disclosed. 9(a)

talks about trial exhibits. And so this is the exchange schedule that relates to those portions.

THE COURT: So the paragraphs you just continuously number after that?

MS. GLAUSER: That is confusing, your Honor. But, yes, the numbering continues on at Subdivider No. 3, it's meant to indicate that the following paragraphs apply to that category of trial evidence.

THE COURT: All right. Very good. Then I think there's nothing more there that needs to be addressed. Let me see. There is an issue about the scope of the plaintiff's rebuttal case that is addressed on Page 33 of the pretrial order. And if the issue there is whether the plaintiff can include in their rebuttal case anything other than their response to the defendant's invalidity evidence, I will say that I think that the plaintiff in Footnote 12 has captured the current practice, which is that the Court expects that the focus of the rebuttal -- the plaintiff's rebuttal case will be rebutting the invalidity evidence and arguments that the defendant has presented in their case-in-chief. But the plaintiff is not precluded from addressing other issues, but should take up with Judge Gilstrap before it launches into its rebuttal case, the scope of issues other than invalidity that

it -- the plaintiff wants to present.

I think that's the position that the plaintiff took in their footnote and -- and I do believe that that captures the current practice of Judge Gilstrap. But if either side wants to offer evidence different than that, this would be the time to do that.

Does the plaintiff have anything beyond that?

MS. GLAUSER: No, your Honor. That is the plaintiff's request.

THE COURT: All right. Does Charter want to offer any other argument on that issue?

MS. GLAUSER: No, your Honor.

THE COURT: All right. Thank you.

And then in that case, my intent is to adopt the pretrial order at this time unless there's some other argument on that. And I don't see any argument being made.

MR. EISEMAN: None by Charter, your Honor.

THE COURT: All right. Thank you, Mr. Eiseman.

MS. GLAUSER: Nothing else for plaintiff, your Honor.

THE COURT: Thank you, Ms. Glauser.

Then we will adopt the pretrial order as

noted. And I know that there are objections in the pending motions to some of the witnesses. Are there other objections beyond what's in those pending motions that either side wants to address? I understand the pretrial order, as in all cases, preserves all manner of objections to particular questions that might be made. But if there are objections to the witnesses themselves that are not in the current pending motions, this would be the time to address those.

Does the plaintiff have any such objections?

MS. GLAUSER: Other than the objection and challenges in the motions to strike expert testimony and opinions, we do not, your Honor.

THE COURT: All right. Thank you.

MR. EISEMAN: And that's the same for Charter, your Honor.

THE COURT: Thank you.

In that case, let's turn to the motions in limine. And we'll start with the plaintiff's motions in limine and specifically No. 1.

MS. GLAUSER: Plaintiff's Motion in Limine No. 1 seeks to exclude three categories of testimony, evidence, and argument. The first is non-relied upon agreements, licenses, or offers. And when I say non-relied upon, I mean licenses, agreements, or offers

that both parties' experts agree were not sufficiently comparable or otherwise not relevant or informative of the reasonable royalty in this case. The second --

THE COURT: And you have identified [redacted] agreements, I'll call them, that you felt were relied upon and therefore could be discussed. And it seemed that the defendant agreed with you on those [redacted] and also nominated two others for that list. Is that your reading of their opposition?

MS. GLAUSER: It is not quite my reading of their opposition, your Honor. I think that they also want to or they have nominated an offer or a [redacted]; that is covered by the second portion of the MIL. And so while it doesn't fall under the category of a MIL unrelied upon, this is our argument that the fact that another service provider offered to supply technology to Charter for a certain price and that Charter did not accept that offer or ultimately deploy that technology and importantly has not elected that technology as a non-infringing alternative, meaning it has no relevance to any of the issues to be decided by this jury.

THE COURT: So let's consider [redacted] to be a category of its own. In this first category that you've talked about, I guess it seems

that's what's at issue is the two additional agreements that the defendant thinks should be included in that?

MS. GLAUSER: I did not read their opposition as suggesting that, and I apologize if I missed it. But I don't know what those two agreements are. As I read their opposition, I thought that -- not to make their argument for them, but I think they accepted the idea generally that non-relied upon licenses should be excluded and they want that to also apply to *Entropic*, which we'll take up as a separate motion in limine. And they wanted to reserve the right to rely upon the [redacted], which is the second part of our motion in limine.

THE COURT: I guess -- and I may be misreading it -- but they open their opposition by saying in the second sentence: However, in addition to the [redacted] license agreements listed by ASSIA, Charter should be able to introduce the master service and license agreement between the parties -- which may not be an issue from your side -- and PMA solution [redacted], which we've, kind of, said is a separate category.

MS. GLAUSER: I apologize, your Honor. I remember that now. And the reason that it slipped my mind is because the parties have already agreed that

that master license and service agreement between the parties may come in and is on the parties' joint exhibit list. So all issues and objections with regard to that particular agreement have been resolved and were never meant to be part of this exclusion.

THE COURT: All right. Then I guess the primary issues on your MIL appear to me to be -- and, obviously, I'll hear from Charter -- but appear to me to be the [redacted] issue. And I guess the *Entropic* issue, we'll take up in full on the defendant's Motion in Limine No. 1 as well.

MS. GLAUSER: That's correct, your Honor. There is a corollary there, which is that of the [redacted], there are a handful that are the subject of our motion to strike opinions from their damage expert Dr. Becker with regard to those particular agreements. And to the extent that the Court grants that motion to strike and precludes their expert from relying on those agreements because he didn't sufficiently analyze whether they were either technically or economically comparable, we are requesting that Charter likewise be precluded from outside their expert offering any evidence, argument, or testimony with regard to those licenses.

And the reason that we do so is because if there is no expert testimony establishing the threshold

issue that they are comparable for purposes of the reasonable royalty analysis, then they're irrelevant and unduly prejudicial to otherwise present to the jury at least with regard to the consideration of value of our -- amount within the agreements.

THE COURT: Well, I do agree that that's an issue that's raised in their opposition, so I will let them speak to that as well. But I understand your position would be that those particular agreements rise or fall with the -- with the Daubert motion of their damages expert.

MS. GLAUSER: Yes, your Honor.

THE COURT: So I guess that leaves us then to hear from you about the [redacted].

MS. GLAUSER: [redacted] is a third party who at some point in time offered to provide some solution that Charter characterized as a PMA solution to Charter. Charter never accepted that offer, never used [redacted] as its technology provider for PMA, and there's no evidence in the record that it tested it or determined that it functions the same way as the accused technology or would offer the same benefits and value of the accused technology.

In addition, Charter does not contend that the [redacted] technology is a non-infringing

alternative that it could have used instead of using ASSIA's patents. And for all those reasons, we believe it's not relevant and that it shouldn't go before the jury because the only basis that Charter seeks to offer it to the jury is that [redacted] offered to provide that technology on the cheap. They want to parade that low number as what they could get for PMA technology. There's no indication it's similar.

THE COURT: Does the defendant's technical expert address the technology that [redacted] offers?

MS. GLAUSER: I will need to double check, your Honor. But my memory as I stand here right now is they do not and it is only addressed in their damage expert's report who says that this is not a benchmark for the reasonable royalty, but it is something that the parties would know about at the hypothetical negotiation. The problem, as you mentioned, is that because there is no technical comparability analysis, as I remember it, there's no basis to say it would be relevant for what the parties would consider at the hypothetical negotiation or for what the jury should consider.

THE COURT: All right. Thank you, Ms. Glauser.

MS. ACHARYA: Your Honor, with respect to the first bucket, you're correct, we agree we're not going to be offering evidence, testimony, or argument of any agreements or valuations that the experts haven't specifically relied on in their expert reports and damages report. However, I will ask the Court if it would apply that motion in limine to both Charter and ASSIA. ASSIA's motion in limine is drafted as directed only towards Charter, but we think for those same reasons it should apply equally to both parties.

THE COURT: I don't know of a reason why it wouldn't be mutual in that sense, but I'll give ASSIA a chance to be heard on that. One thing I do want to make sure is that there is a common understanding about which agreements have been relied upon by the damages experts and ASSIA identified the [redacted] agreements. I think if I'm reading the opposition right, you agreed that those 11 are relied upon.

Are there others that are not mentioned in the briefing of this MIL that Charter believes have been relied upon and therefore can be talked about at the trial?

MS. ACHARYA: So we agree that the 11 have been relied upon. Dr. Becker, Charter's damages expert, makes a categorical observation that based on the

agreements he's reviewed, that it would be reasonable and appropriate for the form of the royalty to be a lump sum. We do not need to present the specific agreements that are at issue. But we do want to be able to have Dr. Becker be able to testify that he did review agreements and those agreements are consistent with his opinion on the form of the reasonable royalty. And then we also have the [redacted] issue as well.

THE COURT: I understand that. And I -- the plaintiff can argue against this, if they want, but my inclination would be that the defendant's damages expert can rely on whatever agreements he thinks support the idea that the form of the license would have been a lump sum, but that the fact that he refers to something for the form of the license as far as lump sum versus running royalty does not mean that the monetary consideration for that license can be put before the jury.

So as long as it's understood that -- to the extent he refers to any other agreements to support the idea of that lump sum form, that it would not include mentioning or displaying in any way the monetary consideration for those agreements. Is that understood and acceptable to Charter?

MS. ACHARYA: Yes, your Honor. We understand

and that was not our intention.

THE COURT: All right. Then talk to me about [redacted]

MS. ACHARYA: So [redacted] -- they're a third party -- they provided a proposal to Charter when Charter was initially deciding how to implement the accused PMA system. It was trying to decide was it going to make an in-house homegrown system using CableLabs, Open Source, or was it going to purchase PMA from a third party. [redacted] provided that proposal as a third-party solution. It was for [redacted], and it was a full solution. It included all the hardware, the software, the service. It was a complete PMA solution.

We are not offering the [redacted] as proof of the value of the asserted patents or even as a comparable license. We're -- Mr. -- Dr. Becker, our damages expert, however, does rely on it as contemporaneous evidence of what Charter would have considered when evaluating whether to license ASSIA's patents or pursue alternatives. So this is just real world market evidence that would apply to the Georgia Pacific factors in terms of what Charter was actually evaluating at that time and whether or not it would have considered taking the [redacted]

[redacted] or would have taken ASSIA's proposal at the negotiation table.

THE COURT: How is that analytically different from a non-infringing alternative?

MS. ACHARYA: It is another alternative. However, neither party has presented technical evidence of the technical underpinnings of that proposal to be able to say it was, in fact -- you know, does not infringe the specific limitations. So we did not consider it as a non-infringing alternative, but it does provide additional market evidence.

THE COURT: It is performing, in your view, exactly the role of a non-infringing alternative, isn't it? You're saying that your client could have chosen this instead of practicing the asserted patents, and I understand you're not admitting that you're doing that, but that is what you're saying this [redacted] would be?

MS. ACHARYA: What we're saying is it helps to show what the value of PMA is to the market at the time of the hypothetical negotiation -- at the time the parties were or at least Charter was evaluating which service and which option and solution to adopt. It also -- to some extent, it is tied into the *Entropic* issue in the sense that it provides a counter. ASSIA is

saying that the *Entropic* settlement agreement shows Charter's willingness to pay for PMA, that's how they intend to use the *Entropic* agreement. That *Entropic* agreement was for [redacted]. We want to be able to -- to the extent that agreement is shown to the jury, which we disagree should be shown to the jury per our MIL No. 1, we need a counter to be able to say, well, these were actually the market conditions at the time and the proposals that were available to Charter at the time.

THE COURT: And is there evidence that the [redacted] technology would have performed all of the functions that the accused technology performs?

MS. ACHARYA: We understand that it was a complete PMA solution, so it would have included, yes, everything; the hardware, the software, the services to support it as well.

THE COURT: And what is the evidence to that effect?

MS. ACHARYA: I believe we have -- if you could give me one minute, your Honor.

THE COURT: Sure.

MS. ACHARYA: Our technical expert analyzed the proposal itself and broke down the fact that there was a separate license for services, there was a separate license for the software. And I -- I don't

believe we have deposition testimony, but I believe at trial we would be presenting our witnesses to be able to further provide that additional --

THE COURT: And so are you saying that you have an expert who will testify that the PMA solution that [redacted] offers performed all of the functions of the accused technology?

MS. ACHARYA: I don't want to say our expert is going to go beyond the bounds of his expert report. So he will be staying within the bounds of his expert report. And in his expert report, he does say that the Broadband proposal accounts for all of the services, software, and hardware related to the PMA system that Charter was evaluating at that time.

THE COURT: And I guess that sounds like you're saying that he says that the [redacted] does what the [redacted] does.

MS. ACHARYA: Yes, your Honor.

THE COURT: And what I'm trying to find out is does he say that what the [redacted] does is what the accused technology of the defendant currently does?

MS. ACHARYA: Our technical expert probably will not be able to say that because there isn't enough evidence so far in the record. However, we would have

factual witnesses who have understandings of what this proposal was to be able to provide additional detail on the [redacted] to the jury. There just hasn't been testimony because ASSIA's -- ASSIA's attorney didn't ask our witnesses about that at their depositions.

THE COURT: All right. Thank you, Ms. Acharya.

MS. GLAUSER: May I just quickly, your Honor?

THE COURT: Yes.

MS. GLAUSER: Okay. Your Honor, we brought up what Charter's technical expert Dr. Almeroth has said about the [redacted] proposal. And as you'll see, there is zero technical analysis of what is actually provided versus what it is that Charter does today or what it is that ASSIA's inventions offer.

And so as a result, where we are in this record, is that Charter never identified [redacted] as a non-infringing alternative even though ASSIA asked for such information through its interrogatory requests and its 30(b)(6) depositions. Charter didn't identify it in its discovery responses and no witness identified it as a non-infringing alternative. Their technical --

THE COURT: So you're saying you had an

interrogatory directed specifically to whether Charter is taking the position that they have a non-infringing alternative?

MS. GLAUSER: We did, your Honor. In addition to the facts that would support such a contention.

THE COURT: And what was the response?

MS. GLAUSER: Charter listed certain non-infringing alternatives and not one of those is [redacted]

THE COURT: All right. And in -- you're saying you also had a 30(b)(6) topic directed to that?

MS. GLAUSER: We did, your Honor.

THE COURT: And that you inquired about that and [redacted] was not part of the answer?

MS. GLAUSER: We did ask certain questions with regard to non-infringing alternatives. We did not realize until now that Charter is contending in some way that it is, in fact, a non-infringing alternative, so we did not elicit testimony with regard to [redacted] that didn't come out as disclosed during the fact discovery until we got the expert reports. But we did ask questions about non-infringing alternatives, and [redacted] was never identified during fact discovery.

THE COURT: And was there discovery about the [redacted] proposal even outside the non-infringing alternative context?

MS. GLAUSER: There was not, your Honor. Other than the production, we are not pleading that the [redacted] proposal wasn't disclosed. It wasn't disclosed as a non-infringing alternative, and there was no questions or further discovery with regard to that proposal because it was never identified as a non-infringing alternative.

THE COURT: What do you say to the argument that their fact witnesses can describe what [redacted] technology does compared to, I guess, what they currently are doing?

MS. GLAUSER: Thank you, your Honor.

I would say that's a violation of Federal Rule of Evidence 701 and that it is improper expert testimony from a lay witness. Those witnesses didn't disclose any kind of report or opinion disclosure with regard to the ability to be able to analyze and compare [redacted] to ASSIA's inventions or to Charter's current PMA systems. And so as a result, that would be inadmissible testimony. It would also be unduly prejudicial. It hasn't been disclosed during fact discovery. That's typically within the providence of

the experts, and their technical expert offered zero analysis that the [redacted] technology is in any way comparable to ASSIA's patents or to Charter's current technology.

As a result, the jury would have zero ability to be able to analyze in what way the [redacted] proposal is relevant technically or economically to the issues that it's being asked to decide.

THE COURT: All right. Thank you.

MS. ACHARYA: Your Honor, if I may briefly respond?

THE COURT: Yes.

MS. ACHARYA: I just want to be clear, we are not offering [redacted] as a non-infringing alternative. We did not disclose that during fact discovery as a non-infringing alternative and our experts don't opine that it is a non-infringing alternative.

THE COURT: And how is it not an undisclosed non-infringing alternative? I understand you're saying you have not disclosed it as such. But what you're offering it as is as an alternative to the patented process that would accomplish the same goal. How is that any different? Isn't that the definition of a non-infringing alternative?

MS. ACHARYA: Your Honor, what we're presenting [redacted] for is to explain -- it's just a market -- a market data point at the time. It helps to explain how the market evaluated PMA. PMA is a feature -- for example, CableLabs has it as Open Source. And so what we're saying is we're not planning on comparing it to asserted patents. We're not planning on having experts or even fact witnesses -- because we agree that's not appropriate for a fact witness to say that it's comparable. What we are saying is that it provides additional market evidence about PMA. ASSIA also plans to provide evidence about the value of PMA.

THE COURT: How is it relevant what [redacted] would have charged for their technology if there's not some opinion that their technology is comparable or would have been an acceptable alternative to the -- to the accused technology?

MS. ACHARYA: So our fact witness, however, will be able to provide testimony on what [redacted] included and the features that Charter was looking to incorporate into its systems at that time and whether [redacted] would have met that need. That's not saying it's necessarily comparable to the asserted patents in this case.

THE COURT: That also sounds like an opinion, whether [redacted] would have accomplished something is -- I don't know -- how can that be a fact issue since we're talking about hypothetical?

MS. ACHARYA: The fact would be what exactly was presented by [redacted] and what specifically Charter was looking for at that time.

THE COURT: But you don't have a technical witness who has offered that opinion?

MS. ACHARYA: Correct, your Honor. Because we are not contending that [redacted] is technically comparable. We are not including [redacted] as part of the damages calculation or the quantitative calculation. It's just additional factors to the Georgia Pacific analysis.

THE COURT: And why did you not have your expert address it as a non-infringing alternative?

MS. ACHARYA: I don't know the answer to that, your Honor. I -- we possibly could have, but we did not.

THE COURT: So as a result, there is no technical opinion that the [redacted] technology is an available or an acceptable replacement for what the plaintiff claims is patented?

MS. ACHARYA: Correct, your Honor. There is

no technical opinions in this case about -- about whether [redacted] proposal is comparable to the facts in this case.

THE COURT: Do you have anything to offer in terms of what was disclosed in the discovery process about the suitability of the [redacted] technology to perform what is accused in the current Charter system?

MS. ACHARYA: We produced the [redacted] proposal months in advance of Charter's PMA witnesses being deposed. There was not an interrogatory that would have been directed specifically to [redacted] because we do not contend it is a non-infringing alternative. ASSIA had deposition transcripts from the *Entropic* case where, for example, Roger Stafford was questioned on [redacted] Mr. Stafford is also -- was also deposed in this matter. And so ASSIA could have asked Mr. Stafford additional questions related to [redacted] but chose not to.

THE COURT: I guess my concern is it sounds like that is an end run around the requirements that the Federal Circuit has imposed on non-infringing alternatives. And why couldn't anybody just say this is not a non-infringing alternative, this is just a real world solution?

MS. ACHARYA: We just consider it to be another indication, another data point about what the market value of PMA to be.

THE COURT: All right.

MS. ACHARYA: And, your Honor, I will say to the extent the Court grants this motion in limine, as we discussed, it should also apply to ASSIA. ASSIA's founder Mr. John -- Dr. John Cioffi offered at his deposition testimony about unconsummated offers related to its products, patents, licenses to its patents that were offered in -- contemporaneously with the DZS proposal. And so we could say there is no evidence -- not no documents, nothing else has been proposed, the experts don't rely on it, that should also not be permitted to come out in this case.

THE COURT: And what specifically are you talking about in terms of an agreement there?

MS. ACHARYA: So before ASSIA sold its patents to DZS and also licensed its patents and products to DZS in 2022, it sold its patents -- licensed its patents and products for [redacted] to DZS.

At his deposition, Dr. Cioffi testified that he received at least one other informal offer that was [redacted] it received from DZS. He also testified that there were our offers that he received.

He said that the offers were received before -- he said that those offers, however, were received before the offer deadline and, therefore, ASSIA couldn't accept them because he had entered -- they had entered into an exclusivity period with DZS at that point.

But we have no documents, no other evidence of these our offers, and neither of the damages experts have offered any opinions regarding these offers. So as part of the motion in limine, should the Court grant it, we would say this is also -- this should also be excluded.

THE COURT: All right. I think that you have or there is another motion in limine that addresses that issue about what offers that weren't formally accepted are admissible. I don't think that all unconsummated offers are necessarily inadmissible. I think that, for instance, an offer by the plaintiff to license their asserted patents, even if not accepted, is something that could be admitted against the plaintiff to show what they contended the value was.

An offer by a third party to the plaintiff that offers some amount of money that's not accepted by the plaintiff, that is the sort of offer that I think is clearly not admissible because that third party is not at the hypothetical negotiation and we don't care what

they valued the patented technology at. Whereas, the plaintiff is going to be there, and if they have valued the technology, that's important.

But in any event, I need to know more than just that something is unconsummated to know whether it is properly admissible. So if there is a time -- is that something that was addressed in your opposition to the motion in limine?

MS. ACHARYA: It was, your Honor. And the reason why I can't provide any additional information is all we have is that testimony. They did not disclose this in any documents, in any interrogatory responses, and the damages experts don't identify this either. So it would fall under MIL Part 1 as well.

THE COURT: All right. But -- so I don't want to make a categorical ruling that just uses that term. But if what you're saying is you're addressing particular statements by Dr. Cioffi in his deposition about offers that he says he received that no documentation has been disclosed to Charter about, is that --

MS. ACHARYA: Agreed, your Honor. Yes, your Honor.

THE COURT: All right.

MS. ACHARYA: And it's at Page 4 in our

opposition brief in the paragraph right before Section C.

THE COURT: All right. All right. So the larger offers, you're saying that was the extent of the testimony, not who they're from or what they were, but just that there were larger offers?

MS. ACHARYA: Correct, your Honor.

THE COURT: All right. I will take that up as well. Thank you.

MS. ACHARYA: Thank you.

MS. GLAUSER: Your Honor, I'm not sure if you'd like to hear from me more on this, but we have the outstanding portion of even if it's stricken from --

THE COURT: Why don't you come up?

MS. GLAUSER: Thank you.

The third portion of the motion, which is that if the opinions of the expert with regard to relied upon agreements are excluded, then we are seeking motion in limine that Charter be precluded from offering those agreements into evidence or using them in argument during the trial generally. And the basis for that is, as an example, the Court's decision in *CoreLogic*, which establishes that as a threshold, no party may introduce an agreement until its comparability is established, and if the expert's opinion that the agreement is relevant

or comparable for purposes of the reasonable royalty analysis is struck, then there is no such establishment here and thus the agreement itself should not be presented to the jury or at least the consideration and value part of it.

THE COURT: I think that statement in *CoreLogic*, to the extent it is accurately quoted, is a little bit too categorical. I think if the plaintiff has testimony from the damages expert that the -- that the license or agreement can be applied to the current case, then it's not -- that agreement is not excluded just because it's up in the air whether the jury is going to accept his view of things. But if -- if what you're suggesting is that there has to be at least a sponsoring damages expert, then I think that's an accurate statement. But I will give the defendant a chance to respond.

But what -- so what I'm hearing then is that there is an agreement on the [redacted] agreements that are listed in your motion, that those are fair game. That the master service and license agreement between the parties is also fair game. I am going to rule on [redacted] in a moment. The -- and I'll hear the response to the -- by the defendant to the issue about whether if the Daubert motion is granted as to their

expert's analysis of any of these agreements, whether that disposes of the admissibility of the agreements.

What is your response to the request that the Court foreclose Dr. Cioffi's testimony about larger offers that were not accepted because of the exclusivity period with DZS?

MS. GLAUSER: In that instance, your Honor, the issue is that the assets that were transferred to DZS are indisputably products that practice the patent, and as a result, there is the fundamental, kind of, threshold satisfaction that it would be technically comparable if they practice the patents, according to defendant's own experts. And so there is a technical difference there, and Dr. Cioffi would just be testifying to the facts.

We do not intend to elicit that testimony, but to the extent that Charter questions Dr. Cioffi in a way that it did during his deposition, Dr. Cioffi should be permitted to provide the facts regarding its sale of assets to DZS, the process that that underwent, which was a request and solicitation for bids, and the bids that he identified in his deposition testimony. We were not seeking to go in response to questions beyond what he disclosed in his deposition, but those are proper fact issues, not expert opinion, and it indisputably

relates to comparable technology.

THE COURT: Do you dispute that you have not revealed any other information about who made those offers, what amount those offers were in, what documentation there was?

MS. GLAUSER: No, your Honor. We do not dispute that. The only testimony in the record is what Dr. Cioffi said at his deposition, which is why we would not elicit it or have him testify about it at trial.

THE COURT: Well, what I'm going to do on that point is just grant the request by the defendant that Dr. Cioffi not be permitted to testify about those larger offers unless you get leave of court first. And if you think they've opened the door, then approach and seek leave. But -- and I'm making this ruling on a nondisclosure basis that to the extent those are relevant, then there's an obligation on the plaintiff to produce documents and other information about it. I'm sceptical that offers of that size were made without any written evidence to support them. But in any event, that will be the ruling on that; that it not be mentioned by Dr. Cioffi unless you get prior leave.

MS. GLAUSER: Understood, your Honor. You said the request better than I did. Thank you.

There was one additional clarification. We

have the [redacted], plus the master license and service agreement between the parties. There is one other agreement that's not in dispute as being relevant, which is an agreement between Charter and one of its vendors Ookla. No party relies on it for purposes of damages, which is why we haven't brought it up as part of this MIL. But the reason that it's relevant is because [redacted] that they're doing it pursuant to a contract so that there's no issues of divided infringement or arguments regarding divided infringement in this case.

And so I just wanted to clarify on the record that that is one of the exhibits that the parties don't have outstanding objections regarding and would be admissible for the technical purposes. Neither side would be relying on it for damages purposes.

THE COURT: All right. If I do not hear to the contrary from Charter now, I will assume that that's not an issue on this.

MS. GLAUSER: Thank you, your Honor.

THE COURT: Thank you, Ms. Glauser.

So, Ms. Acharya, can you address the issue about whether there is any basis that an agreement that cannot be asserted by an expert or because of a Daubert

ruling -- how -- what is the basis that that agreement and its financial terms could be put before the jury without such support?

MS. ACHARYA: Your Honor, our argument is just that it's just premature. We want to see what the bounds of that order look like. If there was a certain aspect of that order where the Court said that a certain portion of that agreement is permissible but not others, that's our only position is that right now it's premature to exclude it and tie the ruling to the motions that are pending. We want to see how those orders actually shake out, but we do not intend to present, for example, fact witness testimony presented in opening, especially related to comparability or things like that, that would require expert opinions.

I will say, though, at least one of the valuations that -- one of ASSIA's valuations was actually given to Charter and would have been, you know, part of the information that Charter would have attached to it when it was evaluating ASSIA's proposal prior to the complaint. So it's a factual issue.

THE COURT: I understand that that would be a part of the factual record. But if the expert is excluded from talking about it, I don't know how that reason would not also apply to a fact witness. But what

I'll say on that -- this issue is that you should assume that if the expert's testimony about an agreement is stricken and there is not another expert that has testimony that has not been excluded on that agreement, that you should consider that this motion in limine precludes a fact witness from discussing that agreement with the jury, meaning that you need to seek leave if you think that the Daubert ruling should not carry over to the fact witness. And the Court will try to make that clear in any ruling that addresses whether an expert can -- can testify about a particular agreement because I understand the -- that issue.

The last thing I would like to address with you is this [redacted] I'm -- you've had some time. If you have come up with any other argument, let me know. But my inclination, otherwise, is to say that the [redacted] proposal is a non-infringing alternative and it's not been properly identified during discovery nor supported by expert testimony. And I don't think that any other use of it is proper.

So I'm -- I'm going to grant the motion in limine regarding the [redacted] proposal. And if you have other argument that you haven't had a chance to make, this would be the time.

MS. ACHARYA: No other argument, your Honor.

THE COURT: All right.

MS. ACHARYA: Thank you.

THE COURT: Thank you, Ms. Acharya.

That takes us to Motion in Limine No. 2. It --

MR. EISEMAN: Your Honor, could I approach? Could I approach the bench?

THE COURT: Certainly, Mr. Eiseman.

MR. EISEMAN: Just so that I can move this microphone down so that I can actually see you.

Thank you, your Honor.

THE COURT: I'll tell you what, we will take a ten-minute recess now and then come back and take up the remaining motions in limine.

(Recess taken.)

THE COURT: Thank you. Please be seated.

And we can take up the plaintiff's Motion in Limine No. 2.

MS. GLAUSER: Hello, again, your Honor. We submitted the parties' joint agreements and e-mailed to the Court indicating agreements that have been reached with regard to plaintiff's Motion in Limine No. 2 and No. 3.

THE COURT: And do you want to put that in the record at this time?

MS. GLAUSER: I would be happy to do that. But because we reached agreement, I want to make sure that I do it absolutely correctly. And so I want to pull up that e-mail to read it into the record. Rather than wasting the Court's time, if you'll permit us, we could move on to the next disputed motion in limine while I get that language. And before we go off the record, I'll make sure that we do --

THE COURT: And it is your understanding that that agreement resolves Motion in Limine No. 2 in its entirely?

MS. GLAUSER: It does. As well as No. 3.

THE COURT: All right. Then I'll be happy to go on. And, frankly, I don't have a problem if -- if the defendant is agreeable in just saying that the Court will incorporate the agreement from that e-mail into the ruling on the motion in limine.

MR. EISEMAN: Charter is agreeable with that, your Honor.

THE COURT: All right. And has that been forwarded to the Court?

Do we have that e-mail?

All right. I'm hearing we do, so that's fine. I'll consider that plaintiff's Motions in Limine No. 2 and 3 have been agreed. I'm not saying the motion

has been agreed to, but there has been an agreement reached and we'll incorporate that agreement into the ruling.

So that takes us to Motion in Limine No. 4.

MS. GLAUSER: Thank you, your Honor.

THE COURT: Good morning.

MR. ALBERTI: Good morning, your Honor. David Alberti on behalf of ASSIA. I'll be arguing ASSIA's Motion in Limine No. 4.

The issue in this motion is very narrow. Charter wants to tell the jury that DZS went bankrupt in 2025 and that that somehow suggests that the patents lack value. And I want to make it clear that we're not arguing that Charter should not be able to mention the sale of products to DZS -- ASSIA did that -- or the licensing terms. This is merely limited to not allowing Charter to use a bankruptcy of a large company that had many products in order to somehow taint the value of these patents.

And it should be excluded for many reasons. First of all, it's simply not relevant under FRE 401 and 402. The timing of the bankruptcy was, again, in 2025. With respect to a hypothetical negotiation, the dates that are relevant are November 2020 for the '398 and '313 patents and April '22 for the '654 patents. And

even more troubling and problematic is the fact that at the time of the bankruptcy, these products had already been sold by DZS to another company. So the idea that you could somehow tie the products or their commercial success to DZS's bankruptcy, it just simply doesn't play out. The timeline isn't there. Again, hypothetical negotiation, 2020 and 2022, sale of the products from ASSIA to DZS, 2022, and then in 2024, DZS then sold those products to another company called AXON. And then later in 2025, DZS files for bankruptcy.

THE COURT: Would you agree that Charter is entitled to offer evidence about the commercial success of the patent practicing products?

MR. ALBERTI: Absolutely. So our only request is that that not be tied to a Chapter 7 bankruptcy, which, obviously, is, you know -- can be emotionally charged. You know, it's a stigma and it's in no way related to the products themselves. And there is no dispute that the products that were initially sold practiced the patents. We're not saying that.

THE COURT: Is there evidence aside from the bankruptcy about the sales of those products that can be offered and relied upon without regard to the bankruptcy?

MR. ALBERTI: Of course. The terms in the

license. There's the amount that was paid. There's -- there's the amount that was paid by AXON. So all of that is perfectly fine, but to tie it to a bankruptcy of a company that had many, many products and didn't even go bankrupt until after the sale of these products, the risk of prejudice here greatly outweighs any probative value.

And even if you -- and I'll refer to our Exhibit E, which is a public discussion of the DZS bankruptcy, there were many, many problems that led up to that. And one of those problems was not the actual products it got from ASSIA. In that exhibit, it says ASSIA had strong products, but DZS faced challenges that were limited to synergies from it selling hardware. It goes on to say DZS also faced challenges with timing. The company acquired another company called Rift, as well as a vendor called Optelian. And then it goes on to say its business was geographically dispersed. There's also difficulties it had with a lengthy process to restate its financial results in 2022 and the first quarter of 2023. These -- these enterprise-wide issues had nothing to do with ASSIA's products. And so --

THE COURT: Is there evidence about those products and what the sales figures were for those while DZS owned them?

MR. ALBERTI: Well, there's certainly evidence regarding the sale of the license. As far as the specifics -- you know, and to the extent there are, we're not arguing that they can't put in evidence that says the product sold for this much and this was their revenue, that's perfectly fine. But then to go try to tie it to an enterprise-wide bankruptcy is extremely prejudicial.

THE COURT: And, Mr. Alberti, my question to you is just whether there is such evidence that you're aware of that -- that would reflect on whether the products met with success in the marketplace?

MR. ALBERTI: I'm not aware of any evidence that their expert is relying on regarding the actual success or failure commercially of those products as far as what, you know, DZS's sales were of those products. Certainly, the products were sold to another company, that's all fine. But there's zero evidence that somehow these products were tied to the bankruptcy, and that's really what this motion in limine is about, that they should not be able to tie the bankruptcy to the sale of these products.

THE COURT: Is there evidence about the consideration that AXON paid for the products from DZS?

MR. ALBERTI: As far as the specific amount,

I understood there was some evidence, but, again, not tied -- and we're fine with that. All that is not a part of this motion in limine. All we're saying is the stigma of the bankruptcy should not come into -- come into play here. And I would also note that this is very similar to the Court's standing MIL No. 13 that says that other litigations related to the parties should not come in. And this is -- a bankruptcy is another litigation proceeding, and not only is not related directly to the parties, it's related to a third party who had already sold the products-in-suit. So it's even more tenuous as far as relevance than any proceeding that the parties themselves were involved in.

THE COURT: All right.

MR. ALBERTI: That's all I have, your Honor.

THE COURT: Thank you, Mr. Alberti.

MR. QUIST: Good morning, your Honor. Trevor Quist on behalf of Charter.

So, first and foremost, I just want to lead with the fact that Charter is not trying to make this into a bankruptcy proceeding. We're not trying to have a side show where there's some, you know, investigation as to, you know, exactly what the financial position was of DZS when it went under. What we do think is highly probative and highly relevant is the pattern that this

failure represents.

This is a unique situation where unlike some of the cases that were cited in ASSIA's brief, where bankruptcy -- the bankruptcy really had nothing to do with the underlying claim or value and people were trying to -- you know, a party was trying to use bankruptcy as, like, a real zinger or a method of, you know, perhaps inflaming the jury in favor of one party or another. We have a really unique situation here, and the situation is that if -- actually, I'd like to show you a timeline, if you would allow me.

If we could pull the slide -- could I get Slide 6?

It looks like the slide on the screen is a little cut off on the board. Can you see it okay, your Honor?

THE COURT: Yes. My screen doesn't have it cut off. It's -- it is -- I'm getting my feed from the computer. So --

MR. QUIST: Okay.

THE COURT: I think it has everything.

MR. QUIST: Okay. As long as you can see it, we're fine. I want to just direct your attention to over here on the left. I just want to give you a timeline of events that helps tell a story, right?

On the left of the slide, you see ASSIA begins -- it's formed in 2003. It begins by filing some patent applications, and in 2005, it starts developing a product called Expresse -- DSL Expresse, right? That happens to be a product that implements features of the '996 patent that ASSIA has acknowledged but has since dropped out of the case. But in 2005, they developed DSL Expresse and begin to try to commercialize that product.

In 2011, the third line on the timeline, they develop another product, CloudCheck, okay, and that indisputably is something both parties have acknowledged practice the three patents that are still in the case, okay? So here is ASSIA in that time frame with two products practicing the very patents at issue in this case. And they're able to go and try to commercialize, and initially they have a little success and then it slowly fades as they get into 2020. By the time we reach 2020, there is a just a steady decline, and they're ultimately operating at a net loss. And they're, in fact, in violation of their covenant with investors about the ratio of the revenues to the debts that they're carrying.

So the investors lose faith in them, and they force a sale of ASSIA's assets. So ASSIA turns and

takes its operating company that's operating the CloudCheck and the DSL Expresse products and it sells them to DZS, okay? And along with that, it sells some patents -- not the patents asserted in this case -- but in order for the transaction to make sense, they had to license the very patents that are in this case -- license them to DZS. So fast forward to 2022, DZS now gets to take their turn to try and commercialize these patents, and they have the products themselves that practice the patents and they fail, okay?

The -- by -- in just a matter of a few years, they find themselves filing for bankruptcy in 2025, and, yes, it is true, they have the -- similar to ASSIA, when it reached financial struggles and started to liquidate, started to sell some assets, DZS does the same thing. Just before they go bankrupt, they sell -- they sell some assets, right? They -- they re-sell the CloudCheck product, the DSL product, and that operating business. So what we think is useful is the fact that they went bankrupt is a signal about -- to some extent, about the lack of commercial success of these products, right?

Commercial success is something that ASSIA, for its part, has its experts opine on. They have their experts -- I would like to use the elmo for just a second.

Is it number one here?

So this is a section in Dr. Kramer's report. It is cited directly in our briefing. And they go -- you know, they're not bashful about going right into showing the commercial success of the -- of the asserted patents by looking at Charter's financials. Hey, look at these -- look at these numbers, these show how successful Charter has been implementing these features. That exact same table there is shown in Dr. Dell's report, their damages expert's report as well.

So if ASSIA is able to show evidence of commercial success and point to Charter and really dig into it, look at the numbers, we think Charter should have every ability to say, hey, you know, here's a company DZS, they tried to -- they tried to market and sell these products and ultimately they couldn't and there's -- they ended up going bankrupt. And to the extent that there's a different story -- and you've heard Mr. Alberti give you some explanation that, hey, there's evidence about DZS -- there is different reasons about why they could have failed, right? There is different reasons unassociated with the patents. They're free to, you know, provide that counter-narrative if they want, but the fact that there was a failure here, we think signals that there's --

there is a different story to tell that --

THE COURT: Do you disagree that DZS had sold the patent practicing products before the bankruptcy?

MR. QUIST: I don't dispute that. They did just before sell the -- they sold, kind of, a bundle of products, including one of their own products, plus the CloudCheck and DSL Express that they had received from ASSIA in its earlier transaction.

THE COURT: So how is it even relevant that after they sold off the patent practicing products they entered bankruptcy?

MR. QUIST: Well, even that -- even the sale of the technology at issue in this case wasn't enough to pull them out of the financial situation and they still, even despite that, had to close down, right? Or had to file Chapter 7 bankruptcy.

THE COURT: I don't know that its uncommon for someone -- for a company to sell off their most profitable assets and then blackout the rest of the debt with bankruptcy.

MR. QUIST: And that may be so. I think that -- to, kind of, take a step back, it provides a data point, right? So there's -- if a kid doesn't finish his homework and the dog ate it, that's -- you might believe that the first time. The second time you

assert the question, there's a pattern that may develop. And we think that it's important to just recognize as this timeline reflects, that what -- ASSIA had the patents, they had the products practicing them, and they tried to commercialize them and failed. And even the limited success that they had was, you know, something that you could -- you could point to, but eventually the market taught them that it wasn't as valuable as they thought.

DZS, under different management, different investors tried its hand at doing the same thing. It didn't succeed. The easiest, quickest way to tell the jury, hey, it didn't work, they ended up filing bankruptcy and selling the assets.

THE COURT: Why can't you tell the -- the part of that story that is relevant by focusing on DZS's sales of the patent practicing products?

MR. QUIST: So we don't have the -- we don't have DZS's financials like at that granular level like that. I don't know what DZS's individual sales are.

THE COURT: How do you know that the bankruptcy was related to the patent practicing products?

MR. QUIST: On the sale of the -- the transaction with -- from ASSIA to DZS was on the -- on

the premise that they were going to sell the product and commercialize the product, right? And if they were able to do that as they had anticipated in 2022 when they picked it up, they -- I don't -- I think it is a reasonable inference to draw that they weren't planning to file bankruptcy in 2024 when they bought the assets in 2022, right? So they buy the assets fully intending to sell them; that's why they got the license from ASSIA in the first place to do that.

And the bankruptcy tells you, oh, it didn't work as planned. They weren't as successful as they thought they would be and they ultimately had to, kind of, offload the assets and file bankruptcy.

THE COURT: Has your damages expert opined that their bankruptcy was related to the poor performance of the patent practicing products in the market?

MR. QUIST: He's offered an opinion that this happened -- that this was an event that happened --

THE COURT: That doesn't sound like an opinion.

MR. QUIST: Well, he's offering an opinion -- a conclusion that, you know, can be drawn from this is there wasn't a -- wasn't commercial success based on that. But I think what you're trying to get at is, is

there some kind of, you know, financial document that shows how poor their sales of DSL Expresse or CloudCheck were that -- is that there, and the answer is no.

THE COURT: Frankly, that would be one thing. But I'm also asking does your expert use his economic expertise to analyze this bankruptcy and say it's related to the under performance of products that practice the patent?

MR. QUIST: Well, I think -- that's actually -- so there is evidence in just the very exhibit that Mr. Alberti pointed to. There's an explanation given in press releases and so forth why this failed. It does, indeed, talk about different reasons why they could have failed and that it was, you know, a difficult market or whatever the reasons may be that led to the poor performance. And so there's -- I think that -- to be fair, there is a story on both sides of this. There's two different narratives and really there's nothing from precluding ASSIA from presenting their narratives and there shouldn't be any restriction on us presenting our narrative. And the jury can have that information. They're welcome to, you know, explain to the jury that there's no indication that -- there isn't a financial document from DZS if they want to -- and this is something the jury is equipped to handle.

One of the things they mentioned in their briefing is, gosh, this is really complex and the jury might not -- might mistake -- might make mistakes. That's just inaccurate. We think the jury's perfectly equipped to be taking on complex issues like this. And, again, this is not -- we're not trying to have a bankruptcy proceeding here in the courtroom. We're trying to mention that, hey, this is a fact that happened, it calls into question a narrative that ASSIA is trying to portray, and we -- we think we should be able to say it.

THE COURT: My inclination is to grant this MIL with respect to testimony or argument about DZS taking bankruptcy after the sale of the patent practicing products, but to deny the motion with respect to other evidence about the performance of DZS's business while they owned and marketed the patent practicing products.

Is there some issue with respect to drawing that line that you think the Court needs to address?

MR. QUIST: I'm trying to just make sure I understand it. So, essentially, the --

THE COURT: The bankruptcy would be out.

MR. QUIST: Yeah. The word "bankruptcy" --

THE COURT: If there -- if there is evidence

about how DZS performed with the sales of those patent practicing products while they owned them, that evidence would not be affected by this MIL.

MR. QUIST: Understood. I understand.

THE COURT: If you think that there's something there, you have some evidence that may bridge that gap in some way that the Court needs to address --

MR. QUIST: Well, one last thing I'll say is there is a case we cited in our briefing called *Lab'y Corp. v. Natera,* okay? The Court took up, kind of, a similar issue here and -- and they drew a line somewhat similar to the line you're drawing and they said don't say bankruptcy, but you can talk about the overall financial performance of the company. And in that case, it was -- there was -- the -- there wasn't actually a bankruptcy that was public. It was some potential for a bankruptcy, right? And it would get too confusing. And one of the cases cited by the judge also -- or cited in the opinion was a case where it was just a -- sort of, a near bankruptcy position. And the line was drawn.

Here we don't have that. Here we just have an easy fact. It's public knowledge. You can look it up. DZS went bankrupt. That's a fact that we think the jury can absorb in the way that it absorbs and analyzes

the whole timeline. And in our view, the timeline can unfold into a story and they can -- they can evaluate that on its own terms.

THE COURT: I understand that. I just disagree with respect to the relevance of the bankruptcy. I think without a lot more evidence, there's not even a basis to decide that their bankruptcy is related to these products that they sold off the year before. But in any event, I think under Rule 403, there is a significant risk of unfair prejudice from the fact of bankruptcy that outweighs the relevance that these patent practicing products may have to that bankruptcy. But I understand your argument and certainly it's preserved.

MR. QUIST: Understood. Thank you, your Honor.

THE COURT: Thank you, Mr. Quist.

Is there something further about the line that the Court is drawing that the plaintiff wants to address before we move on to the next MIL?

MR. ALBERTI: No, your Honor. Thank you.

THE COURT: All right. In that case, we can turn to plaintiff's MIL No. 5.

MR. HAMILL: Thank you, your Honor. Andrew Hamill for the plaintiff.

And ASSIA's fifth and final MIL seeks to preclude evidence, testimony, or argument about Charter's patents, including the number of patents Charter owns and patents owned by third parties such as its vendor Plume. And at the outset, I want to make clear that ASSIA's position is that Charter can make a general statement such as that they own patents. We're not trying to preclude that level of statement. But the details of those patents or going beyond that and in particular the number of patents that Charter owns, which is over [redacted] patents and [redacted] pending applications, that's a big number. And none of that is relevant and it's highly prejudicial. And I would like to briefly address the lack of relevance and prejudice with respect to infringement, damages, and willfulness.

So with respect to infringement, I'll keep it brief since the parties seem to agree that Charter's patents are irrelevant. And in its opposition, Charter states that it does not intend to rely on its patents for non-infringement. But regardless of whether Charter explicitly relies on its patents to argue non-infringement, there's a high risk of prejudice. The sheer volume -- the number of patents, over [redacted] may confuse the jury into thinking that the accused products have patent coverage and therefore can't infringe

someone else's patents such as ASSIA's. And so I'll leave it with that with respect to infringement and turn to damages.

With respect to damages, the parties do dispute the relevance. And the number of patents that Charter owns is simply not relevant. The damages analysis is about determining the incremental value or contribution of the patented invention to the accused products, and Charter's patents are not probative to that analysis. Now, if Charter's experts had done an analysis of Charter's patents and determined that the accused products implemented those inventions and done a comparative analysis of the contribution of those patents versus ASSIA's patents, then maybe those Charter patents would be relevant. But none of Charter's experts performed that analysis.

And so at bottom, Charter's experts didn't do the homework necessary to establish that those patents are relevant.

THE COURT: You know, typically, Mr. Hamill the way I draw the line in terms of what evidence the defendant can offer about its own patents -- and we're assuming that they're not patents that have been elected as prior art in its invalidity case -- but is that the defendant's not allowed to offer testimony or argument

about specific patents. In other words, to identify a patent by name and talk about what it covers, but that the defendant is entitled to make reference to its own portfolio of patents in the field.

And you have identified an issue that I think varies from case to case and that is testimony about the specific number of patents that a -- that a defendant has. The case I can remember recently where that was excluded was a case about standard -- standard essential patents and the defendant in that case wanted to offer evidence that they had some large percentage -- 30 or 40 percent of the patents that were essential to that standard and that, I thought, created a risk that the jury would conclude that they didn't need to license any others, that they were invested enough in that standard.

What is it here that you're worried a jury would conclude assuming -- and I'm looking at what Charter has put in their opposition -- that they have [redacted], et cetera. What are you worried the jury would do with that that is unfair?

MR. HAMILL: So, your Honor -- and some of this has been addressed through ASSIA's motion to strike expert testimony, including Dr. Shoemake's opinions about the number of Wi-Fi patents and large number of

patents generally. And this is really related to that. We think that even Charter disclosing to the jury the number of patents that it owns, it leads to the same problem where the jury thinks that you may need to divide the value of the products by [redacted] or whatever large number of patents we're talking about. And in the case -- a recent case before this Court, the *Daingean Technologies* case, there the defendant wanted to talk about the thousands of 5G patents, but the defendant had not established that the accused products actually practiced those patents. And so that missing link meant there was not sufficient relevance or any relevance that would outweigh the significant prejudice because the -- I think that there's a very real risk that the jury will think, oh, there's all these other patents and they might all be -- they might think they're all equal and do some kind of division in the apportionment analysis and that's -- that's a highly prejudicial risk, if that's not what the damages analysis is supposed to be.

And on the point of that -- on the *Daingean* case, I would say Charter distinguishes that case by arguing that in this case both sides rely on Charter's patents and that's simply not the case. Mr. Dell does not analyze Charter's patents in his analysis, and I can

show the Court a paragraph from Mr. Dell's report that they cite. It simply makes a general statement that the analysis must take into account other technical contributions besides the asserted patents, but if no analysis has been done that those Charter patents actually provide a technical contribution to the accused products, then they're not relevant. The mere existence of these patents doesn't mean they're contributing to the accused products.

And so here we see Mr. Dell's discussion, and he makes the accurate statement that his analysis takes into account other technological contributions apart from the technologies provided by the accused patents, but those -- that category of other technological contributions doesn't include Charter's patents if there's no analysis that that makes that case and Charter hasn't done that.

THE COURT: Is this at issue in the Daubert about this expert?

MR. HAMILL: I don't recall if this specific -- well, we have a Daubert on the rebuttal damages expert from Charter, Dr. Becker, and his discussion of Charter patents.

THE COURT: But this is not an issue that's also raised in a Daubert motion? This -- the reference

to the [redacted] patents and the like?

MR. HAMILL: This specific [redacted] patents, I'm not sure that's within the Dauberts. There is a Daubert on Dr. Becker with respect to industry-wide patents. But we think that the same risk applies in terms of jury confusion and unfair prejudice. And so regardless of whether this specific item is part of the Daubert already, we think that that should also be excluded.

THE COURT: All right. I was inquiring only because additional context to see what the expert is trying to do with the number can be helpful, but maybe I'll hear that from counsel for Charter.

MR. HAMILL: And, your Honor, I'm happy to address this issue further. And there's also the issue of willfulness that I'd like to address.

THE COURT: Go ahead.

MR. HAMILL: Charter asserts in its opposition that the number of patents it owns and those of its vendor Plume are relevant to the willful analysis, and ASSIA's position is that those -- that information is simply not probative with respect to the willful infringement of the asserted patents in this case. And there's a case cited by defendants that I think is important to highlight. It's *Retractable Technologies v. Becton Dickinson*. And in that case, the

defendant acquired a certain technology from someone else and that included acquiring patents for that technology and that was done for the purpose of developing a product. And that was the accused product in that litigation.

And so in that case, the defendant's patents were directly relevant to the product developed in the story. Here, again, for the same reason that I've mentioned before, Charter hasn't done that analysis. It hasn't set forth that it was doing certain research and development that led to certain patents that it incorporated into the accused products. It's simply trying to throw this number out there, which is highly prejudicial.

THE COURT: Well, *Retractable* dealt with actual evidence of the patents, not just a number of patents, right?

MR. HAMILL: That's correct, your Honor. There was a real analysis of how the patents fit into the development of the accused products and that's totally absent here.

THE COURT: But the defendants aren't trying to introduce evidence about particular patents that they own; they're just wanting to offer some testimony about the scope of their portfolio?

MR. HAMILL: Well, with respect to the Daubert on Dr. Shoemake, there is some discussion of categories of patents but with no analysis of whether they're actually incorporated into the accused products. So we think a MIL is appropriate because this is -- through its expert reports, we think there is a risk that Charter will attempt to do -- to do that.

THE COURT: So give me an example of the defendant's experts relying on particular patents of Charter.

MR. HAMILL: Well, in their opposition, Charter does make reference to Dr. Shoemake's report. And so I can put Exhibit 19 from the defendant's opposition up. Here defendant's technical expert Dr. Shoemake states that there are hundreds of thousands (if not millions) of patents that relate to Wi-Fi technology, including many that Charter owns or licenses. And so there's a discussion of a category of technology and a massive number of patents, which is highly prejudicial, without a real analysis as to how they relate to the specific accused products.

And then if you -- further down in this paragraph, there's discussions of certain patents in more detail -- specific patents owned by Plume. So, for example, there's patents that describe and claim

technologies relating to secure and seamless handover between cellular and Wi-Fi networks and specific patents that are cited by Bates numbers. And then there are more examples in that paragraph, Wi-Fi optimization and data gathering, and I think six patents are specifically identified there and that continues in the report.

THE COURT: And so you are seeking to exclude references to Plume's patents?

MR. HAMILL: Yes, your Honor. That's addressed in the Daubert and as well as here we believe that discussion of Charter patents and third parties, including its vendor Plume, that should all be excluded.

THE COURT: And is there any discussion of the actual individual patents other than the citation to Bates numbers?

MR. HAMILL: This is the sort of discussion that continues. So, for example, categories within Wi-Fi technology and then the identification of specific patents. That's -- that's the pattern of Dr. Shoemake's --

THE COURT: All right.

MR. HAMILL: -- discussion.

THE COURT: Anything else, Mr. Hamill?

MR. HAMILL: No, your Honor.

THE COURT: All right. Thank you.

MR. HAMILL: Thank you.

MR. LEVINSTEIN: Good -- it's still morning? Yes. Good morning, your Honor. Matthew Levinstein for Charter.

A lot to respond to. I think a good place to start is to be clear about what testimony Charter will not elicit. So, number one, we're in agreement we are not going to use Charter's patents or Plume's patents as a defense to infringement in any way. We're not using Charter's or Plume's patents to back door an invalidity argument. That's off the table. And to be clear, because I think there is still a little bit of confusion about this, Charter will not elicit testimony about the technical details of any particular Charter or Plume patents that its experts don't rely.

I want to, kind of, clear the table on this to begin with. So there won't be any comparisons of claim language to Charter's or Plume's patent portfolios obviously other than what's been disclosed by the experts. There's no risk of frolic or detours from the jury's principal task here of comparing the claims to the accused products.

THE COURT: And when you say "except as stated by the experts," what have the experts said about specific Charter or Plume patents in any context?

MR. LEVINSTEIN: Sure. Not a whole lot, your Honor. And that goes to what Charter's intent here is. The intent is not to create confusion over what it is that the jury has to do here in this case when deciding it for jury question. All that Charter wants to do with this evidence and all it wants to do is rebut ASSIA's willfulness and their damages claims. And --

THE COURT: How does this relate to the damages claim?

MR. LEVINSTEIN: Sure. I won't belabor the point of what the goal is in the reasonable royalty analysis, but it is helpful to know -- in fact, it's essential for the jury to know -- that Charter would bring certain facts to the hypothetical negotiation; one is the fact that it has a patent portfolio and it owns [redacted] patents --

THE COURT: So are you saying that the royalty should be less for somebody with a big portfolio than it would be for somebody -- some defendant who didn't own any patents at all?

MR. LEVINSTEIN: It's possible. But what I'm saying is, is that we should -- we, Charter, should have the opportunity to meet ASSIA's experts where they're at on the discussion of Charter and Plume's patent portfolios.

So, for example, ASSIA's damages expert Dr. Dell, he concedes that Charter's independent technological contributions that are unrelated to the asserted patents, he says that places downward pressure on the royalty for advanced Wi-Fi and PMA. And that comes straight from his report. And I think you can find it at -- it is Docket 307, Exhibit 17. And he says: Additionally, my analysis also takes into consideration the contribution that Charter provides to sales of the relevant products, including capital expenditures, sales and marketing, as well as other technological contributions apart from the technologies provided by the asserted patents.

He goes on to list a few more factors and then to sum up -- and this is in his Georgia Pacific Factor 13 analysis -- he sums up and says: These factors would tend to have a downward influence on the negotiated royalty payment.

THE COURT: And, obviously, the technical contributions of Charter are not tied to its patents. If Charter is using technology that's not in the asserted patents, it doesn't really matter whether Charter got that technology patented or not. It's the fact that it's not coming from the asserted patents, right?

MR. LEVINSTEIN: I think that's a fair point, your Honor. I would say that there is a possibility that some of it was patented by Charter. I think that's certainly a possibility here. But I think that sidesteps the issue. The issue is that it could be, and it's something that ASSIA's damages expert took into account. And we should have the opportunity to explore that with that damages expert and see what the response is. And the only way we can do that is by introducing evidence of other technology that is unrelated to the asserted patents that may also implicate Charter's and/or Plume's patents itself.

THE COURT: And clearly you can question the experts about any technology that is not within the scope of the asserted patents and yet is in the accused products. You can question them all about that. Why does it matter whether Charter has a patent on that technology or not?

MR. LEVINSTEIN: Well, it matters because that's information that Charter would have brought to the hypothetical negotiation.

THE COURT: They bring everything to the hypothetical negotiation.

MR. LEVINSTEIN: Sure.

THE COURT: I'm asking how is it relevant.

MR. LEVINSTEIN: Sure. Well, I think a party that comes to the hypothetical negotiation without a patent portfolio comes to that negotiation with a different understanding of its leverage and its power over that negotiation itself. And, again, that's what their expert --

THE COURT: Okay. I don't see how unrelated patents -- patents that don't apply to the accused technology -- how that gives you more bargaining power at the negotiation.

MR. LEVINSTEIN: Well, your Honor, I think it's in the concepts of a hypothetical negotiation where you have two parties coming together, Charter is going to come with full knowledge of what's happening in the entire technological space with its understanding of its technological contributions, which may be associated with its patents and perhaps otherwise. And I think all of that is relevant to what we bring to the table, your Honor.

THE COURT: Well --

MR. LEVINSTEIN: So there was another point that your Honor raised about a previous case excluding the number of patents on the basis of standard essentiality. And that's exactly what the *Daingean* case that my counterpart raised earlier, too. So there I can

understand the concern where damages are calculated on the basis of ratios of patents owned by certain entities relative to the total number of patents. There could potentially, depending on the circumstances, be an opportunity for confusion or unfair prejudice.

Here, of course, that's not the situation at all, as your Honor pointed out. And I heard numerous times that there is still prejudice of the jury possibly doing some type of calculation like that, but, I mean, that's -- that to me is not an unfair prejudice if they have an opportunity to explain to the jury through the damages expert through cross-examination and ultimately through closing arguments what the jury is or is not supposed to do with the damages number. I still haven't heard any articulation of unfair prejudice that substantially outweighs probative value here.

THE COURT: Mr. Levinstein, I am thinking about carving from any ruling on this MIL the two statements that are mentioned in your opposition relating to the numbers of patents. Those are on Page 13 of the motion. You quote your expert Shoemake as saying: There are hundreds of thousand (if not millions) of patents that relate to Wi-Fi technology, including many that Charter owns or licenses.

I think that may fall within the fair side

of -- of the issue on that. And there is -- on the next page, Page 14, there's a statement about Dr. Becker saying that Charter's robust patent portfolio holds [redacted] patents in so many families, et cetera.

Are there other statements about Charter's portfolio that you intend to offer to the jury?

MR. LEVINSTEIN: No, your Honor.

THE COURT: All right. Well, my inclination is to grant this MIL with respect to reference to specific Charter or Plume patents, but carve out what I just mentioned as being general evidence. And I do think that frankly the fact that there's a willfulness claim in this has an effect on my belief that you're entitled to include these kinds of statements in your defense. And I don't know that I would feel that way in a different case if there wasn't a willfulness defense. But if you have other argument about that, this would be the time.

MR. LEVINSTEIN: So if I'm understanding your Honor, it would be denied except for --

THE COURT: It would be granted as to any evidence about specific patents of Charter or Plume, but denied as to the general statements about the portfolio that we just discussed.

MR. LEVINSTEIN: Understood. Thank you, your

Honor.

THE COURT: Thank you, Mr. Levinstein.

And I'll give the plaintiff the last word on their Motion in Limine No. 5.

MR. HAMILL: Thank you, your Honor.

Mr. Levinstein stated that at the hypothetical negotiation the number of patents is relevant because there is a possibility that the accused products used those patent, and it's ASSIA's position that a possibility is too tenuous a link to relevance when there is so much unfair prejudice or risk of --

THE COURT: I agree with that. And I'm not relying on that approach at all.

MR. HAMILL: And so the -- for the number -- the very large number of patents, they're assuming hundreds of thousands (if not millions) and the [redacted] Charter patents, that -- there's a real risk the jury's going to -- there's so many patents, each one must only be worth a little bit, when there's been no analysis of these millions or hundreds of thousands or [redacted] patents.

And so -- so there the unfair prejudice greatly outweighs the -- what's really very small probative value, this possibility that they're actually relevant in the reasonable royalty analysis.

THE COURT: And I don't think that the argument is that all of these patents are part of the accused products. I think it is just a fair way for Charter to put in context their relationship to intellectual property given the fact that there's a claim that they're willfully infringing. But I understand your argument, and I will try to delineate the line as well as I can in the ruling on this MIL. But it will be granted in part and denied in part.

MR. HAMILL: I understand, your Honor. Thank you.

THE COURT: All right. Thank you, Mr. Hamill.

And we will go ahead and break for lunch at this time. And we'll come back and take up the defendant's motions in limine and proceed right into exhibits if both sides are still inclined that way.

MS. GLAUSER: That sounds wonderful, your Honor. Thank you.

THE COURT: All right. I have the -- what we have come to call, unfortunately, the bucketized list that was e-mailed out, and I'll assume that's accurate. If there has been any further progress on that, you can e-mail us any updates. But we'll go ahead and be in recess until, let's say, 1:30.

Thank you.

(Recess taken.)

THE COURT: Thank you. Please be seated.

And I think we are ready to pick up with the defendant's motions in limine.

MS. ACHARYA: Good afternoon, your Honor.

THE COURT: Good afternoon.

MS. ACHARYA: Charter's Motion in Limine No. 1 seeks to exclude evidence, argument, testimony, or suggestion related to the litigation between *Entropic* and Charter, the settlement agreement that resulted from that *Entropic* litigation, any deposition transcripts, exhibits, or other materials from the *Entropic* litigation and also a separate litigation between Charter and *Ubee* related to indemnification from that *Entropic* settlement.

As an initial point, everything related to the *Entropic* litigation should be excluded under the Court's standing Motion in Limine No. 13, which excludes and says the parties should be excluded from introducing evidence, testimony, argument regarding another -- either party's other litigations. So we think both of these fall squarely within MIL 13.

The *Ubee* litigation, I would say, also falls within the Court's standing MIL No. 27 because it

relates to indemnification. But even setting aside the Court's motions in limine, the *Entropic* litigation is just different and there's really no reason to deviate from those standing motions in limine for these cases.

THE COURT: What is the overlap, if any, in terms of patents between *Entropic* and this case?

MS. ACHARYA: There is no overlap, your Honor. There is no asserted patent that has been or is asserted in this case that was asserted in *Entropic*.

THE COURT: And has any expert opined on the technical comparability of the ASSIA patents and the *Entropic* patents?

MS. ACHARYA: Yes, your Honor. Both experts opined on -- let me strike that. ASSIA's expert has opined on the technical comparability related to one of the *Entropic* patents that was at issue and the '313 patent that's at issue in this case.

THE COURT: And what is the opinion?

MS. ACHARYA: The opinion of ASSIA's expert is that it is comparable technically, but the damages expert says it's not economically comparable.

THE COURT: All right. And is that opinion that one of the asserted patents is technically comparable to one of the *Entropic* patents, is that opinion under attack?

MS. ACHARYA: No, your Honor.

THE COURT: All right.

MS. ACHARYA: Meaning our technical expert, I don't believe provides an explicit opinion regarding technical comparability because both damages experts don't disagree that there's no economic comparability. And I will note when the '996 patent was in the case, that patent -- the '996, as I alluded to earlier this morning, has to do with downstream PMA. The *Entropic* case also has to deal with downstream PMA.

Downstream PMA is now no longer accused. It is not accused of infringing the '313 patent. There are no technical opinions saying that downstream PMA infringes the '313 patent. And there's no damages opinion tying the damages in this case to downstream PMA.

THE COURT: So your position is that the asserted patents do not claim in any way downstream PMA?

MS. ACHARYA: Correct, your Honor. And ASSIA has not asserted that any of the asserted -- currently asserted patents relate to downstream PMA.

THE COURT: And is it your expert's position that the *Entropic* patents related only to downstream PMA?

MS. ACHARYA: I don't believe our technical

expert has taken an opinion on that position, but I also don't believe that ASSIA's expert have taken a position one way or the other on that. The difference on the downstream versus the upstream really became -- came to light when we dropped the '996 patent because before that both were at issue in the case.

THE COURT: All right.

MS. ACHARYA: The differences are pretty stark. There is -- the *Entropic* litigation, it involved four separate lawsuits. *Entropic* asserted 21 patents against Charter, [redacted]

The prejudice, though, to Charter is pretty great in this case. ASSIA wants the *Entropic* litigation in this case to be brought in front of the jury because the settlement agreement that resulted as a part of that litigation resulted in a [redacted]. That number, if presented to the jury, can really inflate the jury's horizon of damages in this case. The other concern is that it would also introduce evidence of four lawsuits, 21 asserted patents that Charter was accused of infringing leading to potential inferences that

Charter is a serial infringer, and the prejudice here is even more compound because ASSIA doesn't plan to just talk about the settlement agreement.

It actually plans on presenting evidence of what its experts in *Entropic*, such as its damages expert, what his damages opinions were in the *Entropic* case. So they not only want to provide his opinions in this case, but they also want to introduce Mr. Dell's damages opinions in that case.

Mr. Arndt, if you put up Slide 14 for me, please?

And, your Honor, I'm not going to go into a lot of detail on this because this is also detailed in our Daubert motion. But as you can see, this is from Mr. Dell's expert report where he shows the damages that -- his damages opinion -- so this wasn't damages that were determined by a jury or it's not related to the settlement agreement -- but he wants to show the jury his damages opinions from *Entropic*. The '682 patent that's here is the damages that he claims were related to the PMA patent that's at issue in *Entropic*. But that patent has nothing to do with this patent in this case, the '313 patent.

And so that's going to lead to a separate inquiry now distracting from the issues in our case as

to whether or not those damages numbers are sufficiently sustainable and whether they're correct, whether they're reliable, what is the basis for that. All of this -- all of these really large numbers here, plus the settlement agreement, is incredibly prejudicial to Charter. On top of that, that prejudice that we're looking at here, isn't outweighed by any probative value that ASSIA has actually pointed to in bringing up the *Entropic* agreement.

Mr. Arndt, if you could put up Slide 15 for me, please.

Dell concedes -- I'm sorry. Mr. Dell concedes that the *Entropic* settlement is not economically comparable, and because it's not economically comparable, under *CoreLogic*, we can't introduce a settlement amount without first establishing comparability -- economic comparability, so we don't think it should come in because of that.

If you could move to Slide 16 for me, please.

Because there's no economic comparability, ASSIA and its experts admit that it's not relying on the *Entropic* settlement to set a royalty range. That's agreed.

If you can move to Slide 17 for me.

Instead, all they're relying on *Entropic* for

is to say that Charter had a willingness to pay for PMA. ASSIA has admitted this. Charter's experts have admitted this. That seems like a categorical observation, which is similar to what we were talking about with respect to ASSIA's MIL No. 1 with respect to what Mr. Becker was relying on with respect to saying he reviewed agreements to come to the conclusion that a lump sum royalty would be the appropriate form of the royalty for this case.

Similarly, we don't think that ASSIA or its damages experts need to bring in this highly prejudicial information regarding the *Entropic* litigation, the damages in *Entropic* settlement, any of those facts to establish that Charter had a willingness to pay for PMA. Just like Mr. Becker -- just like Dr. Becker, Mr. Dell can just say he reviewed agreements and it's his opinion based on reviewing those agreements that Charter had a willingness to pay for PMA.

This case -- the facts in this case related to *Entropic* and exclusion are very similar to the facts in the *Optis v. Apple* case.

If you could turn to Slide 18 for me, please.

The facts in the *Optis* case are nearly identical to this case. Both involved a settlement agreement that had very large settlements that could

prejudice the jury. The settlement didn't involve any asserted patents in either case. The settlement was derived at the eve of trial. And it wasn't just to resolve a single case, it was a global resolution of litigation. Same on both cases. And in both cases, the experts agreed that there wasn't any economic comparability.

And in that case, the Federal Circuit agreed and remanded the case back down finding the prejudicial nature outweighed any probative value that the plaintiff had set forth.

I'll also note our MIL also seeks to exclude the documents, exhibits, and, for example, depositions from *Entropic*. ASSIA seeks to -- has designated transcripts from *Entropic* from two witnesses, Mr. Roger Stafford, who I mentioned earlier may be coming to trial, and Mr. Williams. Mr. Williams, ASSIA never sought to depose in this case. There were very specific deposition limits in this case, 17 hours. They were getting very close to that limit. They made certain decisions as to witnesses they were going to take, witnesses they weren't going to take. They made certain decisions about how much time to spend with witnesses. Our position is they shouldn't be able to circumvent those limits by bringing in deposition transcripts and

designations from another case which we've now established relates to a technology downstream PMA, which is no longer asserted in this case. They should be limited to what they actually deposed their witnesses on.

Switching slightly now to the *Ubee* case that they want to raise. I think all these arguments apply with even more force with respect to the *Ubee* litigation. *Ubee* was an indemnification case. It followed *Entropic*. Charter sought indemnification from it's equipment suppliers, one of which was *Ubee*, for the cost of Charter's legal defense and settlement from the *Entropic* litigation. Because *Ubee* refused to pay for its contribution in the *Entropic* -- for the *Entropic* litigation, Charter filed a lawsuit against *Ubee* to enforce those contractual obligations that Charter and *Ubee* had.

In that lawsuit, Charter sought indemnification for two of the four *Entropic* litigations and that's because *Ubee* as a supplier was implicated in two of the four. ASSIA wants to introduce evidence from this *Ubee* litigation. Charter's -- I'm sorry. ASSIA's expert Mr. Dell relies on the *Ubee* litigation to form his own opinions about the value of PMA based on the amount of money that Charter sought from *Ubee* on two of

those litigations.

Mr. Arndt, if you could move to slide -- sorry -- Slide 20 for me.

The issue here is that when we open up *Ubee*, this is now talking about -- we're now going to have to talk about indemnification, which is now against the Court's standing MIL 27. We're going to have to explain why Charter only sought indemnification for two and not four of the cases. We'll also have to explain that *Ubee* was not just the only indemnifier. There were a number of other suppliers. And we'll have to justify why Charter sought a certain amount of money from *Ubee* in this litigation and how that amount of money doesn't tie directly into the value that Charter places on PMA.

So we're not only going to be talking about the *Entropic* settlement agreement and why that doesn't relate to this case, we're now going one step further to explain why *Ubee* doesn't relate to this case and bucking what Mr. Dell relies on with respect to *Ubee*. That is our concern here. And we don't agree with Mr. Dell's opinions related to *Ubee*. There's a number of issues with respect to his opinions, and this is going to, again, further confuse the jury, relate to other issues, create a trial within a trial about other litigations that we just don't think are relevant here.

And I'm happy to answer any question the Court has. Otherwise, I have nothing further.

THE COURT: So at issue on this MIL is this first issue about whether any mention of the *Entropic* litigation should be allowed. Then there's the issue, if it is allowed, what about the depositions taken in the *Entropic* litigation of certain witnesses that the plaintiff wants to use, and then there is this related issue about the *Ubee* litigation and the reliance on that by Mr. Dell. Is that --

MS. ACHARYA: So just so I have it clear, it's any mention of the *Entropic* litigation. Then there's also this settlement agreement between *Entropic* and Charter, and then, yes, the deposition transcripts, exhibits, and other materials from the *Entropic* litigation, and then the litigation between Charter and *Ubee*.

THE COURT: In their opposition, the plaintiff refers to -- I guess they're e-mails -- but, anyway, communications within Charter that the plaintiff contends show the value or importance that Charter placed on PMA technology.

Why wouldn't those be something that could be properly used without reference to *Entropic*?

MS. ACHARYA: So the issue comes down to the

downstream versus upstream. And I'm happy to talk about it now, but we also have exhibit objections, too, that, kind of, go directly to this point. But because downstream is no longer accused, we don't believe those are relevant. And the issue here goes beyond just relevance. It's actually highly prejudicial.

So while downstream PMA and upstream PMA do share some technical overlap, I don't think we dispute that, there is vastly different perceptions of value both to Charter and the customer. And to explain this a little bit to -- to make it more clear, when we're talking about upstream and downstream communications, we're talking about downstream being, for example, if a customer streams a movie, streams, like, a large video, upstream is make the request that the customer makes to the cloud saying searching for a specific movie.

The amount of data in general that's required in the upstream is much less than the amount of data that's required in the downstream. Customers in general put a lot of value into downstream because taking my movie example, you don't want -- you don't want a movie that's choppy. But, for example, if it takes a little bit longer to get a response back on your query from the internet about what movie to watch or whether a movie exists on a certain platform, if that takes a little bit

longer, that's not valued -- that's not as much an issue for a customer as having a chopper movie. And because the amount of data required for downstream is so much larger than the need for the upstream data, operators such as Charter put a lot more emphasis on the spectrum and dedicate more spectrum to the downstream than they do the upstream.

So when you apply PMA to the downstream, you have the potential of getting a much larger value than you do in the upstream. And so there are documents out there that -- from *Entropic* that relate to downstream that talk about the value to Charter being [redacted] that value does not translate to the upstream. [redacted]

So our concern is that if you start presenting the jury with the really large values of

downstream that doesn't accurately reflect the value of upstream, you're going to prejudice the jury against Charter again in terms of the damages in this case.

THE COURT: And are you saying that there is no real doubt whether a particular technology relates to the upstream or the downstream?

MS. ACHARYA: I apologize, your Honor. I'm not completely following.

THE COURT: My question is: Is it always clear whether a particular technology relates to upstream or downstream or both?

MS. ACHARYA: So it might not. Sometimes it could be referred to as both. I will say, though, with respect to the specific exhibits that ASSIA plans to show to the jury in this case -- I can show you where when we go through the exhibit objections -- where it's very clear that we're talking about downstream and when we're talking about upstream. And for situations where there's certain documents that talk about both, we've proposed to ASSIA that we just redact what the downstream portion is but keep the upstream. And where it refers to both -- for example, the technology is referring to both, we're generally okay with that being presented to the jury. The issue is when we're talking really about the value that's attributed to downstream,

those are the numbers that are going to be really prejudicial to us.

THE COURT: All right.

MS. ACHARYA: Thank you, your Honor.

THE COURT: Thank you, Ms. Acharya.

MS. GLAUSER: Good afternoon, your Honor.

I think the easiest place to start with this is to address the idea that *Entropic* first only involved downstream and not upstream, that is incorrect. What was alleged there in the damage model was based on both upstream and downstream PMA. In addition, the overlap between the two cases, it's not just generic PMA, the asserted PMA that Charter deploys is at issue here. So our case is now exclusively focused on upstream, but that does not make the *Entropic* litigation irrelevant.

In addition to that, as a general matter, in this case, Mr. Dell has calculated his damage model by looking at Charter's documents and how Charter itself valued PMA. And the original valuation that Charter did related to downstream PMA because that's what it was rolling out first. Later in documents, Charter discusses the fact that the benefit for upstream PMA is the same as, if not greater than, the downstream benefit. And as a result, when Mr. Dell was calculating damages with regard to downstream PMA, he relies on that

valuation, that will no longer be an issue in this case. But then when he's evaluating the reasonable royalty and the rate with regard to upstream PMA, he relies on those same Charter valuations, the one that Charter said we would save X capacity, it would result in Y dollars of profit to us, and later says and the gains would be the same with regard to upstream that we calculated for downstream.

If I can pull up this document. This is the -- one of the primary ones on which Mr. Dell relies. I don't know how -- can you see that, or is that incredibly blurry for y'all?

THE COURT: No. I can see it here.

MS. GLAUSER: Okay. And you'll see here this was a Charter document that was produced in this case in which Charter itself says: MSOs realizes that increasing the capacity in the upstream is just as important as increasing the downstream capacity. Another benefit of PMA, besides maximizing the downstream capacity, is that the same techniques can be applied to the upstream -- can be applied to the upstream path by also operating the OFDMA channels in the same closed loop way. While this is effectively a second control loop operating independently of the downstream controllers, it offers the similar net gains

in capacity. And this is the starting point for Mr. Dell's analysis for upstream capacity gain. It's also why reference to the *Entropic* agreement becomes relevant.

In *Entropic*, Charter settled for [redacted] It contemporaneously with entering into that settlement agreement discussed amongst itself that that settlement permitted it to move forward with PMA. In particular, the upstream PMA that is now at issue in this case, that was rolled out after the *Entropic* settlement.

As a result, we believe that ASSIA should be able to present to the jury not the details of the *Entropic* litigation. We fully intend to abide by the Court's standing MIL and not get into the claims that were at issue or the defenses that were at issue in that litigation. But we don't believe that that standing MIL is meant to exclude a comparable license merely because it's a settlement license. And net payment by Charter for PMA is relevant to Charter's willingness and valuation of the same PMA that's at issue in this case.

THE COURT: And why doesn't your expert opine on the technical comparability and find that the [redacted] is -- is comparable technically to the plaintiff's technology?

MS. GLAUSER: He does not, but our technical expert does.

THE COURT: Well, that --

MS. GLAUSER: Our technical expert offers the opinion that the PMA technology at issue here and the PMA technology at issue in [redacted] are technically comparable.

THE COURT: And tell me who is that and where would I find that? Is it in your opposition to the motion?

MS. GLAUSER: I believe that it is, your Honor. Our technical expert is Shukri Souri -- Dr. Souri. And I think we have the paragraph pulled up, if I can switch our display here. So this is from Dr. Souri's report.

THE COURT: Okay.

MS. GLAUSER: In which he begins by saying, one, that he was involved in the *Entropic* litigation and has personal familiarity with it. And that the patents within the [redacted]

[redacted]

And then Charter's counsel said: These conclusions have not been challenged in the Daubert; that there is no dispute that ASSIA's expert has contended that they are comparable and there is no real opinion from Charter that disputes it, nor could there be. It relates to the exact same accused technology. Mr. Dell then, relying on Dr. Souri's technical analysis, concludes that the [redacted] is relevant to the hypothetical negotiation here. He does not say, contrary to what Charter paraphrases his paragraph to be, that it is not economically comparable. There was a little bit of double negative there.

But the point being, Charter contends that Dell's testimony is that the *Entropic* agreement is not comparable. He has never said that. What he acknowledged is that there are economic differences. And for him, the analysis on that is that there would have been a litigation discount, unlike the hypothetical negotiation in which infringement and validity are presumed. In the *Entropic* litigation, there was some litigation risk and a discount because Charter was disputing infringement and validity.

And so as a result, he uses the [redacted]

[redacted] as a demonstration of the minimum amount of value that Charter would attribute to the exact same PMA technology that's at issue here. And he does so using Charter's own e-mails and then an allocation using the *Ubee* litigation. We have indicated that we do not intend to offer and would be fine doing a redacted version of the Charter statement in the *Ubee* litigation or otherwise a stipulation that effectively calls out that Charter has attributed [redacted] of the settlement amount in *Entropic* to the action that involved PMA. As they said, there were two actions that were at issue, but they have attributed [redacted] -- it may have been more than that. The one action that involved PMA, they have attributed [redacted] of the settlement amount to that particular action. And that's relevant because for purposes of allocating, just as the Fifth Circuit requires, what portion of the agreement would be relevant to this negotiation, that [redacted] is Charter's own statement.

Now, it happens to be the only way that we found out was from a public court filing. They didn't produce any of the underlying analysis at which they arrived at that [redacted] so we were left to only rely on the litigation statements. We do not intend to offer anything else about the *Ubee* litigation.

THE COURT: You know, the position on comparability was complicated for me by the fact that your arguments seemed to focus on the *Entropic* litigation involving the same accused PMA technology. It doesn't matter as far as I can see whether they're accusing -- whether it's the same accused technology. It's a question of whether the patents -- the ASSIA patent and the *Entropic* patent are comparable, whether they're claiming the comparable parts of the accused technology, not whether they're both attacking the same technology.

MS. GLAUSER: I did not mean to brush over that. And to the extent that I highlighted one versus the other, this portion of Dr. Souri's opinion that is still being displayed is the technical opinion that the IP, the patents that were at issue in *Entropic*, are technically comparable to the patented inventions, including the '313 inventions. And there has been no challenge about technical comparability here. Charter hasn't offered an opinion disputing that the *Entropic* PMA patent is technically comparable to the '313, and our expert has offered an affirmative opinion that it is.

As a result, the only evidence in the record is that the patent at issue in *Entropic* that related to

PMA is technically comparable to our '313 patent. Even if the issue were in dispute, there's nothing in a motion to strike or in a Daubert, nor could there be, that undermines or suggests that Dr. Souri's conclusions about technical comparability are irrelevant.

THE COURT: Frankly, I just don't see argument about Dr. Souri's opinion in your response. And that's why this is unexpected to me.

MS. GLAUSER: I think the reason it's not in the response is because it's not an issue that's really in dispute. There is no doubt that Dr. Souri, as we've displayed, concluded that it was comparable. And then if I could put up Dell's opinion, he here at Paragraph 238 relies specifically on that technical comparability analysis and says that he understands Dr. Souri has concluded -- it's his opinion that the intellectual property within the *Entropic* agreement is indeed technically comparable to the '313, as well as the not at issue '996.

THE COURT: All right.

MS. GLAUSER: And unless your Honor has additional questions about the settlement agreement itself, I would also very quickly address the 30(b)(6) deposition testimony that we've designated to potentially offer at trial.

THE COURT: What -- do you have a case where a significant settlement agreement like this was admitted based on the idea that it provides context? It's -- I mean, this is similar to what I have seen damages experts described as a reasonableness check.

MS. GLAUSER: Often times when damages experts have used a reasonableness check and it's been excluded, it's done in the context of someone having determined it wasn't comparable but nonetheless kind of serves as a check or a benchmark. Here the difference is, of course, we have a decision that it was technically comparable and that he uses it to indicate Charter's willingness to pay. And the reason for that is because his actual royalty calculations is based on Charter's own valuations with regard to PMA, and so this wasn't an additional necessary quantitative input into the calculation of that rate. But you are correct that it is supportive and indicative of the value that Charter puts on it and what Charter is willing to pay for the right to continue to use PMA.

THE COURT: I would assume that there is evidence, including some of the correspondence that you've cited about the *Entropic* settlement, that shows the importance that Charter puts on PMA but doesn't include the high nine figure consideration paid.

MS. GLAUSER: We believe that there is a body of evidence separate and apart from *Entropic* that indicates Charter's analysis of the importance of PMA to its company and its business. Some of those our valuations that actually quantify what that incremental profit would be. But this particular data point, while high, shouldn't be excluded merely because Charter has valued that technology at a significant and substantial amount. The fact is, that is how important it is to Charter and its company, and the jury should hear that.

And to the extent that there's any risk of that skewing a damage award otherwise, that could be taken care of with an instruction. In addition, for example, the *Optis* case that defendants cited, the number was repeated multiple times over and over throughout the trial. And as a result, there are ways to avoid the potential of skewing the damage number without taking away evidence of what Charter has contemporaneously indicated is the value to its company for PMA and what it is willing to pay to continue to use PMA. This becomes particularly important because Charter's damages expert Dr. Becker is relying on another license agreement that also doesn't involve the asserted patents and, in fact, doesn't even involve PMA, the profile management application, and that settlement

agreement is a [redacted] number, which, kind of, tracks where the parties are on their damages amounts.

Dr. Becker has said the damages were in the range of [redacted] and relies on the [redacted] for that purpose. ASSIA has said that the damages are in the range of [redacted] and is relying on the *Entropic* agreement in part as supporting that number. So this risk of skewing the numbers for the jury, it's anchored on both sides.

THE COURT: One problem I have with the argument that the [redacted]

MS. GLAUSER: Because Dr. Souri has analyzed both and the factors involved in both and ultimately concluded that the technology at issue is technologically comparable. And so as a result, it -- we're not talking about two completely different technologies. We are talking about comparable pieces of technology to Charter within the PMA system.

THE COURT: The concern I have is about that

dollar figure and so that -- that is what -- what inclines me toward some relief on this motion. But I need to look further at what Dr. Souri said about it because I was not aware of that.

Is Dr. Souri's report in the record on this?

MS. GLAUSER: I can check if Dr. Souri's opinions were part of a motion in limine exhibit. If it wasn't, it's cited here. And, again, the only reason it wasn't is because this wasn't part of the dispute. Charter's arguments were not that the [redacted] should not be admissible because it wasn't technologically comparable. I don't think that was the argument in court today either. So to the extent that it's not, we can supplement and get it on file, or during the next portion where I'm not arguing, I'll find what docket it is attached to so we can point you to those paragraphs again.

THE COURT: All right. I think I will call on you to provide me with a copy of Dr. Souri's report.

MS. GLAUSER: Happy to, your Honor. Also, I don't know if you need argument on it, but the 30(b)(6) issue is a little different than the -- the prior deposition testimony in *Entropic* is a little bit different of an issue than the [redacted] amount if you would like to take argument on that.

THE COURT: I guess so because, frankly, there's two or three sentences is all that deals with it in the motion itself.

What can you tell me about that from your side?

MS. GLAUSER: Thank you, your Honor.

There are three depositions that were taken in the *Entropic* litigation and produced by Charter in this litigation. Those statements were all made by Charter 30(b)(6) witnesses testifying on behalf of the company. And as a result, we have designated certain of that testimony to have the option to use it at trial. We don't know yet if those witnesses are going to appear live. We have disclosed those designations pursuant to the Court's standard procedures, and they are very clearly not hearsay, 801(d)(2) admissions of a party opponent that were made in a prior litigation.

THE COURT: Well, I'm not finding that they're admissible, but I will deny that part of this MIL. I don't think the record is nearly sufficiently developed to rule on that in this connection. So you don't need to address those further at this time.

MS. GLAUSER: Yes, your Honor.

THE COURT: Thank you, Ms. Glauser.

MS. ACHARYA: Your Honor, may I for just a

second?

THE COURT: Yes.

MS. ACHARYA: I just want to note, first, that the Court's standing MIL 13 is not limited just to raising of the infringement claims or the allegations. The MIL itself is broad and talks about evidence, testimony, or argument regarding either party's other litigations. So I know counsel for ASSIA said that it should be more limited, but that's not how the MIL is drafted so we would disagree with that. On the -- sorry, your Honor.

THE COURT: No. I was just going to say, obviously, it is the general MIL, and whether or not there are particular cases that should be accepted from it, is, I guess, what we're trying to decide on this motion.

MS. ACHARYA: Understood, your Honor. On the comparability point, I just want to make clear, we were not paraphrasing Mr. Dell's report.

Mr. Arndt, can you go to slide -- I believe it's 15 for me.

This is what Mr. Dell says regarding economic comparability: It is my opinion that the factors and circumstances involved in the parties agreeing to settle the litigation differs significantly with the economic

construct and circumstances of the hypothetical negotiation. He recognizes that inherent risk and uncertainties that are involved in litigation. This is why ASSIA and Mr. Dell do not rely on the *Entropic* litigation to form the quantitative damages analysis that he now relies on for this case. He only relies on this to show Charter's willingness to pay for PMA. And our damages expert also agrees that there's no economic comparability in this case. And when there is no economic comparability, there isn't enough justification to show the settlement amount or the specifics of that settlement agreement to the jury.

For the limited stance of just showing willingness to pay, Mr. Dell can make that opinion by just saying he's reviewed agreements. I do want to take Dr. Souri's opinions up on the technical comparability.

Mr. Arndt, if you could put up Mr. Souri's report?

I'll move on for now, if you don't mind, your Honor, until our team can put it up.

But what I'll say is Dr. Souri's report doesn't compare upstream PMA. He's looking at PMA that was at issue in *Entropic* and just saying PMA in *Entropic* and PMA in this case. *Entropic* could not have related to upstream because upstream didn't even start until

after *Entropic* settled. There was no upstream PMA in Charter's networks until after the *Entropic* litigation. *Entropic* only involved downstream because of that. Upstream started on March 6th, 2024, and the *Entropic* agreement settled before that.

On this *Ubee* litigation, I just wanted to note, that [redacted] number that counsel mentioned, is not identified in the complaint. That [redacted] is what Mr. Dell opines on based on the numbers in the complaint. And, again, we're going to have to dissect that. We're going to have to dissect those numbers. We're going to have to dissect his opinions on how he gets to [redacted] We're going to have to dissect the justification, what's attributable to the two cases versus the other two cases that he did not opine on. All of that is going to become a side show to the issues in this case.

We actually have the report now, so I can go back to that.

Mr. Arndt, if you could go to Page 499 for me.

Your Honor, starting here is where Mr. Souri provides what ASSIA's counsel said was technical comparability. And as you can see here, he's looking at PMA that was accused in *Entropic* and saying the

[redacted]
But he's not looking specifically at what's accused in this case. And he's not comparing whether the downstream PMA is the same as the upstream PMA. And at the time this report was -- was submitted, downstream was at issue in this case. It just isn't anymore.

THE COURT: So is it your position that the -- basically 100 to 1 difference between the [redacted]

MS. ACHARYA: No, your Honor. If I understood your question -- so I believe you're referring to the [redacted] agreements --

THE COURT: Yes.

MS. ACHARYA: -- that Charter is relying on. Those were not as a result of litigation. Those were just separate agreements. They relate specifically to ASSIA's patents that relate to PMA. Those are not related necessarily to Charter's specific PMA solution. It wasn't a result of litigation related to other PMA solutions. They're different issues.

THE COURT: Well, I'm just trying to figure out if it's your position that the reason the [redacted] is because it dealt with

downstream versus upstream. But that's not the position?

MS. ACHARYA: No. That is -- that is our position. In addition, it's much higher because there are a number of other grants provided to Charter in that agreement. As I noted, [redacted] only one of which ASSIA contends is technically comparable. [redacted] There are a number of other rates exchanged. Charter dropped all of its defenses, all of its allegations against *Entropic*, eve of trial, everything else that comes with a litigation-type settlement. So -- and there's no evidence pointing to what specific portion of that settlement agreement Charter valued the PMA technology to be.

Mr. Arndt, if you could open up PX22 for me, Plaintiff's Exhibit 22. And if you could -- I believe it's Slide 2. The next slide. If you could go one more. One more. Go back.

Your Honor, this is Plaintiff's Exhibit 22, and ASSIA's counsel showed you an excerpt of this. This is the full slide. And I want to just explain this a little bit. So we know that this relates to downstream because it refers to -- in the figures, you can see the reference to OFDM. OFDM refers to the downstream. If

it's upstream, it would refer to OFDMA. On the left-hand side, you can see that it has references to 10 percent gain in performance. It has references to a [redacted] profit.

Going back to what I was explaining to you earlier, the percentage of gain performance, we actually don't have an issue with those percentages necessarily because there are gain performances made in the upstream, gain performances made in the downstream. The issue we have is the [redacted] profit annually that's listed here because it's in the application of that percentage to the spectrum that covers downstream, which as I mentioned earlier, is much larger than the spectrum that's attributed to upstream. And that's where it gets highly prejudicial.

And so our proposal, as I mentioned, is redacting these really large value numbers that are specific just to downstream. But the information that's related to both upstream and downstream, we don't have an issue with that being presented to the jury.

THE COURT: All right.

MS. ACHARYA: Do you have any other questions, your Honor?

THE COURT: Not at the moment. Thank you.

MS. ACHARYA: Thank you.

MS. GLAUSER: Your Honor, I know we've been going long here. If I may quickly on this issue?

The idea that the benefit of upstream PMA is somehow not equivalent to or is less than downstream PMA is a disputed fact issue in this case. And while Charter would like to argue that the upstream PMA is somehow not as valuable -- sorry. That's not the right paragraph -- Dell has concluded based on his analysis that, in fact, the upstream is more valuable. And the reason for that is, as Charter was explaining, the spectrum or bandwidth on the upstream channel is narrower. It's tighter than it is on the downstream.

And so if you imagine a highway where you had a five-lane highway and you add one lane, that increase on the downstream compared to on the upstream where you had a one-lane highway and you added another lane results in significantly more proportionate capacity gain. And so the idea here is that Dell has concluded that Charter says the upstream gains are at least as good as the downstream gains. And then based on technical information in the case, has concluded that, in fact, it would be a conservative estimate to say that the up and the down are the same because, in fact, the upstream would be more valuable.

An example of that is in Paragraph 342 of his

report when he says: When it comes to the upstream signal path, even a modest improvement can provide significant benefits and deferred capital for node segmentation. These capabilities may also enable additional channels in the upstream spectrum. Moreover, I understand that the potential gains and benefits of the upstream US PMA would be likely more than the downstream given that the upstream suffers from a lot more noise, ingress, and funneling effects from the plane. And you'll see there that that is a quote. And if you go down to the footnote, it is a Charter-produced document.

So Charter's own documents indicate that upstream is at least as, if not more, valuable than downstream. And as a result, any of the valuations related to downstream, whether they be that [redacted] number in the Charter document, or the [redacted] settlement in the [redacted] are relevant to upstream valuation. Now, Charter doesn't like these big numbers because they support our damage number, but the facts is that the record evidence here shows that those are Charter's own valuations of the accused technology.

THE COURT: All right.

MS. GLAUSER: Thank you, your Honor.

MS. ACHARYA: Your Honor, if I may really

quick?

THE COURT: You may.

MS. ACHARYA: Thank you.

So there's slightly two different issues at play that I want to make clear. So there is the *Entropic* settlement agreement and the references to *Entropic* and the *Ubee* litigation, which is set forth in our motion in limine. There are separately the documents related to downstream versus upstream that aren't necessarily tied to *Entropic*. And so I just want to make clear, it's almost while there is, like, a downstream/upstream component related to *Entropic*, some of the documents that we have an issue with are not necessarily *Entropic* documents.

And so this is why I had originally asked if we could seek leave to file a separate MIL or another type of briefing on this upstream versus downstream issue because that hasn't been fully briefed to the Court yet. However, the *Entropic* litigation and that relevance and the prejudice of that litigation and the *Ubee* litigation has been briefed to the Court.

THE COURT: Well, based on what I've seen so far, I would probably grant that request. Let's revisit it at -- as planned at the end of the day.

MS. ACHARYA: Understood, your Honor. And I

also just want to make clear, all of those [redacted] with respect to the exhibits -- that is all numbers tied directly to downstream PMA. We do not have an issue with them talking generally about opinions, about how Charter values one versus the other, and if it's the same, the capacity gains that are achieved on one versus the other. What we have an issue with are the very large numbers that we know are derived specifically within information for downstream.

THE COURT: All right.

MS. ACHARYA: Thank you, your Honor.

THE COURT: While you're up there, let's move on to your next motion.

MS. XUE: Good afternoon, your Honor. Wen Xue on behalf of defendant Charter.

THE COURT: Good afternoon.

MS. XUE: So ASSIA shouldn't be allowed to argue that any of its asserted patents derive their importance or benefits from any alleged incorporation into a standard because they simply haven't done legwork of showing that their patents are important to any standard. The patents -- they admitted that the patents are nonessential to any standard, and standard compliance is not part of the infringement theory,

meaning their expert doesn't try to show infringement by comparing the standard with the claim limitation. And there's no evidence that the asserted patents are adopted into any standard.

I believe ASSIA agrees with these points, but with the exception that they still want to take the credit from the industry's recognition of the standard because their patent somehow touched on a standard. So it would be helpful for us to look at ASSIA's argument in their briefing. So this is what ASSIA argues in their opposition to the MIL. It says: Charter argues that the patents are not essential to any standard, but this mischaracterizes ASSIA's position. ASSIA does not claim the patents are standard essential. Rather, ASSIA's evidence shows that the accused implementations practice the patents while complying with these standards, linking the claimed inventions to the standards' commercial success.

So the problem here is that there is not really a link because an accused instrumentality practicing the patent does not really create a link between the patent and the standard. Now, we can try to unpack that with an example. Let's say the accused implementation is -- let's say it's some computing device -- let's say a computer or a mobile phone -- and

it practiced the patent that has some claim limitation that requires the computing device to transmit information over a network. It's a very common capability of any computing device nowadays, and it's a very generic patent limitation that your Honor may have seen in some patents.

Now, all of a sudden under ASSIA's reasoning, this patent will become important and valuable because it's likely to be compliant -- this implementation is likely to be compliant with at least one of a dozen popular networking standards. For example, if the networking -- if the device is transmitting information over a cellular network, that likely will touch upon the 3GPP standards, such as GPRS, GMTS, that's the standard for cellular telecommunication. And if the device is communicating information over Wi-Fi, that likely will touch upon 802.11, the Wi-Fi standard. And if it's doing the communicating information over the internet, then there's a whole dozen of internet-based standards like HTTP, TCP, and maybe even DOCSIS, which is, you know, a standard that's relevant in this case that has to do with how the internet service providers deliver internet to individual homes over the cable network.

So the whole point is that under ASSIA's logic, all it requires is for the accused implementation

to somehow touch on the patent, that any patent reciting network limitations would be important because it's likely implemented under some communication standards. And that's exactly why we brought this motion. The jury shouldn't be presented with these misleading arguments when the -- you know, ASSIA has admitted that their patents are not that important to any standard as to be essential to any standard. Now, there are --

THE COURT: They're not claiming, I take it, that their patents are standard essential?

MS. XUE: Correct. And -- but they're trying to say that their patents should be more valuable and important because some standards -- the accused products are compliant with some standards, but they haven't established that their patents are important or being incorporated into any standards. So there is no nexus between any of the asserted patents and the standards that the accused products are complying with in this case.

THE COURT: And do they argue or testify that they are in some way?

MS. XUE: Yes, your Honor. That's in their opposition brief where they tried to say that the -- their patents are more likely to be valid because they're using the -- the accused products complies with

industry standards as evidence of secondary consideration, and they're also trying to show the commercial success because those standards are recognized by the industry and praised by the industry. But they haven't shown a nexus between the patent and industry praise or industry standing; meaning -- to show that, for example, OpenSync is widely accepted by the industry or DOCSIS is widely accepted by the industry because they use the patented technology.

THE COURT: And so they have a witness who will say that?

MS. XUE: The witness will -- I believe the witness will testify -- for example, in Section B of their brief, the witness -- they plan to have a witness testify that the compliance with DOCSIS PMA and OpenSync is relevant to secondary indicia of nonobviousness and our evidence of commercial success. And I think that's in their expert's report, but their expert hasn't opined on a nexus which is required by law to -- before any evidence of secondary indicia of nonobviousness is presented to the jury because there is no nexus.

THE COURT: I guess my first question is why should this be an in limine matter? I mean, the purpose of motions in limine is to prevent some bell from being rung that can't be unrung. This seems like very

pedestrian cross-examination to me. Why can't this just be taken up if the expert testifies in a way that you think is inappropriate?

MS. XUE: Because of the misleading nature of what we believe ASSIA is going to present the issue. They're going to try to argue that the accused products practice the patents and the accused products comply with standards and that creates a -- you know, a seemingly reasonable link between the patents and the standards while, in fact, the more generic the patents are, the more basic the limitations are, the more likely its likely going to be touching upon on some patents. So it simply doesn't make sense for the jury to hear these misleading arguments and for us to address these through cross-examination. It's a waste of the jury's time.

THE COURT: All right. Thank you, Ms Xue.

MR. ALBERTI: Good afternoon, your Honor. David Alberti again.

Just to state for the record, we're not claiming that these patents are standard essential. We agree not to argue that. However, it's very important to a number of issues in this case that Charter shows to implement the DOCSIS and PMA standards in a way that practices ASSIA's patented inventions. Specifically,

those patents allow ASSIA to practice these standards and that provides a serious economic benefit. There's a direct nexus in Dr. Souri's report tying the functionality of these patents to the DOCSIS and PMA standards.

And I would start -- initially, he does an apportionment analysis where he goes through and he explains how the functionality is tied between the patents and their PMA implementation.

And if I may, can we get Paragraph 691 of Dr. Souri's report up?

Okay. So we see here -- here's Dr. Souri's infringement report where he goes through an apportionment assessment. In Paragraph 691, he explains the '313 patent invention as claimed in Claim 19 provides the functional basis for the IUC upstream profile selection in PMA systems. Based on the analysis above -- referring to his infringement analysis -- I've assessed the weighted contribution of Claim 19 to the seven core functionalities of DOCSIS 3.1 upstream PMA systems as follows. And then he goes through and does a weighting, which is appropriate in any apportionment analysis. And then if you -- if you keep scrolling down, you'll see he says: Based on this analysis, my opinion -- he goes through and then gives a technical

value based on the ability to use these patents to implement these standards.

So it is -- there's a direct relationship -- it's not speculative -- between Charter's use of these patents and its ability to implement these standards. So it's directly relevant to the issue of apportionment. It's also directly relevant to the secondary considerations. Because in terms of commercial success, the commercial success is tied to the fact that it allows Charter to implement these widely adopted standards. There's no requirement in any case that's been submitted to your Honor that you have to first show that a patent is essential to a standard to determine whether or not it's commercially successful.

So if we take a look at Dr. Souri's validity report --

THE COURT: Mr. Alberti, I think that I'm going to deny Motion in Limine No. 2. I think there is sufficient there for that to be presented to the jury. So --

MR. ALBERTI: Thank you, your Honor.

THE COURT: I'll deny that. Thank you, Mr. Alberti.

Let's move to defendant's MIL No. 3.

MS. WANG: Good afternoon, your Honor. This

is Elle Wang on behalf of defendant Charter.

Charter's MIL No. 3 is pretty cut and dry. The issue is ASSIA failed to produce discovery during the discovery period, and ASSIA cannot benefit from that failure. Your Honor has heard about [redacted] patents or agreements. So in October 2024, that was at the beginning of this case, ASSIA [redacted] And among the [redacted] are patents that are technically comparable to the asserted patents in this case.

Mr. Arndt, can you put up Slide No. 24?

So these are two sample patents from the ASSIA [redacted] agreement. Now, I know that the PMA here are not precisely profile management application, but Charter's technical expert will be able to provide explanation at trial that these PMA patents are technically comparable to the asserted patents in this case.

Now, ASSIA sold these patents [redacted]

Can we flip to the next slide?

ASSIA sold these patents [redacted]

[redacted] Now, despite the obvious relevance of this agreement, ASSIA did not produce this during fact discovery. It was not until September 2025, long after the close of fact discovery, Charter independently discovered that ASSIA and [redacted] had this transaction and Charter asked ASSIA for it and then ASSIA produced this patent.

But because this patent was produced long after fact discovery, Charter never had the opportunity to conduct discovery into this agreement, including [redacted]. And ASSIA did not produce anything either that suggests that ASSIA had received [redacted]. And so because ASSIA withheld this agreement and ASSIA -- it's Charter's position that ASSIA is not -- should not be permitted to present any evidence at trial to surprise Charter with [redacted]

THE COURT: Now, doesn't the plaintiff agree with that relief in their opposition?

MS. WANG: Not quite. ASSIA's agreement is -- ASSIA seeks mutual exclusion and a -- ASSIA agrees not to do that, but it also asks that Charter be precluded from doing so. And, specifically, ASSIA requests that Charter be precluded from arguing that no

such [redacted] And this is really -- this is really our issue with this request is that Charter didn't do anything wrong here, and if ASSIA wants to have its expert to opine on something that suggests that the value of this patent, you know, are dependent on [redacted], then Charter should be able to say, no, there's nothing in the record that suggests that ASSIA [redacted].

And so this is -- this is really our request. Our request is not much. It's just that ASSIA should not be permitted to present evidence, and if ASSIA makes any suggestions that it [redacted]

THE COURT: All right. Thank you, Ms. Wang.

MR. KRAMER: Your Honor, procedurally, if we could ask to retroactively put under seal the record on this MIL, MIL No. 3. It does contain some other parties and confidential information.

THE COURT: And this is third-party information, you're saying?

MR. KRAMER: It's ASSIA's information and this [redacted] as well.

THE COURT: All right. All right. Well, you can request that with respect to the reference to the third party.

MR. KRAMER: Okay. Your Honor, I think you hit it right on the head. I think we're in violent agreement on this MIL. We have -- we have a patent purchase sale agreement. ASSIA sold two patents to a company called [redacted]. I'll just put it up here on the elmo. It's Charter that wants to use -- this -- this is Charter's slide. Charter wants to use this agreement at trial, not ASSIA. Charter wants to show the jury that -- that ASSIA sold two patents and that they want to argue the purchase price was [redacted] and then try to argue from that, that ASSIA's patents are not very valuable.

But the agreement itself -- this is the provision of the agreement, the economic terms are quite simple; [redacted]

What ASSIA wants to do simply is that if Charter uses this agreement at trial and says, look, ASSIA sold patents for [redacted] then ASSIA is then

able to show the full economic terms, as we have on this slide, in other words, to rebut what would be a false suggestion that the purchase price was [redacted] when it's clear, and the parties agree, [redacted]

THE COURT: I think you mean [redacted]

MR. KRAMER: [redacted] Sorry. Yes. Your Honor, we -- we agree and we're not suggesting that ASSIA should be able to say to the jury [redacted] That's all fine. We just want to lay out the full economic terms of the agreement rather than having -- what would really be a false suggestion that [redacted]

THE COURT: Well, what I'm hearing you suggest that the resolution should be that the plaintiff is forbidden from referring to this particular agreement unless leave of court was given based on the position that the defendant has opened the door by making a claim that would be rebutted by this agreement.

MR. KRAMER: That's right, your Honor. That's fine. But also I think the dispute is that neither party should inform the jury of [redacted] In other words, the parties can state these were the

economic terms of this patent purchase agreement as shown on the screen and neither -- neither party, not just ASSIA -- neither party will try to inform the jury [redacted]

THE COURT: Well, the -- I understand that. But if the door is opened -- if Charter wants to use it, then you can point out the rest of the terms. Why would that not be fair?

MR. KRAMER: I think it's fine actually, your Honor. To my mind, it's Charter that wants to use the agreement, right? So the way this will arise at trial is they'll put the agreement in front of the jury and make comments about it. What they want is they want to be able to tell the jury that [redacted] We simply, if that occurs, want to be able to show the jury that that's not right. It was -- you know, what the economic terms actually are. That seems straightforward enough. I would think that -- that's why we thought this MIL should be basically agreed to.

THE COURT: All right. I think I'm good on this one.

MR. KRAMER: I'm trying to move it along here

because this one doesn't seem like one people are disputing.

THE COURT: Thank you, Mr. Kramer.

MS. WANG: Your Honor, just very briefly. Your Honor, I think it -- there's a little -- the plaintiff's counsel -- there is a little misunderstanding there. Charter -- Charter's request for this MIL is that if ASSIA -- if ASSIA tells the jury that there is a [redacted]

THE COURT: You know, the plaintiff is not going to be allowed to raise this agreement primarily because they didn't timely disclose it; and, therefore, under Rule 37, very simply, they're not entitled to use it. If you use it, but provide only part of it, then fairness would require that they be allowed to contend that you've opened the door to the rest of it. So if they don't use it and you don't use it, it will never come up.

MS. WANG: Right, your Honor. That is fine. I mean, we're just saying -- first of all, Charter does not intend to provide -- present the provision of this agreement. But what I'm getting at is what happens after ASSIA is permitted to show the full provision? If

ASSIA is permitted to show the full provision and suggest to the jury that, hey, look, [redacted]

THE COURT: And what would prevent you from doing that?

MS. WANG: That's ASSIA's -- that's ASSIA's request in their opposition, and we're just trying to explain that -- that that should -- that that should not be the case and Charter should be able to rebut with that.

THE COURT: Nothing in my ruling would prevent you from following up on anything they offer if they get leave to consider that you've opened the door.

MS. WANG: Thank you, your Honor.

THE COURT: All right. We can move on to the fourth motion in limine.

MR. EISEMAN: Good afternoon, your Honor. David Eiseman, again, for Charter. Before I get to the motion, Mr. Kramer's raising of the issue of [redacted] the third party, made us realize that we also are going to need to respect to seal references to *Entropic*, another third party, and reference to the settlement

amount and related details. So we would like to make that request.

THE COURT: All right. You can request that.

MR. EISEMAN: Thank you, your Honor.

Charter's Motion in Limine No. 4 seeks to exclude two categories of ASSIA's argument. First, we'd like to preclude any evidence or argument that Charter breached the confidentiality agreement or provision in the parties' December 2017 agreement, which the parties have been calling the MLSA, which we looked at before. That's number one. Number two is ASSIA should be precluded from introducing evidence or argument that Charter copied ASSIA's CloudCheck product or its asserted patents based on its review of ASSIA's documents or products after that 2017 agreement was terminated.

Mr. Arndt, if you could put up Slide 29, please.

Here we're showing the master license and services agreement entered into in 2017. And just as some background, the reason that agreement was entered into was that Charter was going to evaluate ASSIA's CloudCheck product for potential use going forward in its system. And at the same time that it was evaluating the CloudCheck product, it was also evaluating Plume's

OpenSync product, which you've heard a little bit about Plume earlier today.

After Charter evaluated both companies' products, Charter determined that the OpenSync product from Plume provided a more complete solution than ASSIA's CloudCheck product. So in December 2019, Charter terminated a statement of work with ASSIA and then later in July 2020 they terminated that MLSA here. Now, we're showing Section 6.7 of the MLSA, and it provides that upon termination of this agreement, or earlier upon discloser's request, recipient will deliver to discloser or destroy all items containing any confidential information, or make such other disposition thereof as discloser may direct.

And what we're concerned about here, your Honor, is that ASSIA is going to try to introduce evidence at trial that somehow Charter breached Section 6.7 by retaining certain ASSIA confidential documents and reviewing them after termination of the MLSA.

If you could go to Slide 30.

During the deposition of one of Charter's witnesses, Mr. Gary Koerper, being one of our 30(b)(6) witness, ASSIA's lawyers asked Mr. Koerper: "Do you know whether, under the Charter-ASSIA agreement

post-termination that Charter -- whether or not Charter is required to destroy any confidential documents from ASSIA?"

So they didn't specifically reference -- reference Section 6.7, but they're clearly asking whether Charter was in compliance with that confidentiality provision.

If we could go to Slide 31.

Also during Mr. Koerper's deposition, ASSIA showed him two internal February 2021 e-mails sent after the MLSA was terminated in which one Charter employee was sharing certain ASSIA documents with other Charter employees. And the two documents we're showing here are found at Docket 306-13 and Docket 306-14, which is ASSIA's opposition. They then went on to ask Mr. Koerper --

And if we could go to Slide 32.

-- about the documents. This is -- they're specifically questioning him about Docket 306-14 where the question is: "And it's an ASSIA document entitled CloudCheck Wi-Fi Data Collection?"

The witness answers.

The questioner goes on and says: "It's marked ASSIA Inc. Confidential and Proprietary." And the -- the questioner goes on and says: "Do you know

why -- again, this is 2021, about two years after the Charter-ASSIA relationship had terminated, why Mr. Perkins would be sharing this information with the Charter engineers?"

So, your Honor, you obviously know this is a patent infringement case. And Ms. Glauser said it perfectly this morning. She said this is only a patent infringement case. We're here to see if Charter infringed ASSIA's patents. It's not a breach of contract case. They haven't asserted a claim of breach of contract. And so for them to be able to question our witnesses about Section 6.7 or the return of documents after the termination of the MLSA or Charter's review of ASSIA documents after that termination, can only be for the purpose of showing that somehow Charter was a bad actor, breached the agreement, and I guess ASSIA's hopes are that the jury will say, well, Charter is a bad actor, they breached the agreement, and that must mean that they've infringed ASSIA's patents.

So it's not relevant evidence, and if there is any marginal evidence or any marginal relevance to the evidence, it's very much outweighed by the prejudice to Charter and also the risk of misleading the jury. So our position is ASSIA should be precluded from questioning our witnesses or arguing about the

confidentiality provision or the treatment of documents after the agreement was terminated.

THE COURT: As long as there's no reference to the confidentiality provision, do you contend that there's something objectionable about testimony about the documents being used after the agreement had ended?

MR. EISEMAN: Yes. There's no relevance to Charter's use of agreement. Now, in their opposition, they make --

THE COURT: Not the agreement, but the technical arguments.

MR. EISEMAN: Sorry. I misspoke. There is no relevance to the use of the documents after the agreement was terminated. And in ASSIA's opposition, they raised two issues, damages and willfulness. Whether Charter was looking at ASSIA documents after the termination has nothing to do with the damages issues in this case.

If we could go back to Slide 31.

If you'll look at the two documents, they aren't talking about the value of ASSIA's technology, much less the value of their patents, all that the person who sent the documents around to other people at Charter says is that these documents might be helpful to you. So it has nothing to do -- Charter's looking at

those documents has nothing to do with the value of the asserted patents. And how do we know that? Mr. Dell, the damages expert for ASSIA, has submitted over 200 pages of expert reports in this case. Nowhere in any of those 200 pages does he cite to either of those documents or even reference them or discuss them.

And so the documents are not relevant to the issue of damages. Now, their other argument is willfulness.

If we could go to Slide 35.

It's undisputed in this case -- this is an interrogatory response from ASSIA -- that ASSIA did not mark CloudCheck with the asserted patents. So Charter was not on notice that ASSIA contended that the patents -- that the asserted patents were embodied in the CloudCheck product. That's point number one.

Let's go to the next slide, Slide 36.

This is Docket 306-15 cited in Charter's -- excuse me -- in ASSIA's opposition. It's a letter from the general counsel of ASSIA to the general counsel of Charter in August of 2020 after the MLSA was terminated. And in that letter -- and this is what ASSIA relies on for its willfulness argument -- ASSIA's general counsel talks about CloudCheck being protected by multiple U.S. patents and there's a reference to ASSIA's patented

technology. But nowhere -- nowhere is there an identification of the specific asserted patents in this case.

And so if we go back to the documents that you asked me about, your Honor, they were February 2021. At that time, Charter was not on notice of the asserted patents or the fact that Charter -- the fact that ASSIA contended that the CloudCheck product practiced those patents. And so the fact that Charter was looking at those documents in December of 2021 is not probative of the issue of willfulness. So the two reasons that ASSIA has given for why those documents should be able to be introduced at trial don't stand -- don't stand scrutiny and our motion ought to be granted.

THE COURT: Why aren't they relevant to infringement?

MR. EISEMAN: They don't talk about -- they don't talk about the asserted claims. They don't talk about Charter's technology. And the issue of whether Charter's technology infringes the patents is going to be based upon looking at Charter's technology and reading it against the asserted claims. It doesn't have to do with CloudCheck.

THE COURT: All right.

MR. EISEMAN: Thank you, your Honor.

MS. GLAUSER: If I may very briefly, your Honor?

ASSIA does not intend to use the word "copying" or in any other way violate the Court's standing MIL No. 9. In addition, we do not intend to allege or otherwise suggest that Charter has in any way breached a contractual obligation, but the mere fact that certain evidence could have potentially been used in a breach of contract case does not make it irrelevant in this case.

And as your Honor as noted, the particular evidence and e-mails in which Charter is circulating ASSIA's technical documentation long after that relationship has ended is relevant to this case both for damages and for willfulness and to --

THE COURT: Tell me how precisely you think it's relevant to your damages.

MS. GLAUSER: Yes, your Honor. We expect in this case that because Charter's product, the one for which the documentation is being circulated, was used by ASSIA, they intend to characterize that patent practicing product as not very beneficial, as not having much technical value to them. In fact, they have exhibits on their individual lists in which they're discussing whether or not ASSIA's product does what it

needs. So we expect that to be one of their trial themes.

And as a result, they should not be permitted to tell the jury that the value of ASSIA's product is minimal while at the same time years after their relationship with ASSIA, their engineers are still circulating the technical specifications related to that very product and characterizing them as useful, as what they might be able to do in their own Plume product.

And so in that way, it shows the value that Charter has placed or assesses towards ASSIA's product, which Charter contends is a patent practicing product.

THE COURT: All right. I'm going to grant this motion in limine with respect to copying, and I'll note that it's agreed with respect to that and with respect to the nondisclosure agreement itself, but deny it as to evidence as to Charter's use of plaintiff's documents.

MS. GLAUSER: Thank you, your Honor.

MR. EISEMAN: Your Honor, could I ask for one clarification?

THE COURT: You certainly can.

MR. EISEMAN: To the extent that ASSIA is allowed to use those documents with Charter witnesses, will the Court issue an order that says they can't tie

the timing of that to the fact that the MLSA between the parties had been terminated? So they can ask about, oh, you sent this over and you looked at it and why'd you do it and that sort of thing, but they won't be able to say this happened two years after you ended the relationship with ASSIA. That's the issue that we have here, and so we'd ask for that clarification.

THE COURT: Certainly, it would -- the order would prevent reference to there being a NDA or this being after the termination of that. Why would the order need to say it was after something? The jury is going to know when the relationship between Charter and ASSIA ended.

MR. EISEMAN: But ASSIA should not be allowed to argue that the fact that we were looking at the documents in February of 2021 is somehow indicative of some breach or -- the timing of when we looked at it is not what the issue is, and so they shouldn't be able to put that into place because the jury will have the MLSA in evidence. It's on the parties' joint exhibit list. And one thing is going to lead to another, and either there's going to be an issue of the jury thinking there's a breach of contract or that possibly the copying.

And I think it's -- it's been pointed out to

me -- I don't have the jury instructions from ASSIA in front of me. But, apparently, ASSIA's jury instructions on willfulness relate to or include about this copying. So, again, if ASSIA is allowed to take these documents in February of 2021 and place them in time compared to when the agreement was terminated, it's going to look like we were trying to copy. And the inference will be there and that will be highly prejudicial.

THE COURT: Well, I'm not going to order that they not relate it to the timing of the relationship, but I will order that they be careful not to create any implication that it was a breach of the agreement. And you'll just have to enforce that if you think they have crossed that line.

MR. EISEMAN: And that there's no implication that Charter was copying?

THE COURT: And that goes without saying. That's part of the Court's standard MIL. Judge Gilstrap is going to enforce that without any push from me, but I will -- I will include that they need to be careful not to imply that there was a breach.

Thank you, Mr. Eiseman.

MR. EISEMAN: Thank you, your Honor.

THE COURT: That takes us to MIL No. 5.

All right. I'll tell you what, we'll go

ahead and take a 15-minute afternoon recess and come back and finish up.

Thank you.

(Recess taken.)

THE COURT: Thank you. Please be seated.

MR. KHANNA: Good afternoon, your Honor. Rajat Khanna on behalf of defendant Charter.

I have some good news. The parties have reached agreement on Charter's Motion in Limine No. 5. So with your Honor's permission, we'd just like to agree on certain language and e-mail that to you for inclusion in the record here today.

THE COURT: All right. So there's an agreement that disposes the motion in limine and you're going to communicate the exact language of that agreement to us?

MR. KHANNA: Yes, sir.

THE COURT: All right. And that's the agreement from the other side as well?

MR. KRAMER: Correct, your Honor.

THE COURT: All right. Very good.

MR. KHANNA: Thank you.

THE COURT: Thank you.

Then shall we turn to the exhibits now? I would start with the -- I guess the way the parties have

organized it is to start with the plaintiff's objections to the defendant's exhibits.

MR. HAMILL: Good afternoon, your Honor. Andrew Hamill, again, for plaintiff ASSIA.

THE COURT: Yes. Go ahead.

MR. HAMILL: And so we have reached the bucket of documents stage. And so starting with the first bucket, that pertains to background prior art not disclosed in any specific invalidity contention. And so this runs afoul of Court MIL No. 4, which precludes any such prior art. And taking DX001 as an example, this is prior art that the defendant's expert uses as part of the technology background in his report on invalidity. Now, the defendants have said that this should be admissible despite the Court's MIL No. 4 because the technology background section is essentially incorporated into the Section 101 invalidity analysis. And as part of this, there's the Alice Step 2 analysis for patentable subject matter. And one of the issues is what was well understood, routine, or conventional at the time.

And it's ASSIA's position that simply because it's part of a Section 101 invalidity analysis doesn't mean that it's anything other than technology background. It's really the same exact thing; what is

well understood, routine, and conventional is the same thing as the technology background of the report. And so it should not be admissible simply because it is incorporated to that section.

And so all of the same concerns apply. It's going to be confusing to have additional prior art that's not part of a disclosed combination. That's going to be confusing for the jury. And so we believe that the expert can provide, you know, at the trial -- testify about an overview, but that this evidence should not come in.

THE COURT: And these are patents or documents or a combination thereof?

MR. HAMILL: DX001 is -- I believe those are web page screenshots from the internet archives, the way back machine, so that's prior art of one type. The rest of them are prior art patents.

THE COURT: All right.

MR. HAMILL: And so we think it's highly prejudicial and confusing to the jury to go back to the jury room with a whole stack of patents that don't have anything to do with an actual obviousness or anticipation, invalidity argument, and an army of certain patents.

THE COURT: And tell me, the defendants have

a 101 defense in their pleadings. Do you have a motion pending on that?

MR. HAMILL: There is a 101 analysis in the invalidity reports and a rebuttal from ASSIA's experts. There is no motion in limine about that, I don't believe.

THE COURT: And I guess I'm not talking about a motion in limine. But I take it from this -- and this is a question coming from a place of ignorance -- have the defendants pled a Section 101 defense?

MR. HAMILL: I don't have their answer to the complaint in front of me, but they have --

THE COURT: Do you know whether Section 101 is a defense in this case?

MR. HAMILL: Yeah. We're not asserting that's not a defense or that they haven't preserved it, your Honor.

THE COURT: Well -- all right. So if it is, is there a motion for summary judgment on that defense? If not, is it your expectation that that defense is just going to the jury?

MR. HAMILL: There's no motion. It's in the pretrial order, so we expect it to be a part of the trial.

THE COURT: All right. And the expert's

report -- the defendant's expert's report on validity discusses these six exhibits as part of the basis for the 101 defense?

MR. HAMILL: These exhibits are relied on to establish what was known at the time. They're not relied on as specifically invalidating through anticipation or obviousness.

THE COURT: They're not 101 or 103 -- I mean, 102 or 103?

MR. HAMILL: That's correct, your Honor.

THE COURT: Why would they be excluded if they're the basis of a defense that's live in the case?

MR. HAMILL: Your Honor, the 101 analysis is -- goes to patentable subject matter and so that invalidity theory does not rely on a prior art reference as a basis. The expert can talk about -- try to establish what was routine or conventional at the time any number of ways, but the result isn't invalidity over a prior art reference. That's not what patentable subject matter is about. And so it's ASSIA's position that none of these prior art references, which are discussed as part of the technology background, should be admissible.

THE COURT: That's what step two of Alice is about, right?

MR. HAMILL: Correct. To determine whether the subject matter was well understood, routine, or conventional.

THE COURT: So how is that not part of the invalidity analysis?

MR. HAMILL: Well, the Court's MIL 4 precludes prior art that's not disclosed in a specific combination. And this is really --

THE COURT: That's for obviousness. I mean, that's what the combination reference is to.

MR. HAMILL: Right, your Honor. But the MIL No. 4 is not so limited. The prejudice of allowing all sorts of background prior art is that there's going to be jury confusion and a big stack of prior art that's not being compared to the claims. And particularly with DX16 through 20, which are all patents. And so we believe that the only patents that should go back to the jury are the asserted patents and any patents that are relied on in an obviousness or anticipation theory of invalidity, your Honor.

THE COURT: When you leave the Section 101 defense to the jury, it's hard for me to say that patents can't be part of the step two analysis.

MR. HAMILL: Your Honor, the background for prior art should not go back to the jury. I don't think

we're disputing that the expert can provide an overview through his testimony.

THE COURT: Are you disputing that if -- if it is determined to be abstract at step one, that it is well understood, conventional, or routine at step two?

MR. HAMILL: Your Honor, we would dispute that.

THE COURT: I understand. So why -- why isn't evidence to the contrary a part of defendant's case?

MR. HAMILL: Well, your Honor, there may be some probative value there even in -- without the Section 101 argument as part of the technology background, but there's a lot of prejudice by having all these prior art references go to the jury when they should not be comparing those to the claims because they're not asserted in a specific combination. And so that's our position, that they should not go back because they really are just providing a background.

THE COURT: I -- it's highly unusual to see the plaintiff not trying to keep the Section 101 defense a matter for the Court. But when it is going to be a part of the case for the jury, it's hard for me to see why the defendant can't offer exhibits to support the step two analysis.

MR. HAMILL: I guess, your Honor, it's -- those types of background documents are relevant to 101 in a similar way they are to an obviousness analysis, but the Court's MIL No. 4 precludes that from going in. And so the -- our understanding of the reasoning there is because it would be confusing to the jury. And so we think the same analysis applies, whether it's -- you know, used or perhaps worked into an obviousness analysis versus a 101 analysis.

THE COURT: I take it you're not disputing step one of the 101 defense?

MR. HAMILL: Excuse me, your Honor?

THE COURT: I take it you're not disputing step one of the 101 defense? You've not raised it with the Court.

MR. HAMILL: We're not waiving any part of the 101 analysis, your Honor.

THE COURT: How would you intend for the Court to address it?

MR. HAMILL: Your Honor, perhaps another approach could be that the Court limit Charter's expert argument about the references in this first bucket to Section 1 exclusively and so that they cannot be worked in to the obviousness analysis.

THE COURT: All right. I will consider that

request, Mr. Hamill. Thank you.

MR. HAMILL: Thank you, your Honor.

MR. XUE: Your Honor, just very briefly.

101 references --

THE COURT: I'm sorry. I can't quite hear you.

MS. XUE: I'm sorry. Wen Xue on behalf of defendant Charter.

On this bucket -- the first bucket, we agree with you 100 percent. This evidence are proper 101 references that should be submitted to the jury. And the expert has opined on our step two relying on these references. We're not planning to -- an expert hasn't offered any opinions -- an opinion using these references in any of the 102, 103 combinations. They're just 101 references on Alice Step 2.

THE COURT: So I take it from that, that you don't oppose the plaintiff's request that these exhibits in bucket one are to be used only in connection with your expert's 101 analysis as opposed to 102 or 103?

MR. XUE: That's right.

THE COURT: All right. Then I will grant -- I will preadmit these documents with that understanding, that they will be limited to the expert's 101 testimony. Which expert is that, Ms. Xue?

MR. XUE: I believe exhibit -- the first one on the list is related to the '654 patent, so that would be Dr. Shoemake. And the remaining references would be related to the '398 and '313 patent and that would be Dr. Almeroth.

THE COURT: All right. Thank you, Ms. Xue.

MR. XUE: Thank you, your Honor.

MR. HAMILL: Thank you, your Honor.

Before I move on to bucket two, I just want to clarify for the record, ASSIA disputes both prongs of the Section 101 analysis. I just want that to be clear on the record.

THE COURT: Your statement is on the record.

MR. HAMILL: Thank you, your Honor.

And so with that, I'll move on to the next bucket. And so this pertains to a document from the inter partes review filing that Charter has admitted in this -- for the patents in this case. And this is precluded by the Court's MIL No. 6, which precludes all evidence of PTAB and inter partes review proceedings. The --

THE COURT: Can you tell me what DX28 is?

MR. HAMILL: Yes. I believe it's the preliminary -- patent owner's preliminary response. And --

THE COURT: All right.

MR. HAMILL: And defendant's expert relies on statements made in it to argue the scope of one of the claim terms. And so this is improper claim construction. And because claim construction is for the Court, not the jury, it's completely irrelevant to any issue before the jury and therefore inadmissible under 402. It's also highly prejudicial. There's a high risk the jury may apply a different claim construction than that ordered by the Court. There provides --

THE COURT: And that's all I need to hear at this point, Mr. Hamill. Thank you.

What is the response?

MR. XUE: Your Honor, we're very familiar with the Court's standing MIL No. 6 about excluding evidence related to PTAB, IPR, and AIA, and we're not trying to confuse the jury here by talking about IPRs or introducing evidence from a whole other proceeding and distract the jury from the issues they're to decide in this case. And we're introducing this patent owner preliminary response for the limited purpose of showing the jury that the patent owner was telling the patent office one thing in the context of invalidity and then they're -- we believe they'll tell the jury the opposite thing in the context of infringement in this case.

And we offer -- in the meet and confer, we offered the -- ASSIA to -- we would redact everything that refers to IPR or the PTAB proceeding and we can just refer to the document simply as -- as a submission or a statement to patent office to avoid any distraction to the jury. And on the point of expert improper claim construction, there is no pending -- ASSIA has a motion to strike Dr. Almeroth's opinion and they didn't argue there was any improper claim construction opinion in there. And, of course, we're not going to offer expert testimony outside of the scope of Dr. Almeroth's opinion.

The exhibit is simply the patent owner's own statement about, you know, what does or does not meet the claim limitation. Dr. Almeroth is not going to offer claim construction based on that.

THE COURT: I'll sustain the objection to the POPR. If there's something in it that you think provides a basis for impeachment of the plaintiff's witnesses, then you can use it in that regard. But it is inherently confusing to introduce documents from an IPR into the infringement case.

MR. XUE: Thank you, your Honor.

MS. GLAUSER: When you're ready, your Honor --

THE COURT: Yes.

MS. GLAUSER: -- the next bucket is Group 3. These are two patents -- and we'll need to seal this portion of the transcript as well.

But these are two patents that underlie a license agreement between ASSIA and [redacted] And that agreement is something that Charter's expert -- damage expert Dr. Becker relies upon. We have filed a motion to strike that portion of Dr. Becker's testimony. And so we believe that to the extent that motion is granted, then these particular patents also should not come in. But to the extent that that motion is denied and Dr. Becker is permitted to testify about the ASSIA[redacted] and then [redacted] agreement, that, nevertheless, the underlying patents shouldn't come into evidence.

The technical experts can discuss the technical comparability, the damages experts would discuss the economic comparability, but the patents themselves shouldn't go back to the jury. That should be limited to the patents-in-suit and the asserted prior art.

THE COURT: Who owns these patents?

MS. GLAUSER: They are currently owned by a third-party [redacted]

THE COURT: And were they assigned by ASSIA to [redacted]

MS. GLAUSER: Yes, your Honor, they were. And then they were licensed from [redacted] And through that, Charter got a license as an [redacted] member and that's the basis on which Charter is relying on that agreement as comparable. We have alleged that there is insufficient economic comparability to rely upon it and also that it's not technically comparable, because while it uses the same acronym PMA, it involves a completely different technology. As your Honor noted at the beginning of this morning, our PMA is profile management application, that PMA is persistent management agent, and they operate on two different portions of the system.

THE COURT: All right. Thank you, Ms. Glauser.

MR. QUIST: Good afternoon, your Honor.

So toward the end of what Ms. Glauser was saying is really the crux of why they're taking issue with this. I don't think there's any real dispute that if there is a patent that's been analyzed by the experts, whether for invalidity or for technical comparability, it is okay for the jury to take that back. In this case, we have Dr. Almeroth who has

analyzed the patents in the [redacted] agreement. Several of them in his opinion are comparable. You heard Ms. Glauser say in their expert's opinion they're not comparable.

But the sections in the report have specific cites to specific language. We think it's absolutely important and critical to -- for the jury to have access to that if they -- if they so choose to go look at the given context and to say -- you know, consider that information for themselves. I don't think that the issue as stated by Ms. Glauser is representative of the real issue they're concerned with, except for the last piece of this, the PMA acronym. Let me just put up on the elmo here --

THE COURT: There is no contention that these relate to validity? This is just -- you're wanting to offer these to support your expert's conclusion that they're technically comparable for purposes of a license that is relevant to your damages issue?

MR. QUIST: That is true. And they're of particular relevance here because they do come from ASSIA -- they originated from ASSIA and, as Ms. Glauser explained, went to [redacted] and then through a series of licenses.

THE COURT: So what would you have the jury

draw from its examination of these exhibits?

MR. QUIST: They're going to hear testimony from both experts on technical comparability and just like they'll hear -- you know, them testifying on other evidence, such as other references. To the extent the jury would like -- you know, we think the jury should have those handy to the extent they want to go explore it.

THE COURT: Okay.

MR. QUIST: May I mention one more thing?

THE COURT: You may.

MR. QUIST: To the extent that ASSIA's counsel is concerned that there's some confusion because of the acronym -- I think that's really the crux -- there's persistent management agent and there's in parentheses PMA. The experts -- our expert and their expert will say, yeah, we agree that that's like an incidental thing. It doesn't mean -- those don't stand for the same thing. But, nevertheless, setting that aside, our expert says these are indeed technically comparable. And that's something that can be represented -- you know, that's something that can come before the jury at a trial. That's an easy distinction to make.

THE COURT: How is it going to be made clear

to the jury that these do not relate to validity?

MR. QUIST: Well, they won't come up in the invalidity or validity parts of the examination of the witnesses. They're not even asserted as invalidity references.

THE COURT: All right. Thank you, Mr. Quist.

Ms. Glauser, if there's some form of relief that would lessen the potential for jury confusion, I -- it does seem to me that the defendant is seeking to use these in a way that is relevant and without having examined what the experts are relying on in their contrary opinions about technical comparability, it's hard to say that it's not something that would benefit the jury to see what the context of those passages is.

Do you have concern that this is going to bleed over into invalidity?

MS. GLAUSER: We have concern the jury will be confused, including with regard to invalidity. I think that it is a standard practice for the Court to admit patents that are the asserted patents and that relate to validity. And there is not typically, even when there are license agreements that claim to be comparable admitted into the record, that all of the underlying patents are admitted.

We have not objected to the idea that if

Dr. Becker is allowed to testify about this license agreement, that during his testimony he could use the patent as a demonstrative to explain why he determined it was technically comparable, but sending the patent back to the jury as part of the record, I think is confusing for purposes of what they're examining with regard to infringement and invalidity.

THE COURT: All right. Thank you, Ms. Glauser.

MR. QUIST: May I just make one point very briefly?

THE COURT: You may.

MR. QUIST: In the event that confusion of the jury is still an issue, we would be happy if the Court gave, you know, an instruction to the jury that this particular reference is not to be considered for purposes of invalidity.

THE COURT: I'm going to sustain the objection, but note that the patents can by agreement be used as demonstratives in connection with the examination of the relevant experts. So that will at least relieve you of having to battle to use them as demonstratives. But I -- I'm not comfortable with the conclusion that it's proper to send them back to the jury room given the potential for confusion between the

patents asserted for invalidity and these patents that share the very similar technology. So I will sustain the objection, but the record notes that there's an agreement that they can be used as demonstratives.

MR. QUIST: Understood. And thank you, your Honor.

THE COURT: Thank you, Mr. Quist.

MS. GLAUSER: Your Honor, may I just clarify what the agreement is? The agreement is subject to our motion to strike Dr. Becker's testimony being denied?

THE COURT: That sounds right to me.

MS. GLAUSER: Okay. Thank you.

THE COURT: All right. That takes us to Bucket No. 4. And I will note for the record that I intend to have the clerk attach a copy of this bucket list to the minutes so that the record will be clear about what we're talking about when we designate these different buckets.

MS. ACHARYA: Your Honor, with respect to Bucket No. 4 and Bucket No. 5, both of those relate to issues that are intertwined with the downstream PMA issue. I conferred with counsel for ASSIA. To the extent that you're inclined to agree to give Charter additional briefing on the MIL related to downstream PMA, we would ask that we defer argument on these two

buckets until you hear argument on that MIL because it could -- a lot of this could rise and fall with the potential additional MIL.

THE COURT: Well, I am inclined to do that. And let me note that I looked at the calender and the afternoon of Wednesday, March the 4th looks like one of the few opportunities I have between now and the trial date to give you a half a day and come back.

So why don't we have an understanding that the MIL that you're talking about would be filed in time for the plaintiff to file an opposition by no later than March the 3rd at noon so that I can prepare for it before that hearing. So, obviously, that's going to be a "sooner the better" situation for yours, but let's have the understanding that we'll take up that issue on March 4th. And any exhibits that we don't reach in the next hour, we'll take up at that time as well.

MS. ACHARYA: Understood, your Honor. May I ask you more of a logistical question in terms of how many pages we're permitted on that MIL and how many pages ASSIA is permitted on opposition?

THE COURT: Do you have a suggestion?

MS. ACHARYA: Ten pages.

THE COURT: All right. I'm glad we're not doing it in writing, so I'm not creating a precedent.

Additional MILs can be ten pages, but just between us.

MS. ACHARYA: Understood. Thank you, your Honor.

THE COURT: All right. Now, does that mean that there's an agreement that Bucket Nos. 4 and 5 should be deferred until that time?

MS. ACHARYA: Yes, your Honor. We would ask that the argument on those two buckets be deferred until after we argue the MIL.

THE COURT: And is that agreeable to counsel for the plaintiff?

MS. GLAUSER: It is, your Honor.

THE COURT: All right. Then that's what we'll do. That takes us then to Bucket No. 6.

MS. GLAUSER: Your Honor, one suggestion would be considering the amount of time we need to get the briefing done and that the original MILs were five MILs to the 15 pages, a single MIL that's ten pages long seems exorbitant for the amount of time the Court will have to review it and the parties to draft it. We would submit, maybe, five pages is more than sufficient.

MS. ACHARYA: Could we do seven?

THE COURT: If I had a gavel, I'd bring it down. Sold. It's seven pages.

MS. ACHARYA: Appreciate it, your Honor.

THE COURT: How soon can you do it while we're talking about this?

MS. ACHARYA: In a week.

THE COURT: That would be the 27th.

MS. GLAUSER: That leaves us three days to do the --

THE COURT: How about --

MS. ACHARYA: I just don't have a calendar in front of me.

THE COURT: So this is Friday. Pick a day next week. Can you get it done by Wednesday or Thursday?

MS. ACHARYA: Thursday we can definitely do it.

THE COURT: Thursday's about half way. So if they file it on Thursday, you can respond to it Tuesday at noon. How about --

MS. ACHARYA: We can do ours Thursday by noon.

THE COURT: Thursday by noon. All right. Then we'll proceed in that fashion.

MS. ACHARYA: Thank you, your Honor.

THE COURT: Good morning -- good afternoon. I'm sorry.

MR. MATHER: Good afternoon. Carter's

Bucket No. 6 is a single PowerPoint exhibit produced by ASSIA. ASSIA's purpose that they've told us this is relevant to is showing Charter's notice to ASSIA's intellectual property. So, you know, I believe the parties understand that it would be subject to Charter's motion for summary judgment on pre-suit willfulness. But separate from that, we have a few objections to this document.

The first objection is a hearsay objection. And to just, kind of, jump into it, I think the main issue here is that to be relevant to Charter's notice of something owned by ASSIA, it would have had to have been shown to Charter. And our position is that plaintiff hasn't shown that this particular presentation was ever actually presented to Charter. So basically to cut to the chase, again -- I know it's late. The -- the document they showed us yesterday is this e-mail where it, sort of, refers to -- please find attached as requested our slides about this presentation.

The issue is, is this e-mail is actually an e-mail in the middle of an e-mail chain. And that e-mail chain, it doesn't have attachment. It doesn't reference an attachment. And actually when coming to this individual PowerPoint, ASSIA's produced multiple versions of it in discovery. They've produced a few

different copies that are a little bit different. So, you know, even, kind of, taking Dr. Cioffi at his word in this e-mail, it doesn't appear to show what version of these slides was actually sent to Charter.

THE COURT: Was Dr. Cioffi questioned about this during his deposition?

MR. MATHER: So Dr. Cioffi during his deposition indicated that he had a meeting. He didn't reference -- and I don't know that he was explicitly asked about slides. These slides actually weren't marked in any deposition either by Charter or ASSIA. So there's also no testimony from Charter that they ever received these slides or ever reviewed these slides.

So it's -- it's -- you know, our contention is that plaintiff hasn't shown that they were ever presented in any way. I mean, even if they say now that Dr. Cioffi can provide this testimony, you know, it's, kind of, getting back to the hearsay issue, which is, you know -- even if we could cross-examine him about that now, we can't really explore some of these issues, you know, with his mindset as it was in 2020.

And then I think the second objection we have is kind of a 403 objection. The -- you know, I think the probative value, you know -- and without getting too much into the MSJ issues, which I know your Honor will

decide -- you know, there is really a very limited reference to IP in this document. You know, it's, kind of, a very -- it's not a specific patent -- specific patent, you know, number issues. It's a -- it's a very, kind of, high level IP portfolio. There's another reference that Charter is -- you know, certain technologies in use at Charter. But this document also has this, kind of, rundown of all these sort of unrelated disputes -- sorry -- that's not very straight, your Honor. You know, it is, kind of, this detailed rundown of these recruiting meetings and supposed, you know, efforts, you know -- and so I think like, you know, our intention is, you know, any limited -- limited notice value this has is substantially outweighed by confusion of the issues and other -- other prejudices.

THE COURT: Do you have any reason to suggest that this document was prepared for anything other than presentation to Charter?

MR. MATHER: I mean -- you know, I certainly -- you know, I guess I don't -- I don't fundamentally dispute in some way that it may have been prepared in connection with that, but I -- we still don't know, kind of, which version of it was shown to Charter, if any, and we don't know that this particular version was ever displayed to Charter, was ever sent to

Charter.

THE COURT: So have you seen during discovery that there are multiple versions?

MR. MATHER: Yeah. And I have a little bit. I mean, it's not a complete redline. Sorry. I thought I had other copies of this. I can get those to plaintiff's counsel. You know, there's -- here's that slide we were just looking at a moment ago. You can see, you know, there's some edits made. I think -- let me see if I can give you the Bates numbers. The Bates ending in 36313 and 33926. So, I mean, there were multiple different versions produced.

And, I mean, the issue, I guess, is this all could have been cleared up if -- if this e-mail, which presumably had the attachment was produced by ASSIA in discovery, but ASSIA did not produce that e-mail, just the top e-mail in the thread, which doesn't include the attachment.

THE COURT: All right.

MR. MATHER: Thank you.

THE COURT: Thank you. Mr. Mather, is it?

MR. MATHER: Yes, your Honor.

THE COURT: All right. Thank you, Mr. Mather.

MS. GLAUSER: Thank you, your Honor.

The document itself is not hearsay. It's not being offered for the truth of the matter asserted. It's being offered to show the notice that Charter was under so it does not qualify as hearsay.

THE COURT: You know, there are, as was pointed out, a lot of different subjects dealt with in it. Which of those is relevant as far as notice goes?

MS. GLAUSER: Your Honor, there are a set of slides within here that we -- as we noted today, Dr. Cioffi is going to be the corporate representative to testify at trial who will be able to testify that this set of slides that I'm showing were, in fact, shown to Charter's CTO. He's the person that actually met with Charter and Charter's counsel did ask Dr. Cioffi about that meeting. He just never brought up the particular documents that we had produced.

So within there, it is a discussion of what ASSIA's patent portfolio relates to, how that could read on Charter's particular implementations of what it offers as an internet service provider. And this is part of, kind of, a litany of communications that go back and forth between the parties that start off somewhat more generic with regard to IP patent portfolios and the suggestion that Charter should take a license.

THE COURT: All right. Well, what I'm going to do with this one is I'm going to allow it to stay on the plaintiff's exhibit list, but it will bear an asterisk on that list, which means that it is not to be referred to in front of the jury until it has been admitted through the testimony of Dr. Cioffi. And assuming that goes as you plan, it will be admitted at that time, and then it'll be like any other preadmitted exhibit. But until that testimony, it's not to be mentioned in front of the jury.

MS. GLAUSER: Understood, your Honor. Thank you.

THE COURT: All right.

MR. MATHER: Your Honor, just one point, if I may?

THE COURT: Yes.

MR. MATHER: Our 402 and 403 objections, you know, especially the parts of the document that are not relevant to notice provisions, are -- will we be able to reserve those or, you know --

THE COURT: Those are taken up now. The only objection that's listed on this bucket list that was filed is hearsay.

MR. MATHER: Well, let me find the e-mail. I believe we have a 403 objection.

THE COURT: All right. It's not reflected on what you sent to the Court.

MR. MATHER: Give me a second.

THE COURT: All right.

MR. MATHER: I think what had happened is there was an initial version of this that, you know, did inadvertently omitted a 403 objection, but it was corrected by Charter. And I think, you know, possibly when ASSIA went to send the e-mail -- I think it was just, like, an oversight -- that perhaps they used the uncorrected version.

THE COURT: Well, here is what I'll say, Mr. Mather, and that is that I would ask you to confer with the other side and see if you can agree on limiting the exhibit to the portions that they want. And if you all can agree on that, then that's fine. If you can't, then bring it back up on March the 4th and we'll address that.

MR. MATHER: Thank you, your Honor.

THE COURT: Thank you, Mr. Mather.

MS. GLAUSER: Your Honor, perhaps the next statement is the good news, which is that the next two categories are agreements between the parties that those exhibits rise and fall with particular motions, either motions that ASSIA has filed or motions that Charter has

filed. And so our request is that those be deferred for preadmittance or not until after the rulings on the motions.

THE COURT: And I'm looking at the bucket list that you provided and it identifies certain motions. Are those the ones that the parties are referring to as far as the exhibits rising and falling?

MS. GLAUSER: They are, your Honor.

THE COURT: All right. Then I will defer further consideration of Bucket No. 7 and 8 until after we resolve those.

MS. GLAUSER: Unless your Honor has something else, I don't believe ASSIA has anything else that needs to be addressed with the conference.

THE COURT: All right. One thing, is there a corrected bucket list -- corrected list of the objections?

MS. GLAUSER: There are e-mail communications back and forth last night as we were preparing the chart. I obviously would never have dropped something that Charter had proposed be in the chart. But I do not have any memory that there was a 403 added. I will go back and check that and perhaps the parties can confer and then address it at the next conference.

THE COURT: And that's fine. I just want to

make sure that we have whatever the parties consider the current version of it. And I'm assuming it's this one that was e-mailed late yesterday?

MS. GLAUSER: That's correct, your Honor. And it was obviously copied to defendants who confirmed that it was served with the Court without any correction at the time.

THE COURT: I understand things get left off in the process.

MS. GLAUSER: Thank you.

THE COURT: Yes, Mr. Eiseman.

MR. EISEMAN: Your Honor, our only question is what time you want us here on March 4th?

THE COURT: You know, in order to give maximum time possible, let's say 1:00 o'clock. If you all figure out that you don't have that much left in dispute, feel free to have a longer time. But right now I have a Markman hearing that morning that I can guarantee I'll finish by noon. So to give you the maximum time, let's say 1:00 o'clock.

MR. EISEMAN: If things change on the parties' side, we'll let the Court know.

THE COURT: All right.

MR. EISEMAN: Thank you, your Honor.

THE COURT: We still -- oh, that is

everything. All right. I thought there was another page of this.

All right. What else do the parties want to take up? The county did say that if we were not out of here by 5:00, we'll get locked in. I'm not sure I take them seriously, but is there anything else that, Mr. Eiseman, that your side wants --

MR. EISEMAN: Not from Charter, your Honor.

THE COURT: All right.

MR. EISEMAN: Thank you.

THE COURT: What about for ASSIA?

MR. KRAMER: No, your Honor. Thank you.

THE COURT: Well, thank you very much. I appreciate your putting up with the difficulties of this beautiful, old courtroom.

But we are adjourned.

(Proceedings adjourned at 4:17 p.m.)

* * *

COURT REPORTER'S CERTIFICATION

I hereby certify that on this date, February 25, 2026, the foregoing is a correct transcript of the record of proceedings in the above-entitled case.

APRIL D. HARGETT
Certified Realtime Reporter
Eastern District of Texas
Beaumont, Texas