██████████████████

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ADAPTIVE SPECTRUM AND SIGNAL ALIGNMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC., <br><br> Defendant. | CASE NO. 2:24-cv-00124-JRG-RSP <br><br> **JURY TRIAL DEMANDED** <br><br> ████████████ <br><br> <u>**REDACTED VERSION**</u> |

**PLAINTIFF'S OPPOSITION TO CHARTER'S PARTIAL MOTION FOR SUMMARY JUDGMENT OF PATENT INELIGIBILITY UNDER 35 U.S.C. § 101 (*ALICE STEP ONE*) (DKT. 346)[1]**

---

[1] Unless otherwise noted, all numbered exhibits herein refer to the exhibits submitted by Charter in support of its Motion (Dkt. 346) and all lettered exhibits refer to the exhibits attached to the Declaration of Robert F. Kramer, dated April 1, 2026 ("Kramer Dec."), filed concurrently herewith in support of this Opposition brief.

Unless otherwise noted, all emphases herein are added.

**TABLE OF CONTENTS**

I.   RESPONSE TO CHARTER'S STATEMENT OF ISSUES ................................................... 1

II.  ASSIA'S RESPONSE TO CHARTER'S SUMFS .......................................................... 1

III. ASSIA'S ADDITIONAL UNDISPUTED MATERIAL FACTS ......................................... 1

IV.  INTRODUCTION ......................................................................................................... 2

V.   LEGAL STANDARD ................................................................................................... 3

VI.  THE '398 AND '313 CLAIMS ARE NOT DIRECTED TO ABSTRACT IDEAS .............. 4

   A.   The Court's Constructions of "Processed Data" and "Communicating the Policy" Define
        a Specific Machine Architecture Charter Cannot Abstract Away ................................. 4

   B.   The Specification and Inventor Testimony Confirm the Claims Address Concrete
        Technological Problems ................................................................................................. 5

   C.   Charter Impermissibly Oversimplifies the Claims ......................................................... 6

   D.   The Claims Do Not Merely Organize Human Activity .................................................. 8

   E.   The '398 and '313 Patents Improve Computer Functionality ......................................... 9

VII. THE ASSERTED CLAIMS OF THE '654 PATENT ARE NOT DIRECTED TO AN
     ABSTRACT IDEA ........................................................................................................ 9

   A.   The Claims Recite Specific Technical Solutions Confirmed by Inventor and Expert
        Testimony ..................................................................................................................... 9

   B.   Charter Impermissibly Oversimplifies the '654 Claims ............................................... 12

   C.   The Claims Do Not Merely Organize Human Activity ................................................ 14

   D.   The '654 Patent Improves Computer Functionality ...................................................... 15

VIII. CONCLUSION .......................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013)........................................................................................ 14

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208, 134 S. Ct. 2347, 189 L. Ed. 296 (2014)..................................................... 1, 2, 3

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 7597 (Fed. Cir. 2019)....................................................................................... 4, 7

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020)........................................................................................ 7, 8

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ........................................................................................ 7, 8, 9

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016)........................................................................................ 4

*Random Chat, LLC v. Altra Federal Credit Union*,
No. 2:25-CV-000478-JRG, 2026 WL 636677 (E.D. Tex. Mar. 6, 2026)........................... 10, 16

*Scale Video Coding LLC v. Cisco Sys., Inc.*,
No. 4:23-CV-803-SDJ, 2025 WL 993364 (E.D. Tex. Apr. 2, 2025)................................... 11, 15

*Solutran, Inc. v. Elavon, Inc.*,
931 F.3d 1161 (Fed. Cir. 2019)........................................................................................ 9

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019)........................................................................................ 7, 9, 10, 13

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020)........................................................................................ passim

*Univ. of Florida Rsch. Foundation, Inc. v. Gen. Elec. Co.*,
916 F.3d 1363 (Fed. Cir. 2019)........................................................................................ 14, 15

**Statutes**

35 U.S.C. § 101................................................................................................................ 15

35 U.S.C. § 282................................................................................................................ 3

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................... 3

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ASSIA or Plaintiff | Plaintiff Adaptive Spectrum and Signal Alignment, Inc. |
| Charter or Defendant | Defendant Charter Communications, Inc. |
| '654 Patent | U.S. Patent No. 11,050,654 |
| '313 Patent | U.S. Patent No. 11,770,313 |
| '398 Patent | U.S. Patent No. 10,848,398 |
| SUMF | Charter's Statement of Undisputed Material Facts (Dkt. 346) |
| AUMF | ASSIA's Statement of Additional Undisputed Material Facts |

I.    **RESPONSE TO CHARTER'S STATEMENT OF ISSUES**

Charter asks the Court to determine that the asserted claims of the '313, '398, and '654 patents are directed to abstract concepts under *Alice* Step One. ASSIA opposes Charter's Motion and cross-moves for partial summary judgment that the asserted claims are not directed to abstract ideas under *Alice* Step One.

II.    **ASSIA'S RESPONSE TO CHARTER'S SUMFS**

ASSIA does not dispute Charter's SUMF Nos. 1 or 2.

III.    **ASSIA'S ADDITIONAL UNDISPUTED MATERIAL FACTS**

**AUMF 1**. The '398 and '313 patent specifications describe that, prior to the claimed inventions, communication units such as Wi-Fi access points used "static" adaptation algorithms that were "dependent on the assumptions made by the designer of the WiFi communication system" and that "may be quite different from the actual operational environments," resulting in "low performance due to non-ideal design of the static adaptation algorithm." Ex. A ('398) at 1:64–2:13; Ex. B ('313) at 1:52–2:29. The specification further explains that "a communication unit does not have the processing power, storage space, or access to large amounts of data to generate the best policy to achieve optimal performance efficiency" and "typically does not have access to historical data related to communications with other stations." Ex. B ('313) at 4:14–19. The specification states that "[t]he remote server resolves the above problems and provides an optimum policy for the communication units to use that can be based on analysis of a large amount of operational data of the communication units and other similarly situated communication units or any other expert knowledge." *Id.* at 4:21–26.

**AUMF 2**. The '654 patent specification describes that, prior to the claimed invention, WAN and/or LAN "performance information is not centrally analyzed" and "communication device[s] coupled to such networks may operate with lower performance than otherwise possible

1

because the communication devices have no means for knowing performance data that can be used to intelligently assess and manage performance . . . ." Ex. C ('654) at 1:28–39. The specification further states that "information about the communication device and communication device performance inside the local area network (LAN) is generally available to other devices on the LAN, however not available to machines outside the LAN; i.e., the wide area network (WAN), or the cloud." *Id.* at 2:25–30.

**AUMF 3.** Regarding the '398/'313 patents, Dr. Wonjong Rhee testified that "people were not really managing the WiFi network in a dynamic way or the configurations were pretty much static," that local devices were "not really capable of doing something sophisticated[,]" and that such devices could not "see what's happening in other network devices . . . ." Ex. D (Rhee Dep.) at 79:10–81:7. Regarding the '654 patent, Dr. Rhee testified that he "was not able to find any [internet service provider] collecting . . . LAN side data, and analyzing them, and . . . that's one of the reasons why we were jumping into that area and . . . trying to develop our management solution." *Id.* at 24:3-5, 24:13-18.. Dr. Bednarz testified that the visibility of a subscriber's home network was "hidden from . . . the carrier" and that "[n]one of that was available." Ex. E (Bednarz Dep.) at 76:3–5, 76:9.

## IV.    INTRODUCTION

Charter's Motion asks this Court to find that the asserted claims of the '398, '313, and '654 patents are directed to abstract ideas under *Alice* Step One. That Motion rests on an impermissible level of abstraction that strips the claims of their specific technological content and ignores the concrete improvements to communication systems that the patents provide. The '398 and '313 patents are directed to a specific method for improving communication unit performance using a server-based architecture that overcomes the limitations of prior art static adaptation algorithms. The specifications explain that communication units lack the processing power and data access to

2

generate optimal policies on their own, and that a remote server resolves these problems by analyzing operational data from across similarly situated communication units. The '654 patent is directed to a specific system architecture that solves the problem of performance information inside the LAN being unavailable to machines outside the LAN, by deploying a downloadable agent that collects data on behalf of a remote server for centralized analysis.

Charter achieves its characterization of the claims as abstract only by stripping away the specific technological elements and disregarding the very claim elements and combinations the specifications identify as the focus of the claimed advance. The Federal Circuit has squarely rejected this approach. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1295 (Fed. Cir. 2020). Charter's Motion should be denied.

## V.   LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Charter bears the burden of proof, and patents are presumed valid. 35 U.S.C. § 282. Against that backdrop, the question at *Alice* Step One is whether the claims are "directed to" an abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217, 134 S. Ct. 2347, 189 L. Ed. 296 (2014); *see also* 35 U.S.C. § 101. Courts must not "oversimplify[] the claims" by ignoring "the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). The court should look to the specification because it sheds light on what "the problem facing the inventor" was and "what the patent describes as the invention." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019). In software cases, the "inquiry often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead" invoke computers "merely as a tool." *TecSec*, 978 F.3d at 1293 (citations omitted).

3

VI. **THE '398 AND '313 CLAIMS ARE NOT DIRECTED TO ABSTRACT IDEAS**

A. **The Court's Constructions of "Processed Data" and "Communicating the Policy" Define a Specific Machine Architecture Charter Cannot Abstract Away**

Charter's Step One theory fails at the threshold because it ignores the specific limitations this Court has already construed and that define the claimed technological architecture. As construed, Claim 19 of the '313 patent requires a server to generate a policy from collective processed data across multiple communication units in different networks, and to communicate that policy to units whose algorithms operate based at least in part on the policy. Dkt. 105 at 19, App'x A; Dkt. 201 at 19–20. Those limitations foreclose Charter's attempt to recast the claims as generic "collect, analyze, and communicate" information processing.

Specifically, the Court's construction of "processed data" (Dkt. 105 at 19, App'x A) imposes a specific architectural requirement: the server must aggregate operational data from multiple communication units located in at least two different networks and must generate the policy based on that collective data. No single communication unit possesses this data. The server architecture is purpose-built to receive, store, and process data streams from communication units in different networks, which the specification identifies as the solution to hardware limitations of individual communication units. Ex. B ('313) at 4:14–26; AUMF 1. The Court further construed the "communicating the policy" limitation to require communication to units that implement algorithms "based at least in part on the policy." Dkt. 201 at 19–20. This construction confirms the claim is not silent on how the policy operates. Instead, it specifies that the communication units executing algorithms must operate based on it. Taken together, the construed claim describes a specific technical architecture rather than an abstract idea, and Charter's oversimplified characterization cannot be reconciled with what the construed claim actually requires.

4

**B.    The Specification and Inventor Testimony Confirm the Claims Address Concrete Technological Problems**

The specification identifies a specific technological problem: adaptation algorithms relied on "static assumptions that do not change over time" and that "may be quite different from the actual operational environments." Ex. A ('398) at 2:5–9; AUMF 1. As a result, "the WiFi communication system . . . may suffer from low performance due to non-ideal design of the static adaptation algorithm." *Id.* at 2:10–13. The specification explains this problem exists because "a communication unit does not have the processing power, storage space, or access to large amounts of data to generate the best policy to achieve optimal performance efficiency" and "typically does not have access to historical data related to communications with other stations." Ex. B ('313) at 4:14–20; AUMF 1. To overcome these limitations, the specification describes a remote server that "resolves the above problems and provides an optimum policy for the communication units to use that can be based on analysis of a large amount of operational data of the communication units and other similarly situated communication units . . . ." Ex. B ('313) at 4:22–26; AUMF 1.

The inventor's testimony confirms that the claims are directed to a specific technological solution. AUMF 3. Dr. Rhee testified that local devices were "not really capable of doing something sophisticated" and could not "see what's happening in other network devices." Ex. D (Rhee Dep.) at 79:10-81:7. His inventive insight was a "layered optimization" approach: "the high level decision, high level smart thing should be done by the remote server, but then that should be passed to the local device specific to that environment and then let the local device really run the rule or implement this dynamic operation, dynamic control." *Id.* at 81:19–82:1. ASSIA's expert, Dr. Souri, confirmed this layered optimization approach "improved computer communications technology" and "overc[ame] problems with existing systems that were static and relied on assumptions made by a designer." Ex. F (Souri Rpt.) at ¶ 200.

## C.    Charter Impermissibly Oversimplifies the Claims

Charter characterizes the claims as directed to "using a policy to improve performance." Mot. at 2. This characterization is "materially inaccurate" in the same way the Federal Circuit found Adobe's characterization inaccurate in *TecSec*. There, the court held that Adobe's reduction of claims was wrong because it "had to disregard elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements." 978 F.3d at 1294. Charter does the same here. To arrive at "using a policy to improve performance," Charter must disregard the server-based architecture, the network monitoring devices, the multi-network data collection, the detection of performance degradation, and the communication of policies to units that implement algorithms based at least in part on those policies.

Charter argues that the patents themselves acknowledge that "algorithms with parameters, rules, or conditions were well known in the field . . . ." Mot. at 3 (citing '313 Patent at 1:63–2:5). But those algorithms rely on the prior art, static, device-level approach that the invention improves upon. Ex. B ('313) at 1:63-2:28. Under *ChargePoint*, that identification of the shortcomings of static algorithms describes the "problem facing the inventor," not a concession that the claimed invention was conventional. 920 F.3d at 767. As Dr. Souri explained, the cited passage "does not pertain to server operation at all—rather it discusses an individual access point that is not working in conjunction with a server" and is "disavowing the prior art approach of using a static algorithm, and [has] nothing to do with communicating a policy to a communication unit that incorporates this input into local optimization." Ex. F (Souri Rpt.) at ¶¶ 212, 215.

Charter's reliance on *Electric Power Group* is also misplaced. The Federal Circuit distinguished *Electric Power Group* in *SRI*, explaining that those claims "were drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of

6

computers and computer networks themselves." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019). The '398 and '313 claims, like the *SRI* claims, "improve[] the technical functioning of the computer and computer networks by reciting a specific technique . . . ." *Id.*

Charter also relies on *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317 (Fed. Cir. 2020), and *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349 (Fed. Cir. 2023), arguing that the claims are "silent on how" to process data and generate a policy. Mot. at 7. In *Ericsson*, the claims made no mention of memory, were not limited to mobile phones, and were entirely silent on how access was controlled—all four recited components collapsed into simply "an access controller for controlling access." 955 F.3d at 1328–30. In *Hawk*, the claims failed to "specify precisely what the parameters are" and the patent did not disclose "performing any 'special data conversion' or otherwise describe how [its goal] . . . is achieved." 60 F.4th at 1357–58. Neither problem applies here.

Here, the Court construed "processed data" to mean "collective processed data from the plurality of communication units." Dkt. 105 at 19, App'x A. That construction answers the *Ericsson* "silent on how" concern because the claims require that the policy must be generated from data aggregated across multiple communication units located in different geographical areas or different networks, which is a specific, technically demanding architectural requirement, not the generic "controlling access" at issue in *Ericsson*. Contrary to Charter's contention, the claims do not merely recite a desired result. They specify both the source of the policy (namely, collective processed data aggregated from communication units in at least two different networks) and the way the policy is used (namely, by communication units that implement algorithms based at least in part on that policy). Ex. A ('398) at 18:22-30; Ex. B ('313) at 18:29-45, 20:10-17. That is a claim specifying a means, not merely reciting a desired result. The Court further construed the

7

"communicating the policy" limitation to require that the communication units implement algorithms "based at least in part on the policy." Dkt. 201 at 19–20. That construction answers the *Hawk* "parameters unspecified" concern because the claims require that the policy—generated from cross-network data aggregation—be communicated to communication units that implement algorithms "based at least in part on the policy."

Charter's table comparing claim elements to generic information-handling steps is similarly misleading. The Federal Circuit rejected this element-by-element reductionism in *TecSec*, holding that asserting "the 'common-place' character of the individual component techniques generally, . . . is insufficient where, . . . it is the combination of techniques that is 'what the patent asserts to be the focus of the claimed advance . . . .'" 978 F.3d at 1297, citing *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019).

### D.   The Claims Do Not Merely Organize Human Activity

Charter argues that the claims merely computerize "the familiar human activity of making and communicating policies based on field data." Mot. at 3. In *SRI*, the Federal Circuit rejected the contention that network monitoring claims were abstract because they encompass steps people can "go through in their minds," explaining that "the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets . . . ." 930 F.3d at 1304. The human mind is equally unequipped to perform what the asserted claims here require: receive data from network monitoring devices across multiple networks, process operational parameters in real time, detect degradation of network performance, and communicate machine-readable policies to devices implementing adaptation algorithms. Moreover, even though non-computer settings may involve the general concept of making policies, "it does not follow that all patents relating to [that concept] are necessarily ineligible . . . ." *TecSec*, 978 F.3d at 1296.

8

Charter's citation to *Random Chat, LLC v. Altra Federal Credit Union*, No. 2:25-CV-000478-JRG, 2026 WL 636677 (E.D. Tex. Mar. 6, 2026) does not change this analysis. *Random Chat* involved claims that merely computerized a pre-existing human conversational concept through generic chat software. *Id.* at *3. The asserted claims here do not implement a pre-existing human practice through generic software; they address hardware constraints with no human analog. Ex. B ('313) at 4:14–20; AUMF 1, 3. *Random Chat* is therefore inapposite.

## E.    The '398 and '313 Patents Improve Computer Functionality

Charter argues the asserted patents do not improve computer functionality. Mot. at 14–15. As discussed above, the '398 and '313 specifications identify a specific technological limitation—communication units lack "the processing power, storage space, or access to large amounts of data to generate the best policy"—and describe a remote server that "resolves the above problems" by analyzing operational data from across similarly situated communication units. Ex. B ('313) at 4:14–26; AUMF 1. This is the precise type of technology-specific improvement found patent-eligible in *SRI*, 930 F.3d at 1303–04; *TecSec*, 978 F.3d at 1296; and *Scale Video Coding LLC v. Cisco Sys., Inc.*, No. 4:23-CV-803-SDJ, 2025 WL 993364, at *7 (E.D. Tex. Apr. 2, 2025).

## VII.   THE ASSERTED CLAIMS OF THE '654 PATENT ARE NOT DIRECTED TO AN ABSTRACT IDEA

### A.    The Claims Recite Specific Technical Solutions Confirmed by Inventor and Expert Testimony

Claim 18 of the '654 patent addresses a specific architectural problem in broadband network management: performance information about devices inside a subscriber's local area network (LAN) is "generally available to other devices on the LAN, however not available to machines outside the LAN; i.e., the wide area network (WAN), or the cloud." Ex. C ('654) at 2:25–30; AUMF 2. The invention solves this visibility gap through a specific architectural mechanism: a downloadable agent deployed on a computing device inside the subscriber's LAN, where it can

collect WAN performance information and transmit it to a remote server for centralized analysis. Ex. C ('654) at 2:30–38. This placement—agent inside the LAN, server outside it—is not incidental. Without a software component operating from within the LAN, a generic cloud server has no means of accessing the LAN-side performance vantage point that makes centralized analysis of broadband performance possible. The inventive architectural feature is the downloadable agent's LAN-side placement, not the cloud server's existence. Charter's characterization of the claims as merely "generic computing functions" (Mot. at 10) omits this specific architectural mechanism entirely.

The specification identifies the specific technological problem these claims address. Prior to the invention, "WAN and/or LAN performance information is not centrally analyzed by a communication device coupled to such networks" and "communication devices coupled to such networks may operate with lower performance than otherwise possible because the communication devices have no means for knowing performance data that can be used to intelligently assess and manage performance." Ex. C ('654) at 1:28–39; AUMF 2. As noted above, the specification further explains that LAN performance data was available to devices on the LAN but not to machines outside it. *Id.* at 2:25–30; AUMF 2. To overcome this problem, the specification describes "an agent . . . which is placed inside the LAN, where the agent collects data on behalf of the cloud or WAN-based server and then transfers that data to the cloud or WAN-based server for analysis." Ex. C ('654) at 2:30–36.

The inventor testimony confirms that this system architecture addresses a real technological problem that had no prior solution. Dr. Bednarz explained: "the main problem is that the visibility of a subscriber's home network is hidden from . . . the carrier. . . . None of that was available. And so that was the problem that we were trying to solve, and our solution is sort of

10

described in this patent, and it involves putting an agent within the home, . . . [that] can then figure out the performance of all the other devices in the home, collate that information, send it up to a cloud for analysis . . . ." Ex. E, 75:3-21; AUMF 3. Mr. Goldburg testified that "there was no widely deployed, standardized, simple way" for ISPs to get data from subscriber premises, and regarding LAN-side data collection, his "informed guess would be no one was collecting data from it." Ex. G, 82:7-8, 86:18-19. Dr. Rhee confirmed that "Internet service providers" were not "collecting … LAN side data, and analyzing them[.] Ex. D, 24:3-5, 24:15-16; AUMF 3.

Charter argues in a footnote that the claimed "downloadable agents" are generic software elements because they "can run on any operating system and any type of device, . . ." Mot. at 12, n.41. But the specificity of the claimed agent lies not in its hardware platform but in its function within the claimed architecture: it collects WAN performance information from within the LAN and transmits it to a remote server, bridging an information gap that previously prevented centralized optimization. As Dr. Bednarz testified, the solution "involves putting an agent within the home" that collects performance data and sends it "up to a cloud for analysis." Ex. E, 75:9-21; AUMF 3. Similarly, in *SRI*, the Federal Circuit found patent-eligible specificity not in the hardware of network monitors but in their deployment and function—"using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors . . . ." 930 F.3d at 1303. Here, the downloadable agent's specificity likewise lies in its functional role: collecting WAN performance information from within the LAN, transmitting it to a remote server for centralized analysis, and sending on-demand change requests associated with throughput or latency. Charter suggests in a separate footnote that an inventor was unable at deposition to identify an example of an on-demand change request. Mot. at 11, n.39. The '654 specification provides an express, detailed example. Ex. C ('654) at 8:61–9:5; *see also, id.* at 14:1–11. A named

inventor's difficulty recalling a specific example at deposition neither negates express specification disclosure nor renders plainly-construed claim language abstract.

### B.    Charter Impermissibly Oversimplifies the '654 Claims

Charter characterizes the '654 claims as directed to a mere concept regarding on-demand change requests. Mot. at 10. As with the '398 and '313 patents, this characterization is "materially inaccurate" under *TecSec* because Charter must disregard the downloadable agent, the LAN-WAN architecture, the collection and analysis of WAN performance information, the generation of results comprising at least throughput, and the reporting of those results—all of which the specification identifies as central to the claimed advance. 978 F.3d at 1294-95. Charter reduces a multi-component system architecture to a single feature ("on-demand change requests") while ignoring the surrounding elements that give the claims their technological specificity. *See id.* at 1294 ("The accuracy of those characterizations is crucial . . . .").

Charter's reliance on *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) is misplaced. The *Accenture* claims involved generic software modules implementing a business process with no identified hardware limitation. *Id.* at 1344-45. By contrast, the asserted '654 claims address a concrete architectural constraint and solve it through a specific system architecture in which a downloadable agent bridges an information gap that previously made centralized LAN-side performance analysis impossible. Ex. C ('654) at 2:25-38; AUMF 2.

Charter relies heavily on *Univ. of Florida Rsch. Foundation, Inc. v. Gen. Elec. Co.*, 916 F.3d 1363 (Fed. Cir. 2019), characterizing the '654 patent as a "quintessential 'do it on a computer'" patent." Mot. at 11. *GE* is distinguishable. In *GE*, the patent described automating manual pen-and-paper data entry from bedside hospital machines—explicitly acknowledging that the prior art collected, analyzed, and displayed the same data manually, and proposing only to do the same

12

thing on a computer. 916 F.3d at 1367. The claims recited only generic functional steps—receiving, converting, performing a programmatic action, and presenting results—described entirely in result-oriented terms, with no technical explanation of how the claimed drivers performed their conversion function. *Id.* at 1368. The court found that neither the patent nor its claims explained how the drivers did the conversion. *Id.* The '654 patent stands in direct contrast. It does not computerize a pre-existing manual activity; it addresses a technical architectural constraint—that LAN performance data is "generally available to other devices on the LAN, however not available to machines outside the LAN; . . ." Ex. C ('654) at 2:25–30; AUMF 2. No prior-art manual process could bridge that architectural gap, because the gap is a product of how broadband networks are structured, not a human task awaiting automation. The *GE* court itself recognized this distinction, expressly contrasting *BASCOM*—which was eligible because its patent "described how its particular arrangement of elements was a technical improvement over prior art ways of filtering such content"—with the GE patent which did not so explain. 916 F.3d at 1369. The '654 patent's specification does exactly what GE's did not: it explains why the downloadable agent must be placed inside the LAN, what specific information gap that placement bridges, and how the resulting data collection enables centralized analysis that was previously impossible. Ex. C ('654) at 2:25–38; AUMF 2–3.

Charter's reliance on *Orostream* (Mot. at 12) is misplaced. The *Scale Video Coding* court distinguished *Orostream* from claims specifying data types, network architectures, and particular methods. 2025 WL 993364, at *10. The '654 claims specify WAN performance information collected by a downloadable agent, analysis generating results comprising at least throughput, and on-demand change requests—far more specific than the broad claims found abstract in *Orostream*. Charter's citation to *Random Chat* is similarly inapposite. There, the claims were directed to "a

13

real-world concept implemented through existing computer technology." Mot. at 9, n.30. But rather than merely implement a pre-existing concept through existing technology, the '654 claims introduce a specific architecture that bridges the LAN-WAN information gap and enables centralized analysis that prior systems did not provide.

### C.     The Claims Do Not Merely Organize Human Activity

Charter argues that a person can "determine that his or her Internet is too slow simply by using it" and then "contact their service provider to request a faster speed." Mot. at 14. But the claims involve a downloadable agent that collects WAN performance information, a server that generates quantitative results including throughput, and on-demand change requests. No human activity involves deploying a downloadable agent on a LAN-connected device to collect WAN performance metrics. *See SRI*, 930 F.3d at 1304 ("the human mind is not equipped to" perform the specific technical operations recited in the claims).

Charter's analogy to a person deciding their Internet is slow and calling their service provider likewise fails categorically. The claimed on-demand change request is not a phone call. Under the Court's plain meaning construction of the term, it is a machine-generated request associated specifically with measurable throughput or latency metrics and received by a server. Ex. C ('654) at 8:61–9:5; Dkt. 105 at 24–25. Nor is deploying software within a home network to collect WAN performance data and to transmit it to a cloud server a human activity. As the Court's construction of "WAN performance information" confirms, this WAN data is specifically excluded from the prior-art application-layer client-server transactions the '654 patent distinguishes. Dkt. 105 at 30. The difference between Charter's analog and the claimed system is qualitative, not one of computational scale.

14

### D.    The '654 Patent Improves Computer Functionality

Charter argues the '654 patent does not improve computer functionality. Mot. at 14–15. As discussed above, the '654 specification identifies a concrete technological problem—LAN performance information was not available to machines outside the LAN—and describes a downloadable agent that bridges this gap by collecting data for centralized analysis. AUMF 2. Before the invention, there was no way to collect and centrally analyze performance data from both sides of the broadband connection. AUMF 3. Charter's argument that any improvement "is due entirely to undisclosed and unclaimed subject matter" (Mot. at 15) conflates the means of improving performance with the system architecture that enables such improvement.

Charter suggests in a footnote that Claim 19 of the '654 patent—requiring the server to reside in a "cloud"—is abstract because cloud computing is long-conventional. Mot. at 9, n.31. The cloud location of the server is not the inventive feature. The inventive feature is the downloadable agent deployed inside the subscriber's LAN—the specific placement that makes collection of WAN performance data within the LAN possible and transmissible to any server, cloud-based or otherwise. A conventional cloud server without the claimed downloadable agent architecture cannot access LAN-side performance data, regardless of where it resides. Charter conflates the architectural component that enables the invention (the downloadable agent inside the LAN) with the generic delivery infrastructure through which the collected data travels.

## VIII.  CONCLUSION

For the foregoing reasons, ASSIA respectfully requests that the Court deny Charter's Motion and grant judgment in ASSIA's favor that the asserted claims of the '398, '313, and '654 patents are not directed to abstract ideas and are directed to patent-eligible subject matter under 35 U.S.C. § 101.

███████████████████████

April 1, 2026                                    Respectfully submitted,

                                                */s/ Robert F. Kramer*
                                                Robert F. Kramer
                                                CA Bar No. 181706 (Admitted to E.D. Texas)
                                                rkramer@kramerllp.com
                                                **KRAMER LLP**
                                                1133 Broadway, Suite 1510
                                                New York, NY 10010
                                                Telephone: (415) 419-1895

                                                Nicole Glauser
                                                Texas Bar No. 24050694
                                                nglauser@kramerllp.com
                                                **KRAMER LLP**
                                                500 W 2nd Street, Suite 1900
                                                Austin, TX 78701
                                                Telephone: (212) 363-1492

                                                David Alberti
                                                CA Bar No. 220265 (Admitted E.D. Texas)
                                                dalberti@albertilim.com
                                                Sal Lim
                                                CA Bar No. 211836 (Admitted E.D. Texas)
                                                slim@albertilim.com
                                                Russell S. Tonkovich
                                                CA Bar No. 233280 (Admitted E.D. Texas)
                                                rtonkovich@albertilim.com
                                                Hong S. Lin
                                                CA Bar No. 249898 (Admitted E.D. Texas)
                                                hlin@albertilim.com
                                                Andrew Hamill
                                                CA Bar No. 251156 (Admitted E.D. Texas)
                                                ahamill@albertilim.com
                                                **ALBERTI LIM & TONKOVICH LLP**
                                                950 Tower Lane, Suite 1725
                                                Foster City, CA 94404
                                                Telephone: (650) 825-4300
                                                Facsimile: (650) 460-8443

                                                Melissa Richard Smith
                                                Tex. State Bar No. 24001351
                                                melissa@gillamsmith.com
                                                **GILLAM & SMITH, LLP**
                                                303 South Washington Ave.
                                                Marshall, TX 75670

16

Telephone: (903) 934-8450
Facsimile: (903) 934-9257

*Attorneys for Plaintiff*
*Adaptive Spectrum and Signal Alignment, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 1, 2026, and any confidential versions are being served by electronic mail.

*/s/ Robert F. Kramer*
Robert F. Kramer

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

Pursuant to Local Rule CV-5(a)(7), the undersigned counsel hereby certifies that authorization for filing under seal has been previously granted by the Court in the Protective Order (Dkt. 22) entered in this case on July 22, 2024.

*/s/ Robert F. Kramer*
Robert F. Kramer

17